**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**UNITED STATES OF AMERICA**

          **Plaintiff,**

**v.**                                            No.   **13-cr-20600**
                                                  **Hon. Paul D. Borman**

**FARID FATA, M.D.,**

          **Defendant.**
**_____/**


# The United States' Sentencing Memorandum

1

**Table of Contents**

Table of Authorities ................................................................... vi

I.    Summary of Argument ................................................................1

II.   Factual Background ...................................................................5

      A.    Fata's Background...........................................................5

            1.    Medical Training....................................................5

            2.    MHO .....................................................................5

            3.    Other Fata Businesses and Charity ............................7

      B.    Fata's Cancer Misdiagnoses, Mistreatment and Overtreatment ..........7

            1.    Chemotherapy Given to Deliberately Misdiagnosed
                  Multiple Myeloma Patients [Counts 9, 10, 11—Guilty
                  Pleas] ........................................................................7

            2.    Unnecessary Zometa Given to Deliberately
                  Misdiagnosed Multiple Myeloma Patient [Counts 7, 8—
                  No Plea/Relevant Conduct Stipulation]....................11

            3.    Mistreatment of Lymphoma Patients in Remission and
                  Non-Cancer Patients with Rituximab [Count 12, 14, 15—
                  Guilty Pleas + Relevant Conduct Stipulation]...........13

            4.    Mistreated and Overtreated Pre-Leukemic
                  Myelodysplastic Syndrome (MDS) Patients [Counts 1, 2,
                  18, 19—No Plea/Relevant Conduct Stipulation].....................18

            5.    Patients Given Underdoses of Necessary Chemotherapy
                  [Not In Amount of Loss]...........................................22

i

6.  Unnecessary Human Growth Factor Injections [Count 3–Guilty Plea] ...................................................................24

7.  Excessive, Unnecessary Anti-Nausea Medications [Relevant Conduct Stipulation] ...................................................25

8.  Unnecessarily Extended Infusion Times [Not In Amount of Loss] ......................................................................26

9.  Chemotherapy Ports [Not Included in Amount of Loss].........28

10. Mistreatment of Acute Myeloid Leukemia [AML] Patients [Relevant Conduct Stipulation]...................................29

11. False Prognoses and Mistreatment of End-of-Life Patients [Not In Amount of Loss]...............................................30

C.  Guardian Angel Hospice and Home Care Kickback Conspiracy [Count 20—Guilty Plea] .......................................................34

D.  Other Infusion Mistreatments: Iron, IVIG and Hydration .................37

1.  Iron [Counts 4, 5, 6, 16—Guilty Pleas] ....................................37

2.  IVIG [Count 13—Guilty Plea]...................................................40

3.  Hydration [Not Included in Amount of Loss] ..........................42

E.  Vital Pharmacy ....................................................................................43

F.  United Diagnostics: PET Scan Fraud [Count 17] and Promotional Money Laundering [Count 22, 23]................................43

G.  Fata's Control Over Patients ...............................................................46

1.  Access to Medical Files/Control Over Care .............................46

ii

2.      Bullying Patients ........................................................................47

H.      Fata's Continued Deceit After Indictment ...........................................48

III.    Sentencing Guidelines ........................................................................49

A.      Guidelines: The Parties' Positions .................................................49

B.      Section 2B1.1(b)(1): Amount of Intended Loss..................................51

1.      Stipulation to Billing Totals....................................................51

2.      Amount of Intended Loss.........................................................52

a.      Loss Including Co-Pays and Co-Insurance is Over $20 million....................................................................55

b.  Understated Loss from Patient Harm....................................59

c.      Understated Loss Due to Scope of Fraud .....................62

C.      Section 3B1.3: Abuse of Trust is More Appropriate Than Use of Special Skill ........................................................................64

D.      Section 3B1.1(a): Fata Held a Leadership Role in an Otherwise Extensive Kickback Conspiracy.........................................................67

E.      Upward Departures Applicable to Fata's Conduct ...........................73

1.      Aggravating Role Departure (Section 3B1.1(a)) .....................74

2.      Physical and Psychological Harm (Section 2B1.1, 5K2.1, 5K2.2, 5K2.3).........................................................................74

a.      Section 5K2.1:  Death....................................................75

    b.  Physical Injury: Section 5K2.2 or Physical Harm
      Section 2B1.1, App. Note 20(A)(ii) ..............................77

    c.  Extreme Psychological Injury (Section 5K2.3) or
      Psychological Harm/Emotional Trauma (Section
      2B1.1, App. Note 20(A)(ii)) ..........................................78

   3.  Extreme Conduct (Section 5K2.8)..........................................80

IV. Section 3553(a) Factors .........................................................................81

  A.  The nature and circumstances of the offense and the history and
    characteristics of the defendant. ...........................................................81

  B.  The need for the sentence imposed (A) to reflect the seriousness
    of the offense, to promote respect for the law, and to provide
    just punishment for the offense; (B) to afford adequate
    deterrence; (C) to protect the public from further crimes of the
    defendant; and (D) to provide the defendant with appropriate
    education, vocational training, or medical care. .................................82

  C.  The sentencing range established by the United States
    Sentencing Guidelines.........................................................................83

  D.  Any pertinent policy statement issued by the United States
    Sentencing Commission ("U.S.S.C.")..................................................83

  E.  The need to avoid unwarranted sentencing disparities among
    defendants with similar records...........................................................83

   1.  Sentences Over 100 Years/At Statutory Maximum for
     Fraud ......................................................................................84

2.    Courts Have Imposed Sentences Up To 50 Years for
      Defendants Convicted of Health Care Fraud Without
      Harm To Patients ....................................................................88

Recommendation ................................................................................91

# Table of Authorities

## Other Authorities

*Koon v. United States*, 518 U.S. 81 (1996)................................................................74

*United States v. Adam*, 70 F.3d 776 (4th Cir. 1995)................................................65

*United States v. Alvarez*, No. 08-20270 (S.D. Fla. 2008).......................................88

*United States v. Anthony*, 280 F.3d 694 (6th Cir. 2002)...................... 68, 69, 70, 71

*United States v. Antonio Macli*, No. 11-20587 (S.D. Fla. 2013)...........................88

*United States v. Astorri*, 923 F.2d 1052 (3rd Cir. 1991).......................................80

*United States v. Barnes*, 125 F.3d 1287 (9th Cir. 1997).......................................80

*United States v. Barnes*, 375 F. App'x 678 (9th Cir. 2010) ..................................61

*United States v. Barnett,* 89 F. App'x 906 (6th Cir. 2003).....................................66

*United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997) ...................................69

*United States v. Davis*, 30 F.3d 613 (5th Cir. 1994)...............................................76

*United States v. Duran*, No. 10-20767 (S.D. Fla. 2011)................................... 88, 90

*United States v. Elliott*, No. 13-20560, 2015 WL 327648 (5th Cir. Jan. 27, 2015) 54

*United States v. Evans*, 272 F.3d 1069 (8th Cir. 2001)..........................................77

*United States v. Fortier*, 242 F.3d 1224 (10th Cir. 2001) ......................................76

*United States v. Frost*, 281 F.3d 654 (7th Cir. 2002) .............................................71

*United States v. Greene,* 17 F. App'x (9th Cir. 2001) ...............................................80

*United States v. Grover*, 486 F. Supp. 2nd 868 (N.D. Iowa 2007) .........................76

*United States v. Hodge*, 259 F.3d 549 (6th Cir. 2001) ...........................................66

*United States v. Hoffman-Vaile*, 568 F.3d 1335 (11th Cir. 2009) ...........................56

*United States v. Hoogenboom*, 209 F.3d 665 (7th Cir.  2000) ...............................65

*United States v. Isiwile*, 635 F.3d 196 (5th Cir. 2011) ............................................54

*United States v. Jarvis,* 258 F.3d 235 (3rd Cir. 2001) .............................................80

*United States v. Kennedy*, 233 F.3d 157 (2d Cir. 2000) ..........................................69

*United States v. Khan*, No. 12-00064 (S.D. Tex. 2015) ..........................................89

*United States v. Liss*, 265 F.3d 1220 (11th Cir. 2001) ............................................65

*United States v. Madoff*, No. 09-00213 (S.D.N.Y. 2009) ........................................85

*United States v. May*, 706 F.3d 1209 (9th Cir. 2013) ..............................................61

*United States v. McCollister*, 96 F. App'x 974 (6th Cir. 2004) ...............................66

*United States v. Miller*, 316 F.3d 495 (4th Cir. 2003) .............................................54

*United States v. Miller*, 607 F.3d 144 (5th Cir. 2010) .............................................66

*United States v. Mousseau*, 517 F.3d 1044 (8th Cir. 2008) ....................................76

*United States v. Myers,* 66 F.3d 1364 (4th Cir. 1995) .............................................77

*United States v. Newman*, 965 F.2d 206 (7th Cir. 1992) .........................................78

*United States v. Nishona*, 156 F.3d 318 (2d Cir. 1998)..........................................65

*United States v. Norman Schmidt*, No. 04-00103 (D. Colo 2008) ........................85

*United States v. Nossan*, 647 F.3d 822 (8th Cir. 2011) ..........................................76

*United States v. Pergola* , 930 F.2d 216 (2nd Cir. 1991) .......................................80

*United States v. Popov*, 742 F.3d 911 (9th Cir. 2014)............................................54

*United States v. Poulsen*, 655 F.3d 492 (6th Cir. 2011) .........................................62

*United States v. Reis*, 369 F.3d 143 (2nd Cir. 2004) ..............................................76

*United States v. Roger Charles Day*, No. 07-00154 (E.D. Va. 2011) ...................84

*United States v. Singh*, 390 F.3d 168 (2d Cir. 2004) ..............................................54

*United States v. Stanford*, No. 09-00342 (S.D. Tex. 2012) ....................................86

*United States v. Valdez*, 726 F.3d 684 (5th Cir. 2013) ..................................... 53, 55

*United States v. White*, 979 F.2d 539 (7th Cir. 1992).............................................76

*United States v. Williams*, No. 09-00213 (D. Md. 2012).........................................85

*United States v. Yeager*, 331 F.3d 1216 (11th Cir. 2003)................................. 72, 73

**Statutes**

18 U.S.C. § 3553(a) ............................................................................85

**Guidlines**

U.S.S.C. § 5K2.0 ...................................................... 78, 81

U.S.S.G. § 2B1.1 ..................................................... passim

U.S.S.G. § 3B1.1 ............................................... 54, 72, 77

U.S.S.G. § 3B1.3 ........................................... 54, 68, 69, 71

U.S.S.G. § 5K2.1 ..................................................... 79, 80

U.S.S.G. § 5K2.2 ...........................................................79

U.S.S.G. § 5K2.3 ............................................... 79, 82, 83

U.S.S.G. §5K2.8............................................................ 84, 85

ix

## I.      Summary of Argument

Dr. Farid Fata (Fata) is the most egregious fraudster in the history of this country, measured not by the millions of dollars he stole but by the harm he inflicted on his victims, over 550 identified so far. Rather than healing or easing the suffering of the cancer patients and others who sought his help, Fata administered thousands of unnecessary treatments—a variety of chemical infusions and injections, all with potentially harmful and even deadly side effects—to the patients who entrusted him with their care. He did it entirely for his own benefit.

To accomplish his goal of administering and billing for expensive, unnecessary treatments, Fata had to tell lies. He had to tell thousands upon thousands of lies and perpetrate untold numbers of deceits upon his patients, their family members, his staff, other treating physicians, insurers, and even charitable foundations seeking to assist his patients. The lies Fata told differed in many ways, but were the same in one. Fata's singular overriding purpose was to persuade, cajole, frighten and deceive his patients into accepting more injections, more infusions, more tests, and any other treatments that he could bill through his solely-owned practice, Michigan Hematology Oncology (MHO) and its infusion centers, opened in 2005, and later his pharmacy Vital Pharmacare (Vital) and diagnostic testing facility, United Diagnostics, both opened in 2013.  The longer Fata kept his

1

patients in his infusion chairs, the more money he made. To Fata, patients were not people. They were profit centers.

The investigation and prosecution of Fata turned up patterns to his lies and deceits, across his patient population.  Some of the lies and deceits Fata used to accomplish his scheme included:

Chemotherapy and Supportive Therapies (MHO)

- Fata deliberately misdiagnosed patients with multiple myeloma in order to administer and bill unnecessary chemotherapy at MHO.

- Fata administered chemotherapy to patients whose pre-leukemic condition myelodysplastic syndrome (MDS) required, at most, observation in order to bill chemotherapy through MHO.

- Fata lied to patients about the availability of alternative treatments, including cures like stem cell transplants, to keep them on chemotherapy he could bill through MHO.

- Fata told patients with any type and at any stage of cancer, including Stage IV cancer patients with dire prognoses, that they had a 70% chance or greater of remission to give them "hope" so they would take chemotherapy billed through MHO.

- Fata administered chemotherapy to patients with Acute Myeloid Leukemia (AML) in the outpatient setting at MHO when it should have been administered in a hospital both for safety and effectiveness.

- Fata ordered infusion times increased beyond what was medically necessary or advisable purely to increase his reimbursement through MHO.

2

- Fata ordered the administration of redundant, unnecessary doses of anti-nausea medications accompanying chemotherapy, often causing painful constipation and other side effects in order to bill them through MHO.

- Fata ordered medically unnecessary human growth factors to stimulate white and red blood cell growth in order to bill them through MHO.

- Fata ordered Zometa, a supportive medication to treat symptoms of cancer that affects bones, for a patient who did not have cancer, causing all of his teeth to fall out, a known side effect of Zometa.

- Fata told patients who were in remission from cancer that they needed medically unnecessary "maintenance" Rituximab treatments (a monoclonal antibody infusion) so that they would not relapse in order to administer and bill those treatments at MHO. He concocted a "European" or "French protocol" to support these unnecessary treatments, and even provided to the government falsified documents to support this fake study.

Home Health Care and Hospice (Guardian Angel)

- Fata directed his staff to send referrals and forced his patients to receive care from Guardian Angel home health care and hospice care, a company that was paying him kickbacks. Patients and staff report that Guardian Angel's care was often substandard, at best.

Other Unnecessary Infusions: Rituximab, Iron, IVIG, Hydration (MHO)

- Fata also administered Rituximab to patients who purportedly had a condition known as ITP (idiopathic thrombocytopenia purpura), when in fact they either did not have ITP or had recovered from it in order to bill it through MHO.

- Fata told patients that they had iron-deficient anemia in order to bill and administer unnecessary iron infusions at MHO (1) where they did not have iron deficiency (2) and even if they did, oral iron is the safer, more appropriate initial treatment (3) and where the infusions caused many to

3

reach dangerous levels of iron, otherwise known as iron overload (4)
which he sometimes remedied by alternating iron infusions with
phlebotomies, i.e., removing blood to reduce iron.

- Fata ordered medically unnecessary intravenous immunoglobulin (IVIG)
treatments in order to administer and bill it through MHO.

- Fata ordered hydration for patients not suffering from dehydration, which
can and did cause complications such as atrial flutter, *i.e.*, heart
arrhythmia, in order to bill infusion time through MHO.

Pharmacy (Vital)

- Fata ordered all medications, particularly oral chemotherapy medications,
be dispensed through his pharmacy Vital even though it was often under-
stocked and patients had to wait days for their medications and travel to
his business rather than go to a pharmacy near their homes.

Diagnostic Testing (United Diagnostics)

- Fata ordered medically unnecessary PET scans—a cancer detection
test—in order to bill them through United Diagnostics. When his new
facility was not ready to open on time, he lied, rescheduled and delayed
the tests (both necessary and unnecessary), telling patients that they must
or should wait for a variety of reasons including (1) their insurer would
not cover it at another location; (2) his PET scan machine was better; and
(3) it did not matter if they waited months for this cancer test.

In addition to these lies, Fata employed a number of tactics to maintain

control over his patients and their care, including controlling access to patients'

files and remaining on call even when other doctors were rounding on his

hospitalized patients. At times, Fata bullied, berated and browbeat patients who

4

dared to question his treatment, telling them they risked death without him or in the case of a patient who could not afford copays, "It's your life or your money."

Fata's crimes demand a sentence commensurate with the momentous suffering he inflicted: a life sentence or statutory maximum of 175 years.

## II.    Factual Background

### A.    Fata's Background

#### 1.    Medical Training

Farid Fata is originally from Lebanon, where he obtained a medical degree in 1992. He immigrated to the United States thereafter and was a resident at Maimonides Medical Center in Brooklyn from 1993-96. Following his residency, he began a hematology-oncology fellowship at Memorial Sloan Kettering Cancer Center in New York that he completed in 1999. In 2000, he began working as an attending physician at Geisinger Medical Center in Danville, Pennsylvania.

#### 2.    MHO

In 2005, Fata incorporated MHO, his solely owned practice, located at 543 N. Main Street in Rochester Hills. As of August 2013, MHO had grown to seven locations in Rochester Hills, Clarkston, Bloomfield Hills, Lapeer, Sterling Heights, Troy and Oak Park.

Fata's original practice on Main Street was a small, single physician office. By his arrest, MHO had 16,000 historical patients and 1,700 current patients, the vast majority of whom were Fata's. Fata accomplished this astonishing growth by a number of means. Numerous employees report (and records confirm) he was seeing as many as 50-60 patients per day, scheduled in 8 minute increments. Fata employed non-licensed physicians with medical degrees from foreign countries to work them up before he saw them for 5-10 minutes, billing at the two highest levels for office visits. Patients waited for hours at a time before they were seen.

Even at the Main Street office, Fata had a plan. He told an oncology supply company representative supplying most of his drugs he wanted to compete with large practices. Fata's orders skyrocketed in only a year to over $7 million, then $16 million.  At times, he ordered in bulk at the ends of quarters to reach the threshold for contractual discounts. Over time, Fata's buying noticeably outstripped his peers, particularly for Neulasta (Count 3), Feraheme (Counts 4, 5, 6, 16), and Aloxi (an overused anti-nausea medication included in the amount of loss as relevant conduct). What should have lasted him a quarter was gone in six weeks. An average doctor in an oncology practice purchases approximately $1.5 million of drugs in a given year; by Fata's arrest, MHO was purchasing $45 million for only three doctors.

6

### 3.    Other Fata Businesses and Charity

In addition, Fata expanded his businesses to include (1) a radiation treatment center, Michigan Radiation Institute (MRI), (2) an in-house pharmacy at MHO's Rochester Hills location, Vital Pharmacare (Vital), and (3) a diagnostic testing facility, United Diagnostics. He also created and controlled a charity located at MHO and staffed by social workers and grant writers, Swan for Life.

### B.    Fata's Cancer Misdiagnoses, Mistreatment and Overtreatment

The government's evidence of Fata's mistreatments comes from numerous sources: patients, second opinion doctors for the patients, employees and experts. The two experts employed by the government, Dr. David Steensma and Dr. Dan Longo, are Harvard Medical School professors, as well as practicing hematologist-oncologists at Dana-Farber Cancer Institute. Both have noted that Fata defaulted to more costly treatments over the medically correct treatments.

### 1.    Chemotherapy Given to Deliberately Misdiagnosed Multiple Myeloma Patients [Counts 9, 10, 11—Guilty Pleas]

Fata admitted he deliberately misdiagnosed M.F. [Count 9] and J.M. [Counts 10, 11] with multiple myeloma, a plasma cell cancer so he could administer Velcade, a chemotherapy.  Additional Medicare patients misdiagnosed with multiple myeloma were identified through expert patient file review.

7

M.F. and J.M. did not have cancer.  Rather, they each had a positive M

protein test, which is known as monoclonal gammopathy of undetermined

significance (MGUS), a pre-cancerous condition that carries a risk of evolving into

cancer, most commonly multiple myeloma. Approximately 3% of individuals over

the age of 50 have MGUS and 5-7% over the age of 70 have MGUS.  In the

majority of individuals, MGUS will not progress into cancer: only in

approximately 1% of MGUS patients per year.  *Id.* MGUS should generally be

observed, not treated.

Proper diagnosis and treatment of multiple myeloma, smoldering myeloma

and MGUS is as follows:

| Diagnosing Multiple Myeloma | |
| --- | --- |
| **MGUS**<br>(Observe, treat in less than 5% of cases) | 1.     M protein present |
| **Smoldering Myeloma**<br>(Observe, treat in less than 5% of cases) | 1.     M protein present<br>2.     Over 10% plasma cells in bone marrow |
| **Multiple Myeloma**<br>(Treat) | 1.     M protein present<br>2.     Over 10% plasma cells in bone marrow<br>3.     One of four "CRAB criteria" present: high calcium; renal insufficiency; anemia; or bony lesions |

Neither M.F. nor J.M. even had smoldering myeloma: M.F. had 1% plasma

cells, and J.M. had less than 10% in every bone marrow biopsy result.

Nevertheless, Fata began chemotherapy.

8

Fata initially lied and told M.F. she had 5% plasma cells; he then lied again by telling her she had smoldering myeloma. Later, he said she had 7% plasma cells (another lie) calling his treatment preventative because he was catching her cancer early. Fata's lies were uncovered when M.F. broke her leg and was admitted to Crittendon hospital on July 1, 2013. While in the hospital, she first learned that a pre-operative bone marrow biopsy did not show any indication of cancer. *Id.* Then, one of Fata's employees, Dr. Soe Tin Maunglay, reviewed M.F.'s records while rounding at Crittendon, and told M.F. not only that she did not have cancer but to "run" from Fata. Because of Dr. Maunglay's intervention, M.F. received only one dose of Velcade on July 1, 2013 [Count 9].

Patient J.M.'s false diagnosis and unnecessary treatment were not discovered or stopped until after Fata's arrest. J.M., a 33 year military veteran, received approximately 28 unnecessary Velcade treatments between December 2012 and May 2013, including one on December 21, 2012 [Count 10] and one on April 26, 2013 [Count 11]. Before starting chemotherapy, J.M. was in good health, walking two miles, three times a week and regularly bowling. After starting chemotherapy, J.M.'s health deteriorated significantly, resulting in at least ten hospitalizations for congestive heart failure (a known side effect of Velcade), kidney dysfunction and blood clots. J.M.'s current treating doctor believes Velcade may have contributed

9

to his congestive heart failure. His heart functions at 25% of its capacity and he uses a walker.

Fata's deliberate misdiagnosis of multiple myeloma stretches back years with the earliest confirmed instance occurring in 2006. Fata administered Velcade to Maggie Dorsey, a patient with MGUS, who later got a second opinion and sued him. According to patient file notes Fata created (found on his home computer), (1) Fata told Dorsey her diagnosis was unclear; (2) Dorsey and her husband insisted on chemotherapy, (3) Dorsey and her husband insisted on continuing it after she suffered from side effects over Fata's objections, and (3) Fata eventually stopped the chemotherapy over their wishes. He repeated this version of events in a deposition. Dorsey and her husband vigorously deny Fata's version, stating that Fata told Dorsey she had multiple myeloma and treated her with chemotherapy until she found a second opinion. Fata settled the lawsuit with Dorsey in January 2009.

Dorsey, like J.M., continues to suffer numerous aftereffects from the unnecessary Velcade, including severe osteoporosis and painful neuropathy. . I am on lots of medicine and even with all that I take; it only takes the edge off just enough to keep me from going insane or crying incessantly . . . I didn't deserve to end up like this even though I am still alive with love & many thanks, some days

10

when the pain is too great I close my eyes longing for the relief of heaven . . ."
Maggie Dorsey VIS. Another patient reporting unnecessary treatment for
smoldering myeloma, including oral chemotherapy (Revlimid), IVIG (Octagam),
iron and Neulasta states that "the things that are wrong with [me] now are related
to the unnecessary chemo treatment.  I am now weak . . . I have constant bone and
muscle pain . . . I was very active before this and now I cant do the things I was
able to prior to treatment."  Doris Gilley VIS.[1]

### 2.   Unnecessary Zometa Given to Deliberately Misdiagnosed Multiple Myeloma Patient [Counts 7, 8—No Plea/Relevant Conduct Stipulation]

Fata administered unnecessary Zometa, an expensive cancer supportive
medication for bones, to Robert Sobieray based on false diagnoses of multiple
myeloma and metastatic bone cancer. Despite not pleading to these counts, he
stipulated that the government can prove the conduct by a preponderance for
purposes of the loss amount.

---

[1]   Each Victim Impact Statement submitted to the U.S. Attorney's Office
included a consent form regarding the publication of portions of the Victim Impact
Statement.  The consent form requested the writer to indicate whether their full
names could be used, only their initials, or neither. The government includes in this
sentencing memorandum only the level of identification permitted by each of the
writers.

Sobieray had a test in November 2010 showing a minor M protein (the protein present when a patient has MGUS), although the M protein disappeared from all subsequent tests. The M protein's presence was likely due to an inflammation. Sobieray did not even have MGUS much less multiple myeloma or any other cancer. Nevertheless, Fata began him on a regimen of Zometa, a drug approved for patients with active myeloma, intended to support patients with weakened bones. Fata wrote a letter saying Sobieray had both myeloma and metastatic bone cancer (cancer that originated elsewhere and migrated to the bone marrow) and would need to be on Zometa for the rest of his life.  There was no medical support for these diagnoses.

The most well-known and feared side effect of Zometa (as described in the manufacturer's label) is osteonecrosis of the jaw—death of the jaw bone. Zometa should be stopped if necrosis occurs. After starting Zometa, Sobieray's teeth began to hurt.  When he asked Fata if it was due to the Zometa, Fata told him no. Sobieray continued on the treatment for over two years during which he received approximately 25 doses of Zometa, including on November 3, 2011 [Count 7] and November 15, 2012 [Count 8].

All but two of Sobieray's teeth have fallen out and he cannot afford to have them replaced.  Not only his teeth, but also the roots have fallen out and the

12

necrosis (death) of the jaw bone left a hole in his gums from his mouth to his

sinuses that surgeons had to cover with a piece of skin from his cheek pulled over

the hole.  Sobieray lost his job, and experiences extreme ongoing pain, taking daily

morphine and Oxycontin.  He says, "I have terrible dreams of what I look like to

people who don't know me because of no teeth." Sobieray VIS.

Other patients and family members report unnecessary Zometa treatments:

- "An oral surgeon refused to touch my father because of the high chance my dad could have "osteonecrosis" (bone death) of the jaw with the slightest dental work.  Meaning: so much as pulling a tooth or filling a cavity could cause his jaw to start melting away like wet plaster, a side effect of this drug." Ellen Piligian VIS, Daughter of Patient.

- "[Fata] gave me Zometa infusions to strengthen my bones . . . My bone density was fine.  I never needed to receive the Zometa!" Patient Melissa Ann Kloc VIS.

### 3. Mistreatment of Lymphoma Patients in Remission and Non-Cancer Patients with Rituximab [Count 12, 14, 15—Guilty Pleas + Relevant Conduct Stipulation]

Fata invented "maintenance" regimens so he could administer unnecessary

Rituximab (Rituxan), a monoclonal antibody used in the treatment of, among other

things, certain lymphomas and certain blood disorders. Appropriately

administered, rituximab can increase the effectiveness of chemotherapy for certain

diseases, such as diffuse large B cell lymphoma. It is also a second or third-line

treatment for idiopathic thrombocytopenic purpura (ITP), a non-cancerous

13

autoimmune condition. Unnecessary rituximab poses multiple risks, as it is a powerful immunosuppressant that increases risk of infections and reactivation of latent viruses. One significant, if rare, risk associated with rituximab is Progressive Multifocal Leukoencephalopathy ("PML"), a generally fatal disease of the nervous system caused by reactivation of a latent infection. Fata ignored these risks, for instance, by inappropriately administering it to a patient with Hepatitis C.

The three examples to which Fata pleaded guilty in the indictment represent the spectrum of unnecessary rituximab administrations he ordered: in July 2012, D.M. received medically necessary and appropriate rituximab to treat his diffuse large B cell lymphoma. After D.M. successfully entered remission in August 2012, Fata continued to administer rituximab six weeks on/six weeks off, totaling 23 doses over the next year, including one on July 22, 2013 [Count 14], none of which were medically necessary. Fata referred to this administration of rituximab as "maintenance" and told D.M. that without two years of rituximab, his lymphoma could return. There are no medical studies to support rituximab's use as maintenance therapy for diffuse large B cell lymphoma. Fata also told D.M. that his remission made him a "miracle" patient. In fact, the chemotherapy regimen that Fata used to treat D.M.'s cancer through July 2012 is a highly effective therapy that results in remission for most patients.

14

M.H. initially received rituximab appropriately as part of her treatment for ITP.[2] The treatment saved her life. However, after her ITP successfully resolved in February 2010, Fata continued to administer rituximab to M.H. on a six weeks/six weeks off schedule, totaling 76 doses over more than three years, including one on July 9, 2013 [Count 15]. Not one of the 76 infusions was medically necessary.

Fata diagnosed patient Teddy T.H. with ITP and began administering rituximab to him in early 2012. In fact, T.H. never responded to the rituximab and, in fact, actually had liver cirrhosis. *Id.* Rather than cease this ineffective treatment, Fata continued to administer the medically unnecessary rituximab for over a year, totaling 12 doses, including one on July 18, 2013 [Count 12]. When T.H. could not afford the expensive co-pays for his rituximab treatments, Fata's office assisted him in applying to a foundation that helps patients like him. Upon discovering that the foundation did not have grant money for patients with T.H.'s diagnosis (ITP), *id.*, Fata changed the diagnosis to lymphoma for purposes of obtaining the grant money only. T.H. has never heard of lymphoma nor did Fata ever diagnose him— in his patient file or through insurance billing—as having lymphoma. This

---

[2]    Even medically appropriate treatments were marred by Fata's greed. M.H.'s first rituximab dose came while she was hospitalized due to severely low platelet levels. Fata claimed to be unhappy with how the hospital administered rituximab, and yelled at M.H.'s husband to have her discharged and brought to MHO the same day for treatment (that he could bill).

15

additional lie was solely to obtain additional funds from a charitable organization intended to assist needy patients in receiving necessary medical treatments.

D.M., M.H. and T.H. were not taken off rituximab until Fata was arrested and they went to new physicians. In 2014, T.H. received a liver transplant for his real condition, liver cirrhosis.

Multiple MHO nurses and doctors confronted Fata about his overuse of rituximab, particularly the six weeks on/six week off regimen resulting in 52 doses over the course of two years.  Fata repeatedly told the suspicious medical professionals (and patients) that he followed a "European" or "French" protocol, which they could never locate through their own research. The "French protocol" does not exist.

Months after Fata was indicted, his attorneys produced to the government, pursuant to a reciprocal discovery request, papers purporting to reflect a medical study under Bon Secours Cottage Health Services in Grosse Pointe, Michigan with the six weeks on/six weeks off protocol. No explanation was given for how it is European. Dr. Donald Bignotti, who purportedly approved the study in a letter dated May 25, 2005, was interviewed and reported the following:

- Dr. Bignotti had no memory of approving a rituximab study or Fata being part of any study at Bon Secours.

- Dr. Bignotti had no memory of the approval letter.

16

- Fata's purported approval letter was dated after Dr Bignotti had left Bon Secours Hospital.

- In official documents such as a letter approving a medical study, Dr. Bignotti would have (1) listed his middle initial, which was missing from this letter and (2) used a formal signature, which the letter did not have.

- The language of the approval letter was not the language Dr. Bignotti would have used, and he would have included additional information such as approval date and a due date for the project.

Furthermore, when shown a "Rituximab Maintenance Protocol" dated January 2006, Dr. Bignotti could not understand how the study could have been approved in May 2005 before the proposal was written and submitted. In other words, Fata fabricated and forged an entire medical study to cover up, after the fact, for his unnecessary rituximab treatments.[3]

Victims of Fata's fake rituximab (Rituxan) "French protocol" report physical and psychological devastation in its wake:

- "I was also given rituxan treatments six weeks on six weeks off for two years that totaled around 52 treatments that I should have never had. They say the rituxan destroys your immune system. When I contacted the NCI they told me that no one should ever receive back to back rituxan treatments and no more than sixteen treatments in a one year period . . . All the hours of waiting in his office to see him for five minutes . . Now my bones hurt all the time I'm sick all winter long because I can't even

---

[3]    Although the government did not seek and Probation did not apply it, the government notes this conduct arguably falls within the Section 3C1.1 obstruction enhancement.

fight off a cold . . . I have problems with my hands and wrist they hurt all the time." Patient Tim Parkin Sr. VIS.

- "I was also told that they have no idea as to what effects this will have on me as no one has had this much retuxan.  I live in fear every day no knowing what, when or how my organs will fail."  Diane Molitoris VIS.

### 4.    Mistreated and Overtreated Pre-Leukemic Myelodysplastic Syndrome (MDS) Patients [Counts 1, 2, 18, 19—No Plea/Relevant Conduct Stipulation]

Fata diagnosed numerous patients with myelodysplastic syndrome (MDS) who either did not have it or did not need treatment so he could administer and bill for medically unnecessary chemotherapies called Vidaza (injection) and Dacogen (intravenous).  While he did not plead guilty to Counts 1, 2, 18 and 19, he has stipulated to the amount of loss related to these examples of MDS mistreatment as well as others.

MDS is a pre-leukemic condition in which bone marrow fails to produce adequate amounts of healthy blood cells. The patient's prognosis is assessed using a scoring system that divides MDS patients into four risk groups, further grouped as "lower risk MDS" and "higher risk MDS." Many patients in the lower risk MDS groups can be observed and not treated. Studies show generally no established benefit from early initiation of treatment,. and, in fact, recent studies show that premature initiation may actually be detrimental. For higher risk MDS patients, the first key decision is whether the patient should receive a stem cell transplant, the

18

only known cure for MDS. Stem cell transplant candidates should receive one as soon as it can be arranged. They may receive Vidaza or Dacogen as a bridge therapy while awaiting a transplant.

The two patients whose treatment forms the basis of Counts 1, 2, 18 and 19 of the indictment were low risk MDS patients with no indications for treatment:

W.W. came to Fata as a lower risk MDS patient. He was observed for a time, however, Fata ordered him started on Dacogen on July 14, 2010 despite no apparent change in his condition. Fata ordered 155 doses of Dacogen over the next three years even though W.W. never having exhibited features of higher-risk MDS. Fata had no medical justification for beginning the Dacogen and certainly not for continuing it for three years thereafter.

Fata initially told W.W. that his prognosis was one to two years. After two years, Fata upgraded his prognosis to five years, telling him the chemotherapy was for life. W.W. independently researched and discovered stem cell transplants, the only cure for MDS. When he asked Fata about them, Fata lied and told W.W. he was too old because he was over 50.

After Fata's arrest, W.W. was initially taken off of Dacogen, but later went into decline, which his physicians believe may have been due to the unnecessary chemotherapy. With his condition in decline, W.W.'s new treating physician

19

assessed him and determined he was an "outstanding transplant candidate" and well within the appropriate age range. Unusually, W.W. has a perfect match donor: his fraternal twin brother.  W.W. received a stem cell transplant from his brother in 2014.

W.D. was a low risk patient with CMML (chronic myleomonocytic leukemia), which is an overlap syndrome with features of MDS such as bone marrow failure and chromosomal abnormalities. His tests showed that he was a low risk patient with CMML, and observation would have been appropriate. However, W.D. was started on medically unnecessary Vidaza, received 21 injections of Vidaza from May through July 2013, including on May 23, 2013 [Count 1]and July 18, 2013 [Count 2]. Fata told W.D. he would need chemotherapy for the rest of his life. W.D.'s new physician stopped treatment after Fata's arrest and he is currently on observation.

Dr. Steensma, the government's expert, has identified numerous problems with Fata's treatment of multiple other MDS patients, including:

- Patients who were treated with Vidaza and Dacogen when in fact they had myelofibrosis for which the indicated treatment is a less costly oral medication.

- Patients whose tests did not clearly demonstrate that they had MDS, much less require treatment with Vidaza or Dacogen.

- Patients who probably had MDS, but whose risk score was such that observation was appropriate, not treatment with Vidaza or Dacogen.

- Patients whose MDS subtype indicated treatment with an oral medication, not Vidaza or Dacogen infusions.

- MDS patients who received IV iron when they were neither iron deficient nor anemic. Patients with MDS are at risk for iron overload. Giving them IV iron might have increased their risk of subsequent iron overload.

One of the non-indictment MDS victims identified through expert file review says, "During the years of treatment by Fata I suffered from many side effects…Currently my ability to walk normally has become very difficult because of neuropathy in my legs, feet and arms." H.G. VIS. Family members report the psychological toll of believing their loved one was dying of MDS:

- "From the beginning of his horrible diagnosis [of MDS], which was presented to us as terminal, I begin to feel a sense of helplessness . . I'm going to los[e] my soulmate.  I had retired and had planned on having a fun active life together . . All this seemed shattered.  This caused me . . to battle with depression . . I also began  smoking cigarettes and drinking alcohol. . The emotional breakdown of our relationship is the hardest for me to copy with now . .. We took a rushed Disney trip to make memories for our family.  I watched as if it was surreal as my wife gave away all the things she thought people close to her would want to remember her . . we felt hopeless and in despair."  Michael Hester VIS, Husband of Patient Patricia Hester VIS.

- "When I found out that [she] had Myelodysplatic Syndrome . . . I was inconsolable.  I feel into a deep depression.  I felt like I couldn't go on . .. I cried myself to sleep almost every night.  Those years we thought [she] was sick were the worse years of my life.  We will never get

21

those years back . . Then I found out that Fata had purposely had her believe she was dying, I became very angry, the years of sadness . . . had taken over our lives." (Writer Requested Anonymity).

### 5. Patients Given Underdoses of Necessary Chemotherapy [Not In Amount of Loss]

Fata regularly underdosed patients, giving real cancer patients less chemotherapy than they needed. Multiple staff members noted the underdosing, one noting underdosing to round numbers, mostly in patients with non-small cell lung cancer, as well as any head or neck cancer and another that he automatically reduced chemotherapy doses by 25%.

This was confirmed in expert review. Dr. Steensma found that some MDS patients were appropriately given Vidaza or Dacogen and others were not. Regardless of the necessity, however, he found that Fata systematically underdosed them all, creating a spreadsheet comparing appropriate dosage to actual dosage. The underdosing was in round numbers, all at 100 mg or less, when normal dosing would not expect to be round as it is based on a calculation involving the patient's weight and height. The round numbers suggest no calculation was performed at all. Of 7039 total Vidaza doses billed by Fata to Medicare, 7002 were exactly 100 mg, and 37 were less. By contrast, other oncologists' dosages billed to Medicare follow no pattern, with amounts above, below and at 100 mg.

22

Fata's choice of 100 mg or less was not arbitrary. Vidaza comes in 100 mg vials. If patients had been dosed properly, for instance given 138 mg, then 62 mg in the second vial would likely be wasted. Medicare does not pay for the entire second vial; it pays just for what is actually administered and in increments of 25 mg (2011 Medicare average paid amounts: 100 mg—$406, 125 mg—$513, 150 mg—$612, 175 mg—$666, 200 mg—$807). By consistently using only one vial (100 mg) and billing for exactly that vial (100 mg) irrespective of patient need, Fata maximized his profit margin perfectly.  Administering according to patient need would have risked losing (1) the product itself (excess Vidaza from the second vial for which Medicare would not pay) and (2) the opportunity cost of billing the entire vial. Fata did not just overtreat MDS patients who did not need chemotherapy, he undertreated MDS patients who did need it to increase his profit margin.

One MDS patient's dosage stands out as being close to the correct amount. D.K. was underdosed for a period of time, but after his leg was amputated his weight loss made Fata's dose close to the correct amount. D.K. reports that Fata refused to let him take chemotherapy breaks to heal after multiple amputation surgeries, breaks his new oncologist permits him to take. D.K. VIS. Fata did not

23

just underdose D.K. He also withheld from him the knowledge of a possible stem cell transplant cure until it was too late and he was too old:

- "My husband started treating with Fata 7 years ago for MDS. . . Since 2007, David has remained on chemo, in addition to iron infusions and four injections a month. . . .[Our 2nd opinion doctor] asked us why we never tried stem cell transplants? He said they can be very effective in treating MDS, rather than taking dangerous chemo treatments. Dr. Fata never told us this was an option. When we discussed alternatives to chemo, all Dr. Fata indicated was that if Dave did not follow Dr. Fata's chemo regimen, David would get leukemia . . . He did not tell us stem cell transplants have been available for years. Unfortunately, the normal cutoff is 70. David is 71." T.K. VIS, Wife of Patient D.K.

### 6. Unnecessary Human Growth Factor Injections [Count 3– Guilty Plea]

Fata administered a variety of unnecessary human growth factors, intended to stimulate either white or red blood cell production. Fata pleaded guilty to ordering unnecessary Neulasta [Count 3], an injection that is used to increase white blood cell counts and decrease the risk of fever or infection during periods of low white cell counts (neutropenia). Fata ordered it with numerous chemotherapy regimens regardless of whether the patient had low white blood counts or whether there was a danger of neutropenia, as he did to W.D. on multiple occasions, including on June 26, 2013 [Count 3]. In some instances, patients actually had high white blood cell counts. Neulasta can cause ruptured spleens, rashes, muscle

aches, and bone aches. Additional unnecessary Neulasta administrations were identified in individual patient file review and are included in the amount of loss.

Fata also ordered unnecessary red blood stimulating factors such as Procrit and Aranesp. These work by stimulating the bone marrow to produce red blood cells, and should only be administered when a patient's hemoglobin measures at a low level. Potential side effects include elevated blood pressure, headaches, and pain at the injection site and/or bones and joints. Fata would change the hemoglobin criteria under which he would administer Procrit and Aranesp to justify their use.  Significantly, when used outside of guidelines as Fata did, these drugs can shorten remission time or survival time in some people with certain types of cancer.

### 7.     Excessive, Unnecessary Anti-Nausea Medications [Relevant Conduct Stipulation]

Expert review revealed that Fata regularly ordered excessive anti-nausea medication, known as antiemetics.[4] Antiemetics are intended to prevent nausea and vomiting associated with chemotherapy. Fata (1) administered the antiemetics in the absence of associated chemotherapy, which would have no beneficial effect;

---

[4]     Vital's pharmacist noted that Fata ordered redundant anti-nausea medications that sometimes cost patients a $100 co-pay.

(2) regularly ordered powerful and expensive infusion antiemetics, that are typically used only after less powerful and expensive antiemetics have failed; and (3) regularly prescribed multiple antiemetics at the same time from the same therapeutic class, which would have no therapeutic benefit.

Some of the patients who received excessive and unjustified antiemetics include indictment patients W.V., W.W. (who reported painful constipation), and W.D. Multiple patients who received excessive and unjustified antiemetics also reported that they had no nausea and complained of no nausea before having the drugs administered to them.

In addition to expert file review by government experts, the stipulated amount of loss includes data analysis of the expensive antiemetic infusion, Aloxi. Aloxi should typically be given no more than once every five days, three days at most. Aloxi given more than once every three days was included in the amount of loss.

### 8.     Unnecessarily Extended Infusion Times [Not In Amount of Loss]

Fata's greed extended to every aspect of his medical practice, even the most marginal payments. Fata told a nurse on multiple occasions to check on the additional amounts that he could bill by extending infusion times for a variety of treatments beyond what was appropriate and indicated by the manufacturer.  Fata

26

knew that his reimbursements increased the longer that a patient stays in the infusion chair, by particular increments, *e.g.*, changing an IV push to a 20 minute infusion or lengthening an infusion to 35 minutes would convert it to an hour for billing purposes.  In one instance, after learning that billing a chemotherapy infusion an hour longer only increased reimbursement by $22, Fata replied, "$22 over $22 over $22 is a lot of money." This was a volume business for Fata.

Fata ordered infusion times lengthened for numerous medications:

| Drug | Appropriate Administration | Fata Administration |
|---|---|---|
| **Aloxi** *(Anti-nausea)* | IV push (1-2 mins) | 20 minute infusion |
| **Adriamycin** *(Chemotherapy)* | IV push (1-2 mins) | 20 minute infusion |
| **Alimta** *(Chemotherapy)* | 10 minute infusion | 1 hour infusion |
| **Avastin** *(Tumor-shrinking aid)* | 1st admin: 90 mins 2nd admin: 60 mins 3rd admin: 30 mins | 1st admin: 100 mins 2nd admin: 60 mins 3rd admin: 35 mins |
| **CPT-11 with Leucovorin** *(Chemotherapy)* | 90 minute infusion (infused together) | 2 hour infusion (infused separately) |
| **Decadron** *(Steroid) with Aloxi* | 10 minute infusion | 20 min infusion |
| **Folfox** *(Chemotherapy, 2 drugs: Oxaliplatin, Leucovorin)* | 2 hour infusion (infused together) | 3 hour infusion (infused separately) |
| **Velcade** *(Chemotherapy)* | IV push (1-2 mins) | 1 hour infusion |
| **Zometa** | 20 minute infusion | 35 minute infusion |

The nurse infusion manager reported Aloxi was being infused on the lengthened schedule as early as August 2007 (when she was hired) through 2011, when she ended the practice. When she ordered the nurses to infuse on the correct times, Fata would order them to change the times in the file to increase the billing, which was often then rejected. In keeping with this theme of administering medications in the way that profited him over the way that benefited the patient, Fata resisted switching to an injectable form of Velcade (multiple myeloma chemotherapy) when it became available, even though studies show it caused a lower rate of neuropathy (pain caused by nerve damage). His own staff assumed this was due to greed. One year after the approval came through, Fata finally switched from the more expensive infusion to the injection.

The only way the nurse-manager could get Fata to adjust treatments was to show that it affected his bottom line, in which case Fata would respond, "Yeah, if we lose money, then we won't do that." Fata's disregard for the practice of medicine and the comfort of his patients is staggering.

### 9.    Chemotherapy Ports [Not Included in Amount of Loss]

Chemotherapy ports are surgically installed in the patient's chest or arm under anesthesia or sedation. They give direct access to the patients' veins and decrease the number of times a patient must be stuck with a needle. Countless

28

patients had chemotherapy ports surgically installed, many so that Fata could administer unnecessary infusions. Other times, he left ports in patients in remission. Many patients had them removed only after his arrest.

### 10.    Mistreatment of Acute Myeloid Leukemia [AML] Patients [Relevant Conduct Stipulation]

A physician employed by Fata noted that he treated patients with acute myeloid leukemia (AML) at MHO when the appropriate treatment in the induction phase of chemotherapy is weeks of inpatient treatment in a hospital. Expert review of patient files confirms that for multiple (properly diagnosed) AML patients, Fata administered inappropriate, less effective treatment that he could bill through MHO. He has stipulated to the related loss amount.

AML is a cancer that can arise on its own or develop from MDS or CMML, with a five year survival rate of approximately 25%. For patients under 70 with relatively few health problems, AML treatment should begin with an inpatient intensive seven-day chemotherapy regimen of cytarabine (a chemotherapy) administered by around-the-clock continuous infusion. Taking breaks in the continuous regimen limits its effectiveness. Cytarabine administration puts patients at risk for infection and other complications, which is why they are typically kept in the hospital where they are monitored closely and treated quickly if they develop signs of infection.

29

By administering cytarabine at MHO in the outpatient setting and not continuously, Fata both limited the effectiveness of the chemotherapy and put his patients at greater risk. Furthermore, he (1) dosed them with Leukine, a white blood cell growth factor, that was contraindicated because it can actually stimulate the growth of leukemia, (2) used another contraindicated medication that can cause cardiac rhythm abnormalities, and (3) does not appear to have referred stem cell transplant candidates for transplantation.

It is impossible to know whether Fata's AML patients could have survived longer, achieved better results with proper chemotherapy and stem cell transplants, or suffered less. What is certain is that Fata reduced their chances by administering chemotherapy in the manner most beneficial to his wallet and not the patients.

### 11.    False Prognoses and Mistreatment of End-of-Life Patients [Not In Amount of Loss]

Fata lied to patients about their prognoses, telling every new patient they had 70% chance or better of remission irrespective of the type or stage of cancer. The effect of this lie was to induce patients to take chemotherapy, with particularly devastating effect on late stage cancer patients. Fata robbed many dying patients not just of their money but of their choices and dignity. Instead of spending their last days coming to terms with their deaths, these patients endured painful treatments in search of a non-existent cure.

30

Nurse practitioners worked with Fata to assess new patients and with social workers who counseled patients with new diagnoses of cancer. Both groups report that Fata told every new cancer patient—regardless of the type of cancer, stage of that cancer, and known medical research concerning remission and survival rates—that they had a 70% or greater chance of remission. When asked by those nurses and social workers about his false prognoses, Fata would say he was giving the patients "hope."

Fata's false hope extended to multiple Stage IV lung cancer patients:

- <u>M.D.</u>:  70-77% chance of remission.

- <u>V.I.</u>: first opinion: 3-4 months, no treatment; Fata's opinion: 70% chance of remission.

- <u>J.H.</u>: Curable with a couple of years of chemotherapy and radiation.

- <u>A.C.</u>: 70% chance of remission.

- <u>L.H.</u>: 75% chance of remission.

In reality, Stage IV non-small cell lung cancer patients and extensive stage small cell lung cancer patients have a prognosis of approximately 9-12 months.

Fata told these patients that their post-chemotherapy tests showed improvement. He told M.D. her tumors were shrinking, V.I.'s daughter that his tumor was shrinking, and A.C. his tumors were shrinking as A.C. was getting

31

sicker. Fata told L.H. his tumors were shrinking when the radiology report said they had spread.  When confronted by L.H.'s daughter, Fata said the radiologist was wrong.

None of them lasted a year. M.D. lived just under seven months from diagnosis. V.I. lived four months. J.H. lived less than two months. A.C. lived just under a year. L.H. lived less than four months.

Some of these terminal patients never knew they were dying because of Fata's lies. L.H. never believed he was going to die because Fata told him he was making progress.  A.C. and his children never questioned Fata, even as A.C. got sicker. A.C. wanted to live and was hopeful because the 70% chance of remission was "gigantic." Fata told A.C. at one of his last hospital visits, and after the cancer had spread to his brain, that he still had a 70% chance of remission.  By the time he died, A.C. had lost 200 pounds from his 300 pound frame. At A.C.'s last visit to MHO, he fell and hit his head. He was taken inside and given chemotherapy before being sent to the hospital. Within four hours, he was on life support. Several days later, he died.[5]

_____

[5]     When A.C.'s wife learned she also had Stage IV lung cancer in January 2013, she decided not to get treatment based on the suffering she saw her husband endure. According to the couple's daughter, her mother did not suffer at the end

MHO medical staff report that Fata's patients generally were not adequately counseled about hospice care, and that many were on chemotherapy far beyond what they believed was appropriate. At least one social worker reports Fata counseling patients out of hospice care that they wanted.

What Fata stole from these dying patients is immeasurable and unrecoverable: time to make plans, time to be with family and friends, time to make peace with their fates. One victim's family reports Fata caused an estrangement when they tried to get their dying mother a second opinion:

- "Our mother . . . was diagnosed with Stage 4 Breast Cancer. It had already metastasized to her lungs, her brain, her liver and her sternum. . . In that very first meeting [with Fata] he said, "I can cure you". He indicated that he had access to medications that other doctors did not. He indicated that as long as [she] followed his instructions and kept her insurance paid up, she could be cured . . .Fata had instilled so much FALSE HOPE of a cure over the months of seeing him . . . Farid reminded [her] that she would die without him . . .we were wondering if there was any reason to file bankruptcy, questioning her life expectancy. He indicated again that he was trying a new therapy and we should definitely file bankruptcy on her behalf, "but make certain you do not cancel any of her insurance. I won't be able to treat her without", he told us . . .we asked about Hospice . . . He . . . stated that our discussion of hospice was unnecessary as he had access to so many more drug therapies that she would be around for a long time. He then held her hand, looked straight into her eyes and gently said, "Don't worry, I will not let them stop the treatments you need". . . She . . . was very angry at us for the discussion that had just taken place. In addition to everything else he was doing, he was also coming between my mother and us . . .maybe she would have

like her father did, instead she "lived her last few months" where A.C. had "only existed."

33

participated more in life knowing that it was nearing the end.  She kept putting things off thinking that she would have time "when she got better." . . [our mother] was never able to accept that she was dying because Fata convinced her she was not.  We never had the benefit of the final conversation we should have been able to have, to say the things we wanted to say. Family of Deceased Patient VIS.

*See also* Ex. A (Victim Impact Statement Excerpts) at Section VII. Instead of treasuring final moments with their loved ones, patients struggled to the end against their fatal diseases and endured painful treatments, never knowing it was all to feed Fata's bottomless greed.

### C.    Guardian Angel Hospice and Home Care Kickback Conspiracy [Count 20—Guilty Plea]

Fata has admitted to taking illegal kickbacks from the owner of Guardian Angel Hospice and Guardian Angel Home Care, payments made to him as a fake "Medical Director" for Guardian Angel Hospice, but in reality inducements to refer Medicare patients. Guardian Angel's owner got his money's worth, as Fata manipulated and forced patients into Guardian Angel's often substandard hospice and home care, with the assistance of his unknowing, but often suspicious, staff.

Fata may have been reluctant to send patients to hospice care, but once he did, he made sure it was Guardian Angel:

- The family of M.D., a Stage IV lung cancer patient who had been told by Fata she had a 70-77% chance of remission, fired Guardian Angel hospice after two days because they were "terrible." Fata called the

patient's daughter and was "irate" telling them that Guardian Angel was the only hospice her mother's insurance was cover.

- Fata yelled at the daughter of L.H., a Stage IV lung cancer patient he had told had a 75% chance of remission, when she placed her father in hospice, then questioned her choice of Hospice of Michigan over Guardian Angel Hospice.

- After ignoring the family's calls for days, Fata yelled at the wife of hospitalized V.I., a Stage IV lung cancer patient he had given a 70% chance of remission, when she chose not to use Guardian Angel Hospice. V.I. died a day later.

- "[In June 2010], L.B. received chemo again . . [on] July 5, because Dr. Fata wouldn't talk to us, [we] began to interview hospice providers. We decided which one we wanted to use and Dr. Fata finally came in . . and said, "Oh, no, you must use Guardian Angel's. They are the best" . . . The next morning, our whole family was there waiting for Guardian Angel's nurse to come. SHE NEVER SHOWED UP, no phone calls, nothing. . .[another doctor] said, "you can choose which hospice you want." [The new hospice] talked to Dr. Fata to see if he would still be L.B.'s doctor and he would not. We had gone against his wishes by using another hospice and he was not able to make any more money off of us. L.B. passed away July 22." B.B. VIS, Wife of Patient L.B.

Fata had social workers consult him about hospice referrals, and forced patients go to Guardian Angel with limited exceptions.

Fata also bullied patients into taking treatment from Guardian Angel home health care, despite the fact that patients often preferred other companies and despite Guardian Angel's terrible treatment and reputation with his staff. MHO received many complaints that Fata would not allow patients to go to non-

35

Guardian Angel home care companies. The only occasions on which Fata allowed

patients to go elsewhere is if they fought with him. Furthermore, there were

numerous complaints about Guardian Angel's poor patient care, including not

receiving appropriate care and not showing up to appointments. Patients told MHO

staff Guardian Angel was engaged in outright fraud, having them sign multiple

documents at a single visit and never returning. Fata exclusively referred to

Guardian Angel until phased out around 2012, which coincides with the end of his

kickbacks.

Fata gave the owner of Guardian Angel extensive access not only to his

patient population but also his charity and other MHO physicians to obtain more

referrals. Fata installed Guardian Angel's owner on the board of the charity Swan

for Life. Swan for Life and MHO both advertised Guardian Angel's services,

which Swan employees found suspicious.[6]   At the same time, the owner of

Guardian Angel was paying thousands of dollars of "donations" into Swan for

Life. Guardian Angel sponsored a "welcome" party for an MHO doctor when he

---

[6]     Unbeknownst to its staff, Swan for Life was another vehicle for Fata's
kickbacks. In addition to the relationship with Guardian Angel's owner—whose
companies donated to Swan for Life—Fata solicited kickbacks from at least one
pharmaceutical representative through Swan for Life, insisting by email that he
"expected" support from her company, and threatening by phone to stop ordering
their drugs if Swan for Life did not get $10,000.

36

began with MHO, with the clear purpose of getting his referrals (which he rarely gave). The owner had left the Swan for Life board by the time of Fata's arrest, coinciding with the end of his kickback payments and a decline in Fata's referrals to him.

### D.    Other Infusion Mistreatments: Iron, IVIG and Hydration

#### 1.    Iron [Counts 4, 5, 6, 16—Guilty Pleas]

Fata admitted to repeatedly misdiagnosing patients with iron deficient anemia and administering unnecessary intravenous iron to them. Fata achieved his false diagnoses by deliberately misapplying iron guidelines created for patients with chronic kidney disease to those who did not have kidney disease. Even had they been iron-deficient, the appropriately first line treatment is oral iron. Fata always prescribed expensive iron infusions first.

Numerous MHO medical professionals noted the overtreatment. One questioned amount of iron treatments. Another said Fata had every patient tested for low iron, used wrong levels and old blood work to justify infusion, and had no real list of guidelines. Another felt too much iron was administrated under chronic kidney disease guidelines, noting IV iron can cause bad reactions.  Fata was so intent on giving iron infusions that he had the front desk keep an "Iron List." He ordered staff to schedule patients for infusions even before he had lab results to

justify the treatments.  He also changed what levels were needed to justify iron administration. At times, Fata ordered a phlebotomy (a procedure removing blood from a patient to reduce his or her iron) followed by an iron infusion. As one patient who received alternating iron infusions and phlebotomies succinctly put it:

- "I received a regular dose of Iron supplement on a schedule of about every 2 months . . .Once he had moved to the new clinic in Rochester Hills, he continued with my infusions of Iron but now they started withdrawing blood because my counts were too high . . . WTF is with that?" Jack Fields VIS.

The examples in the indictment demonstrate the lengths Fata took to ensure he could bill unnecessary iron infusions.  On May 20, 2013, cancer patient W.V. went to Fata's office for a medically unnecessary iron (Feraheme) infusion [Count 6]. As W.V. was walking into Fata's office, he fell and hit his head and was knocked out for several minutes. Individuals in the waiting area and MHO staff rushed to his aid and called paramedics. Fata came out to the waiting area and instructed that W.V. be placed in an infusion chair. Fata then ordered that W.V. be given an iron infusion before going to the emergency room. When EMS arrived, the paramedics had to wait approximately 30 minutes for the infusion to conclude. W.V. did not need iron, much less for his acute treatment to be delayed for an infusion. After being transported, he was admitted to a hospital where a CAT scan showed bleeding in the right back of the brain. W.V. passed away several weeks later in a rehab facility. In addition to the May 20, 2013 infusion, Fata administered

38

multiple other medically unnecessary iron infusions to W.V., including infusions on May 23, 2012 [Count 4] and May 29, 2012 [Count 5].

Fata administered medically unnecessary iron treatments to numerous patients, including indictment patients on multiple occasions like M.H. [Count 16] on November 28, 2011, and D.M.  Fata told M.H. he was administering it for her fatigue. She discovered after his arrest that the real cause of her fatigue was untreated sleep apnea.  Some additional patients who received unnecessary intravenous iron were identified through expert patient file review and included in the amount of loss.

Iron is toxic, and sustained iron overload can lead to organ failure. At particular risk are the liver, pancreas, and the heart. Fata put many patients into iron overload, some of whom have submitted statements:

- "Fata repeatedly gave me iron infusions (Fereheme) that I did not need . . . the day after Dr. Fata was arrested I brought my lab reports to a new hematologist who explained that my ferritin levels were dangerously high . . I missed so much work leaving early for appointments with Fata or to receive injections.  I waited for *hours* to see him each time. . . The injections made me feel ill. . . In August 2013 my ferritin levels were over 10-15 times what they should be. . . high levels of iron cause organ damage and major complications.  To this day, I am still having complications from my high iron levels and my ferritin levels are still very high.  The iron started depositing in my liver causing pain and abnormal blood levels.  An MRI confirmed that the iron was in my liver. . . they had to drain blood out of my body and throw it away.  This was emotionally very hard for me; I should have never had to endure this procedure!"  Jessica Arsenault VIS.

- "I spent three (3) days a week during my first pregnancy and five (5) days a week getting [iron] infusions from Fata during my second pregnancy. I was depressed, in pain; my veins were destroyed because of the constant blood draws and infusions… I received nearly 300 infusions, but after his arrest, I got a second and third opinion [and] was told I never needed more than five (5). I was also advised that the type of iron was not the correct type. . . I went to two doctors. Both of them advised me that I had iron poisoning. Both of them told me, I now have to check my major organ functions and also be checked for calcification of my organs.. .I had to have both of my children tested for iron poisoning . . .I took them to the hospital. I had them poked by needles, a two (2) year old and four (4) year old. I had to have their blood drawn . . continued testing will be necessary in order to properly monitor them for the unforeseen future . . . I have residual damages as a result of the iron. I have been advised to have regular phlebotomies in order to get rid of the extra iron I have. I have lost feeling, due to nerve damage." (Writer Requested Anonymity) VIS.

## 2.   IVIG [Count 13—Guilty Plea]

Fata repeatedly and deliberately administered unnecessary intravenous immunoglobulin (IVIG) treatments to numerous patients in his practice. He created false criteria and ordered his staff to review patient blood tests to find medically incorrect justifications for the treatments.

There are three human immunoglobulins: IgG, IgA and IgM. IVIG is an immunoglobulin treatment containing is a highly purified immunoglobulin G (IgG) taken from human donors. Octagam and Gammagard are two common types of IVIG. IVIG is primarily used to treat severe immune deficiencies, as decreased antibodies make patients more susceptible to infections. IVIG is appropriate where the patient both (1) has low IgG levels and (2) recurrent and/or serious infections.

40

It is contraindicated for low IgA as it could produce an adverse reaction and will not increase low IgA or IgM levels. Fata ordered IVIG for patients who had not only low (or borderline low) IgG levels but also low IgM (not medically indicated) and low IgA (medically contraindicated) levels. Fata ordered a nurse to find a study justifying IVIG for low IgA and IgM where none existed.

To justify the unnecessary IVIG, Fata reverse engineered a fake need. In normal medical practice, a doctor presented with a patient suffering from an infection and low total gamma globulin levels might order immunoglobulin (IgG, IgA, IgM) testing to determine if low IgG is an issue for the patient. Fata ordered immunoglobulin testing for patients irrespective of their condition, then ordered his staff to review for low IgG, IgA or IgM. Like the iron infusions, IVIG lists were created at the front desk and tests ordered before the lab results came back.

To justify the second criteria—a history of recurrent infection—Fata admitted in his arrest interview and other employees confirm he would add it even where the patient did not report it. Fata stated, in response to question whether he gave IVIG to patients without recurrent infection knowing low IgG and recurrent infection were required, Fata replied, "Yes, we overutilized." And a nurse said he ordered nurses to falsely add recurrent infections to files.

41

MHO nurses finally put a stop to the IVIG treatments. In the summer of 2013, the nurse-manager confronted Fata about his over-administration of IVIG treatments and, Fata agreed to stop giving them for low IgA and IgM levels. When an infusion nurse reviewed charts of patients scheduled to receive IVIG the next day, she discovered that 90-95% of patients did not have low IgG to justify the treatments. Numerous patients had IVIG added to their treatment regimens inappropriately, such as Teddy T.H. on multiple occasions, including on June 4, 2013 [Count 13]. Other indictment patients who received unnecessary IVIG include J.M. and D.M. Fata also ordered medically unnecessary IVIG for M.F. that was never administered because she left his care after finding out he had misdiagnosed her with cancer. The government has identified numerous other patients who received unnecessary IVIG treatments through a patient file review, and Fata has stipulated to the related loss amount.

### 3.      Hydration [Not Included in Amount of Loss]

Fata often ordered unnecessary hydration. He frequently directed patients to return to MHO on days they had off from chemotherapy to receive the hydration, which he was able to bill for infusion time in the chair. Hydration can be harmful in older patients who are not dehydrated, causing complications like heart arrhythmia that can and did lead to hospitalizations.

### E.    Vital Pharmacy

Fata required all MHO patients to fill their prescriptions at his pharmacy, Vital, after it started in May 2013. The patients did not like this for a variety of reasons including insurance limitations, convenience to other pharmacies and Vital's access to drugs. Often, Vital would run out of various medications, including oral chemotherapy. On those occasions, Fata would refuse to send their prescriptions to another pharmacy unless some insurance limitation applied to Vital. Angry patients would be forced to drive back to MHO's Rochester Hills location once the drugs were available, rather than getting the drugs immediately from their local pharmacy.

### F.    United Diagnostics: PET Scan Fraud [Count 17] and Promotional Money Laundering [Count 22, 23]

Fata opened United Diagnostics in July 2013, just before his arrest, and began ordering and billing for unnecessary PET scans, a cancer detection test. Fata funded this next stage of his fraud with money obtained from the infusion fraud at MHO. He pleaded guilty to the United Diagnostics conduct in Counts 17 [PET scan fraud], 22 and 23 [promotional money laundering].

When Fata incorporated United Diagnostics in December 2012, it had no staff, physical location or equipment to perform tests.  Nevertheless, he ordered his staff to schedule all PET scans at United Diagnostics rather than a hospital or other

43

location.  The facility was scheduled to open in April 2013, so the original round of PET scans were scheduled for that date.  The percentage of patients for whom Fata ordered PET scans dramatically increased after he incorporated United Diagnostics.

In April 2013, United Diagnostics was not ready to begin operations because of credentialing issues. Rather than send the patients to other facilities for the test, Dr. Fata ordered his staff to reschedule all of the patients. The rescheduling occurred on multiple occasions over the next several months, as United Diagnostics was not ready to open and bill Medicare and other insurance companies. It finally opened its doors in July 2013, performing tests for just over a month before Fata's arrest.

Staff and patients reported intense concern because patients believed their medically necessary and important cancer tests were being delayed by months. When patients called to ask about the delay, Fata resisted sending them to another facility. He ordered staff to lie and say that the patient did not need the scan yet, his machine was more high tech or their insurance would not cover it elsewhere. At least one MHO staff member subverted Fata by obtaining referrals to outside facilities. When United Diagnostic's medical director told Fata to refer patients

44

elsewhere during the delay, Fata just pushed him to open faster. Fata never spoke about patient care to him.

In addition to delaying PET scans, Fata ordered numerous unnecessary PET scans, justifying them with false information. In the case of M.C. [Count 17], Fata was required to do a peer-to-peer pre-authorization for the PET scan with a Blue Cross Blue Shield (BCBS) doctor.  He lied to the doctor, saying that M.C. had a rising tumor marker (a sign of possible tumor activity) and a low kidney function (which could rule out using a contrast CT scan in place of the PET scan). In fact, M.C.'s file reflects that her tumor marker was decreasing, and no other legitimate basis for ordering a PET scan. M.C. herself confirms Fata's lie, as he told her that her tumor marker was normal at the same time he was telling BCBS it was rising.

Dr. Fata pleaded guilty to using the fraud proceeds from MHO to fund the fraud at United Diagnostics.  Specifically, he admitted to funding it with two checks drawn on the MHO bank account that received insurer payments and deposited into the United Diagnostics bank account, one dated May 3, 2013 in the amount of $100,000 [Count 22] and one dated July 2, 2013 in the amount of $100,000 [Count 23].

45

### G.    Fata's Control Over Patients

Fata did not run a medical practice. He ran, in his own words, a "kingdom" or "empire." According to Fata, God and the prophets worked through him. As the king, he exerted his control over every aspect of MHO and its patients in a variety of ways that fed the fraud he was committing.

### 1.    Access to Medical Files/Control Over Care

Fata controlled the patients' and other physicians' access to patient medical information.  To seek a second opinion and possibly a new treating physician, it is important to have your medical record. MHO staff report that Fata had an unusual policy that patient files could only be released with his personal approval. At times, he refused to release files, released only parts of files or tried to convince patients that they should not leave his practice when they requested their files. At least one member of his staff defied him and secretly provided patients with their full files.

MHO physicians split rounding duties, with other MHO physicians seeing Fata's patients on weekends when they rounded at one of the hospitals where Fata had privileges. Those physicians reported that Fata had the unusual practice of never turning off his pager, and generally keeping other physicians in the dark about his treatment of his patients. In other words, Fata kept control over the treatment of his patients instead of relinquishing it to the rounding physician for a

46

single weekend. Notably, it was while rounding at Crittendon that Dr. Maunglay

discovered Fata's misdiagnosis of Monica M.F.

### 2. Bullying Patients

Numerous examples exist of Fata's callous disregard for his patients and

bullying tactics:

An MHO biller reports that Fata sometimes asked her to contact certain

patients about their balances saying, "Go talk to him/her…I know they have

money." Another time, Fata told the biller he was going to recommend a patient

for hospice care and wanted her to settle the account before the patient died,

because Fata would have a difficult time collecting after the fact. Twenty minutes

after the family was informed the patient was dying, a staff member told the biller

Fata wanted her to go speak to the patient's family. The biller entered the room to

ask about the patient's outstanding balance, with his wife, children and grandchild

present. The patient's wife cut her off, saying, "Are you kidding me with this? Are

you really going to do this right now?" The biller left, upset and ashamed.

In front of another biller tasked with helping patients bridge the cost of

copays, Fata told a patient who could not afford treatment "your life or your

money" in spring 2013. Another time, Fata refused to treat a patient who could not

47

afford the copays because he said she was "loaded." He refused even after the biller enrolled the patient in an assistance program.

When the daughter of a lung cancer patient told Fata she planned to seek a second opinion, Fata became upset and "nervously aggressive," telling mother and daughter that other doctors did not have the same drugs or doses as Fata. Fata then told the patient, T.R., that he did not want her daughter in the room anymore. T.R. died in March 2013, not long after Fata told her that her cancer was shrinking and she was on the verge of a cure.

Victim impact statements also contain numerous examples of Fata's bullying and strong arming patients into treatment that benefitted his bottom line. Ex. A (Victim Impact Statement Excerpts) at Section XII.

## H.    Fata's Continued Deceit After Indictment

Fata's lies did not end with his arrest. On May 20, 2014, Fata's attorneys submitted a motion for CJA funds.  (Dkt. # 95).  In communications with attorneys for the government regarding the motion, the government stated it would ask for Fata to not only sign a financial affidavit but also be put under oath and on the stand—whether in public or *in camera*—to attest that he no longer had any funds. Shortly thereafter, on June 10, 2014, the motion was withdrawn. (Dkt. # 99).  No further motion has been filed.

In the interim, the government learned that Fata had accounts at Pershing LLC which contained approximately $630,000.  One of the accounts, which contained in excess of $500,000, received a stream of income coming out of investments which were sourced with fraudulent Medicare proceeds.  Upon discovering these additional accounts, the government seized the account that contained in excess of $500,000. Prior to the seizure, on June 9, 2014, Fata had $121,472.81 withdrawn from the other Pershing LLC account to fund his defense, thereby depleting that account of available funds.  Fata's greed extends to the taxpayers: attempting to have the Court fund his defense using money intended for the indigent when he had access to approximately $630,000.

## III.   Sentencing Guidelines

### A.   Guidelines: The Parties' Positions

The parties' positions regarding the Guidelines are as follows, with the areas of dispute highlighted:

| Guideline | Probation | Government | Defendant |
|---|---|---|---|
| **Base Offense Level 2B1.1(a)(2)** | 6 | 6 | 6 |
| **Amount of Loss 2B1.1(b)(1)** | 22 | 22 (over $20 million billed amount) | 20 (over $7 million paid amount) |

49

| Guideline | Probation | Government | Defendant |
|---|---|---|---|
| **Federal Health Care Program Offense 2B1.1(b)(8)(iii)** | 4 | 4 (over $20 million billed amount) | 3 (over $7 million paid amount) |
| **Offense Involving Large Number of Victims (over 250) 2B1.1(b)(2)** | 6 | 6 | 6 |
| **Sophisticated Means 2B1.1(b)(10)(C)** | 2 | 2 | 2 |
| **Risk of Death or Serious Bodily Injury 2B1.1(b)(15)(A)** | 2 | 2 | 2 |
| **§ 1956 Money Laundering 2S1.1** | 2 | 2 | 2 |
| ***Base Offense Level*** | ***44*** | ***44*** | ***41*** |
| **Abuse of Trust or Special Skill 3B1.3** | 2 (Special Skill) | 2 (Abuse of Trust) | 2 (Abuse of Trust) |
| **Organizer/Leader of Otherwise Extensive Crime 3B1.1(a)** | 0 (Foreclosed by 3B1.3 special skill enhancement) | 4 (Leader/organizer, otherwise extensive) | 0 |
| ***Adjusted Offense Level*** | ***46*** | ***48*** | ***43*** |
| **Acceptance of Responsibility 3E1.1** | -3 | -3 | -3 |
| **TOTAL** | **43 (LIFE)** | 45, adjusted to → **43 (LIFE)** | **40 (292-365)** |

50

B.      **Section 2B1.1(b)(1): Amount of Intended Loss**

1.      **Stipulation to Billing Totals**

The parties agreed by stipulation that the government is able to prove by a

preponderance of the evidence the following amount of loss:

| Category | Billed | Paid |
|---|---|---|
| **Patient File Review by Experts Drs. Steensma and Longo** | Medicare: $14,728,413<br>BCBS: $1,069,250 | Medicare: $6,241,916<br>BCBS: $753,687 |
| **Rituximab** | Medicare: $7,577,325<br>BCBS: $1,721,675 | Medicare: $4,324,932<br>BCBS: $1,924,224 |
| **Aloxi** | Medicare: $1,886,715<br>BCBS: $556,450 | Medicare: $405,567<br>BCBS: $267,245 |
| **IVIG** | Medicare: $3,985,954 | Medicare: $1,621,828 |
| **Office Visits** | Medicare: $3,178,610 | Medicare: $1,866,735 |
| **Home Health Care Based on Kickback Referrals** | N/A | Medicare: $195,099 |
| *Medicare Subtotal* | *$31,357,017* | *$14,656,077* |
| *BCBS Subtotal* | *$3,347,375* | *$2,945,156* |
| **Total** | **$34,704,392** | **$17,601,233** |

These amounts were reached by the following methodology:

- Patient File Review: Particular files reviewed by Drs. Steensma and Longo in which they found specific inappropriate treatments, including patients diagnosed with multiple myeloma, MDS, lymphoma, AML, ITP, and other conditions, are counted as loss.

- Aloxi: Aloxi should not be given more than once every five days, three days at most. All Aloxi treatments given more than once every three days are counted as loss.

51

- <u>Rituximab</u>: Rituximab should never be given to diffuse large B-cell lymphoma patients more than eight times. For patients with indolent lymphomas, no patient should ever receive more than 24 administrations in a two-year period. For patients with ITP, Rituximab should not be given more than six times. Rituximab infusions above that amount are counted as loss.

- <u>IVIG</u>: A review of Medicare IVIG patients. Every patient with an IgG level over 500 or no justifying IgG test (and no autoimmune diagnosis) are counted as loss.

- <u>Home Health Care</u>: Guardian Angel's billing based on Fata's kickback-procured referrals are counted as loss.

- <u>Office Visits</u>: Fata spent approximately 5 minutes with most patients but billed the highest codes for these visits even when unlicensed physicians were working them up. Existing patient visits billed at the highest two codes are counted as loss.

Based on this analysis, 553 patient victims have been identified. Along with the four insurer victims (Medicare, BCBS, HAP and Aetna), there are in total 557 known victims at this time. The analysis also reflects over 9000 medically unnecessary infusions or injections, each one ordered by Fata.

## 2.   Amount of Intended Loss

The United States Sentencing Guidelines provide that the appropriate measure of loss in economic crimes offenses is the greater of the actual or intended loss.  U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A).  Intended loss is defined in the same section as "the pecuniary harm intended to result from the offense," where the actual loss is "the reasonably foreseeable pecuniary harm that resulted from the

52

offense." *Id*. at cmt. n.3(A)(i-ii).  Intended loss may include "pecuniary harm that would have been impossible or unlikely to occur." *Id*. at cmt. n.3(A)(ii).  In health care fraud cases, the government must "prove by a preponderance of the evidence that the defendant had the subjective intent to cause the loss that is used to calculate his offense level."  *United States v. Valdez*, 726 F.3d 684, 696 (5th Cir. 2013).

In the instant case, the parties have stipulated that that the government could prove that Fata caused approximately $34,704,392 to be fraudulently billed to the Medicare program and to Blue Cross/Blue Shield of Michigan (BCBS), with approximately $17,601,233 of that amount paid by those insurers on those claims. The Probation Office used the amount Fata billed for these medically unnecessary procedures as the intended loss for the purpose of calculating Fata's offense level. Fata objects to Probation's use of the total billed amount as an appropriate measure of intended loss. Medicare and BCBS have fee schedules capping the amount they will pay for a particular procedure or service; Fata argues that he was aware of this cap on reimbursement and consequently knew full well that he would not receive the full amount billed on any of his fraudulent claims.  Fata therefore asserts that the amount paid on those fraudulent claims is the best measure of loss for Guideline purposes in this case.

An amendment to the Guidelines in 2011 instructs that in health care fraud cases involving a Government health care program, such as this one, the "aggregate dollar amount of fraudulent bills submitted to the Government health care benefit program shall constitute *prima facie* evidence of the amount of the intended loss." *Id.* at cmt. n. 3(F)(viii). This presumption is rebuttable, however, in that the defendant may introduce evidence that the billed amount overstates the economic harm defendant subjectively intended to cause. *See United States v. Popov*, 742 F.3d 911, 915 (9th Cir. 2014). This burden-shifting framework was already established in several Circuits even before the 2011 amendment became effective. *See, e.g. United States v. Isiwile*, 635 F.3d 196, 203 (5th Cir. 2011); *United States v. Singh*, 390 F.3d 168, 194 (2d Cir. 2004); *United States v. Miller*, 316 F.3d 495, 504 (4th Cir. 2003). The framework has been affirmed in a number of Circuit-level cases in the past several years, with results varying based on the factual pattern presented at sentencing. *See*, *e.g*., *United States v. Elliott*, No. 13-20560, 2015 WL 327648 (5th Cir. Jan. 27, 2015) (holding district court not clearly erroneous using amount billed to Medicare as intended loss, despite some evidence adduced at trial showing defendant's familiarity with Medicare fee schedule) (Unpublished opinion); *Popov*, 742 F.3d at 916 (vacating and remanding for re-sentencing based on guidelines calculation using billed amount, with instructions

54

that district court consider evidence that defendants were aware of Medicare caps on reimbursement); *Valdez,* 726 F.3d at 696 (error to use billed amount as intended loss figure without consideration of evidence defendant subjectively intended to collect less than total amount billed).

In this case, the government does not dispute that Fata was generally familiar with the fee schedule and reimbursement process, and would have known he was unlikely to recoup the entirety of the amount billed to Medicare or BCBS on his fraudulent claims. Fata was nothing if not a sophisticated criminal. However, using the amount paid by insurers in this case, on these procedures, as the measure of intended loss substantially *understates* the economic loss Fata purposely sought to inflict in the course of his offenses. Fata's intended harm was greater than the total amount he received from Medicare and BCBS on the stipulated fraudulent claims, and was more than $20 million, as set forth below.

      a.    *Loss Including Co-Pays and Co-Insurance is Over $20 million*

First, the approximately $17.6 million paid by Medicare and BCBS does not capture co-pays paid by patients, and does not capture all of the co-insurance paid by third parties. Medicare Part B, as a primary payor, "allows" a certain maximum amount to be paid for a given procedure or service on a fee schedule. Generally, 20 percent of that allowed amount is paid by the Medicare beneficiary as a co-pay,

or by the beneficiary's secondary insurer.  The paid amount set forth in the PSR
does not include the amounts paid by patients or any co-insurance paid by insurers
other than BCBS, when acting as a secondary insurer for Medicare beneficiaries.
All the PSR captured was the amount Medicare and BCBS actually paid for
medically unnecessary procedures – nothing patients, or other secondary insurers,
paid was included.

　　　Fata, by any standard, intended to collect co-pays and co-insurer
reimbursements on his fraudulent claims. *See United States v. Hoffman-Vaile*, 568
F.3d 1335, 1344 (11th Cir. 2009) (not error to use billed amount where doctor
knew or reasonably should have known she could recoup 20% not paid by
Medicare from private insurance companies or patients).   The evidence obtained
in this case is replete with examples of Fata's meticulous familiarity with dollar
amounts due to him, from patients and insurers.   As set forth in Section G-2 of this
memorandum, *supra*, Fata bullied patients who had difficulty paying their co-pays,
telling one patient that "it is your life or your money." He personally oversaw the
collection of patient balances, in the case of one Medicaid patient with a five-
figure balance, sending an email to his billing staff regarding collection that ended
with, "I need my money!"  Ex. B (8/3/13 Email). In another email, he told billing
staff he (1) questioned why a patient had been given chemotherapy during the

month in which his insurance had lapsed (2) asked what action had been taken on his high balance, and (3) informed staff that he (Fata) had negotiated the patient's payment plan at $300 per month. Ex. C (8/1/12 Email). Fata even involved himself in patients' efforts to obtain co-pay assistance from charitable groups, going so far as to lie about patients' diagnoses to ensure that the foundation would pay for his medically unnecessary treatments.  Plainly, Fata was well aware that his fraudulent claims entitled to him to reimbursement greater than the insurance payment from the primary insurer – it entitled him to co-pays from patients, and co-insurance reimbursements from secondary insurers as well.

Using the allowed amounts for Medicare on the claims in the PSR – claims Fata concedes were unnecessary – yields a figure of $18,346,136, which is substantially higher than the roughly $14.6 million <u>paid</u> to Fata by Medicare on these fraudulent claims.  The difference of roughly $3.7 million is money Fata certainly intended to collect from patients and co-insurers, and should fairly be included in any calculation of intended loss.

BCBS was a secondary insurer on many of the claims referenced above on which Medicare was primary, and as such, paid Fata the co-insurance amount on certain of those claims.  However, BCBS was also the primary insurer of many of the victims included in the stipulated loss figure, and incurred losses from Fata's

57

fraud totally independent of those suffered by the Medicare program or Medicare beneficiaries and co-insurers.  The parties have stipulated that BCBS paid a total of $2,945,156 on Fata's fraudulent claims.  Of this amount, approximately $1,843,427 was paid by BCBS on behalf of Fata patients who never had a claim paid by Medicare.  In other words, BCBS incurred <u>actual</u> losses from Fata's fraud that are wholly separate from the $18,346,136 in loss that Fata intended to cause Medicare, Medicare beneficiaries, and Medicare secondary insurers.  This $1,843,427 figure, representing losses Fata intended to and actually did cause to BCBS, should certainly be added to any computation of intended loss in this case.

In sum, the Medicare allowed amount is a better proxy of Fata's intentions that the amount actually paid by Medicare, as it includes funds that Fata intended to obtain from patients and co-insurers on his fraudulent Medicare claims.  When the $18,346,136 Medicare allowed amount (paid amount plus the amount sought from patients and coinsurers) is added to what BCBS actually paid on separate fraudulent claims for beneficiaries who were not insured by Medicare, we arrive at a figure of $20,189,563.  This amount is a conservative estimate of the dollar value Fata intended to fleece from his victims, and yields a 22-level adjustment from his base offense level.

## b. Understated Loss from Patient Harm

Second, the amount paid on the fraudulent claims by Medicare and BCBS excludes any amounts paid out of pocket by patients to undo the physical harm Fata wrought. Unlike the typical economic crimes case, Fata's victims incurred costs completely independent of the amounts they, or their insurers, paid to his practice.  Indeed, patients incurred direct, tangible medical and other expenses related directly to Fata's frauds and deceits.  While impossible to calculate at this stage, the indisputable existence of these costs provides another reason for the Court to estimate the appropriate loss figure as one above and beyond the amounts paid by Medicare and BCBS on Fata's fraudulent treatments.

Under the Guidelines, actual loss is defined as "reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1 cmt. note 3(A)(i).  The Guidelines go on to define "reasonably foreseeable pecuniary harm" as "pecuniary harm the defendant knew, or, under the circumstances, reasonably should have known, was a potential result of the offense." U.S.S.G. 2B1.1 cmt. note 3(A)(iv).

Fata, given his training and experience in the practice of oncology, was undoubtedly aware of the possibility of tangible pecuniary harm to patients seeking to remedy the damage his frauds inflicted upon their bodies.  Every time Fata

59

administered a dose of unnecessary rituximab, Fata knew that the patient may

eventually incur costs to treat infections resulting from the immunosuppressive

features of the drug. Every time Fata implanted an unnecessary chemotherapy port

into a patient's chest, Fata knew the patient may someday incur costs to remove the

port.  Every time Fata provided unnecessary iron infusions to his patients, he knew

that the patient may ultimately incur costs to treat iron overload.

The existence of these tangible pecuniary harms to patients are not

speculative – they are real, and the victim impact letters submitted in this case are

full of references to such costs.  The letters of victims of Jessica Arsenault and the

second iron victim who wished to remain anonymous (Iron Victim 2), cited *supra,*

each illustrate the reality of costs patients of Fata's are continuing to incur as a

result of his crimes.  Ms. Arsenault states that she received unnecessary iron

infusions from Fata, and that her ferritin levels eventually reached 10-15 times

normal.  Jessica Arsenault VIS.  She references current complications she suffers

as a result of this excess iron, and states that she is presently having to endure

having "blood drained out of my body and thrown away." *Id.*   Iron Victim 2 also

received excessive iron from Fata while pregnant, and referenced having to endure

regular testing for herself and her children in order to monitor for iron poisoning.

Iron Victim 2  also referenced the need for regular phlebotomies as a result of her

Fata-induced iron overload.  The phlebotomies, tests, and procedures these women have endured as a result of Fata's unnecessary iron infusions carry enormous emotional costs, eloquently spoken to in the victim impact statements; however, they also carry tangible pecuniary costs.  These procedures cost money, and those wholly unnecessary costs are being borne by victims and their insurers as a result of Fata's offenses.

Courts have recognized that "reasonably foreseeable pecuniary harm" in economic crimes cases can include costs imposed on victims above and beyond the amount stolen from them directly by the defendant.  In *United States v. May*, 706 F.3d 1209 (9th Cir. 2013), defendants were convicted of mail theft and receipt of stolen mail.  The defendants' scheme was sufficiently pervasive that the post office was forced to change its delivery policy in the area where defendants were active. *Id*. at 1212.  The changes to the delivery policy imposed costs on the Post Office, and the defendants challenged the inclusion of those costs in their intended loss figure for guideline purposes.  The court held that the cost of these remedial measures could appropriately be considered as part of the intended loss figure, given the reasonable foreseeability of the harm.  *Id*. at 1213.  In *United States v. Barnes*, 375 F. App'x 678 (9th Cir. 2010), defendant was convicted of bank fraud for attempting to steal approximately $193,000 from a bank.  Individual account

holders had their direct losses reimbursed; however, they incurred certain

"collateral" expenses, such as the hours spent "going to their banks, signing

affidavits, and fixing their accounts." *Id*. at 680.  The inclusion of these costs in

the intended loss amount was found not to be clearly erroneous. *Id*.

The government acknowledges that these additional losses, borne by patients

or their insurers, are unquantifiable at this stage.  However, these losses are

nonetheless relevant to the defendant's subjective intent, and there is no

requirement that the loss figure be calculated precisely.  Indeed, the Guidelines

expressly contemplate that the district court "need only make a reasonable estimate

of the loss."  U.S.S.G.  Section 2B1.1 cmt. note 3(C).  The Sixth Circuit has

recognized the same principle, holding that "the district court does not have to

establish the value of the loss with precision . . . ." *United States v. Poulsen*, 655

F.3d 492, 513 (6th Cir. 2011).  The existence of this body of unquantifiable, but

real, costs provides a further basis for the Court to estimate the amount of intended

loss in this case to be substantially above and beyond the amount paid by Medicare

and BCBS.

c.    *Understated Loss Due to Scope of Fraud*

Third, the loss amount – as stipulated to by the parties – substantially

understates the amount Fata actually stole, and does so because of practical

62

limitations on the government's investigative resources. The government has

undertaken a huge effort with thousands of agent, prosecutor, expert and other

employee hours to substantiate the harms Fata caused through his deceits.  But the

government's loss figure is necessarily bounded by the resources it has at its

disposal. Some examples of reasons why loss is undoubtedly understated:

- an IVIG test review was done for Medicare patients, but not BCBS or other insurers, based purely on available resources

- employee witnesses report overuse of human growth factors like Neulasta, but individual patient file review is necessary to substantiate each

- the files reviewed by the experts who found serious instances of patient harm number in the dozens, where 16,000 files exist that could theoretically be reviewed

- the real, but underdosed, MDS and other cancer patients are not included

- the scope of the search warrant began in 2009 so allegations regarding treatment before that date could not be verified

- the Rituximab data analysis was never done for insurers other than Medicare and BCBS

- second opinion physicians notified the government of so many examples of Fata's mistreatment than not all of them could be investigated criminally, often describing trends of unnecessary bone marrow biopsies, overuse of Feraheme and rituximab in Fata patients taken in after his arrest.

There are many more examples of how the full scope of Fata's theft is

undercounted due to the limits of what the government's ability to investigate

63

every aspect of his fraud.  These additional losses have not been quantified, but

there is evidence supporting their existence, and they bear on Fata's subjective

intent to cause substantially more loss than is measured in the insurer-paid amounts

that form part of the stipulation.  The existence of these additional losses counsels

in favor of the Court estimating the intended loss in this case as an amount

substantially higher than the dollars paid by Medicare and BCBS on the agreed-

upon fraudulent claims.

Because, in the instant case, the insurer-paid amount included in the PSR

substantially understates the amount of economic harm Fata intended to create

through his conduct, the government submits that the Court can reasonably

estimate that the intended loss exceeded $20 million and thus apply a 22-level

adjustment under Section 2B1.1(b)(1).

### C.   Section 3B1.3: Abuse of Trust is More Appropriate Than Use of Special Skill

Fata violated every trust in his quest for money. His Guidelines should

reflect that abuse. In addition, making the special skill finding over the abuse of

trust unnecessarily forecloses consideration of Fata's role in the offense—that is,

that he was a leader/organizer of the kickback conspiracy. Probation added a two-

level enhancement because Fata "abused a special skill."  PSR ¶ 81 (citing

U.S.S.G. § 3B1.3).  Fata filed no objection, and agreed in a stipulation between the

parties that "the government could prove, by a preponderance of the evidence, that

Fata's offense involved the abuse of a position of trust."  The government objects

to Probation's application of the special skill enhancement rather than the abuse of

trust enhancement under Section 3B1.3.

Every Circuit Court of Appeals that has directly addressed the issue has

found that physicians occupy a position of trust with respect to insurance

providers, including Medicare, and that physicians who defraud their insurers may

be liable under Section 3B1.3 for abusing that trust. *See*, *e.g.*, *United States v. Liss*,

265 F.3d 1220, 1229 (11th Cir. 2001); *United States v. Nishona*, 156 F.3d 318, 321

(2d Cir. 1998); *United States v. Adam*, 70 F.3d 776, 782 (4th Cir. 1995); *United

States v. Hoogenboom*, 209 F.3d 665, 671 (7th Cir.  2000). Insurers like the

Medicare program entrust physicians with great discretion in the exercise of their

professional responsibilities, and expect them to ensure the integrity of the claims

submitted.  *See*, *e.g., Adam*, 70 F.3d at 782 (physicians exercise enormous

discretion: their judgments with respect to necessary treatments ordinarily receive

great deference and it is difficult to prove that those decisions were made for

reasons other than the patient's best interests); *Hoogenboom*, 209 F.3d at 671

(Medical Service providers occupy positions of trust with respect to public or

private insurers and enjoy significant discretion and consequently a lack of

supervision in determining the type and quality of services that are necessary and appropriate for their patients). The Sixth Circuit does not appear to have addressed this issue directly in the Medicare context; however, in applying an abuse of trust enhancement under section 3B1.3 to a physician who wrote fraudulent prescriptions, the Circuit did note that a practicing physician enjoys perhaps the highest level of discretion afforded any professional. *See United States v. McCollister*, 96 F. App'x 974, 976 (6th Cir. 2004).

One need not even be a physician to violate trust with an insurer. *See, e.g. United States v. Hodge*, 259 F.3d 549, 556-57 (6th Cir. 2001) (therapist operator of substance abuse counseling facility held position of trust due to managerial role); *United States v. Barnett,* 89 F. App'x 906, 910-11 (6th Cir. 2003) (upholding abuse of trust enhancement to non-owner office manager "who had substantial discretionary judgment) (unpublished). *See also United States v. Miller*, 607 F.3d 144, 150 (5th Cir. 2010) (upholding application to owner of a licensed DME provider whose "complex, situation-specific decision making [] is given considerable deference").

Fata did not just violate insurers' trust.  He violated his patients' in the most egregious possible manner. The Hippocratic oath states in part:

> I will use those dietary regimens which will benefit my patients according to my greatest ability and judgement, and I will do no

66

> harm or injustice to them…I will not give a lethal drug to
> anyone if I am asked, nor will I advise such a plan…Into
> whatever homes I go, I will enter them for the benefit of the
> sick, avoiding any voluntary act of impropriety or
> corruption…So long as I maintain this Oath faithfully and
> without corruption, may it be granted to me to partake of life
> fully and the practice of my art, gaining the respect of all men
> for all time. However, should I transgress this Oath and violate
> it, may the opposite be my fate.

*See* https://www.nlm.nih.gov/hmd/greek/greek_oath.html.  Fata violated every part of this oath: acting for his own good, doing harm, prescribing deadly drugs for his own pleasure (money), giving advice that could hasten death, and entering these patients' lives with corrupt purpose, and not for their good, but his own.

One of the hallmarks of Fata's criminal conduct is the manner in which he abused the many trusts placed in him. His Guidelines should reflect this abuse pursuant to Section 3B1.3.

### D.   Section 3B1.1(a): Fata Held a Leadership Role in an Otherwise Extensive Kickback Conspiracy

Fata should receive a four-level enhancement as a leader/organizer of the Guardian Angel kickback conspiracy. Fata and the owner of Guardian Angel entered into a criminal agreement – Guardian Angel paid Fata kickbacks and in exchange he sent Guardian Angel Hospice and Guardian Angel Home Care patients. Each of the co-conspirators led his part of the conspiracy: Fata's leadership was in organizing and directing the MHO staff and Swan for Life

workers who sent the patients to Guardian Angel. Probation applied the Section 3B1.3 Use of Special Skill enhancement (rather than the Abuse of Trust under the same section) which forecloses the application of a leadership role. The Government objected.

The MHO-Guardian Angel kickback conspiracy was "otherwise extensive." An offense is otherwise extensive "when the combination of knowing participants and non-participants in the offense is the functional equivalent of an activity involving five criminally responsible participants." *United States v. Anthony*, 280 F.3d 694, 699 (6th Cir. 2002). The Sixth Circuit has explained that the test for extensiveness under Section 3B1.1(a) is a test of "numerosity," *Anthony*, 280 F.3d at 700, and has set forth specific instructions as to how courts must examine the contributions of knowing participants and non-participants to determine whether the combination is the functional equivalent of an activity involving five criminally responsible participants.  The three-factor test, as adopted from the Second Circuit, examines:

> (1) the number of knowing participants;
>
> (2) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and

> (3) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.

*Anthony,* 280 F.3d at 700-01(citing *United States v. Carrozzella*, 105 F.3d 796, 803–04 (2d Cir. 1997), *abrogated in part on other grounds by United States v. Kennedy*, 233 F.3d 157, 160–61 (2d Cir. 2000)). "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the services of many outsiders could be considered extensive." *Anthony*, 280 F.3d at 700 (quoting U.S.S.G. § 3B1.1, App. Note 3).

After this Court determines the number of individuals who should be counted under (1) and (2), this Court must consider whether the combination of knowing participants and countable non-participants is the functional equivalent of an activity carried out by five criminally responsible participants. "The Second Circuit noted that this requires more than a simple summation of participants and non-participants because '[t]he use of unknowing participants to carry out a criminal activity may be more inefficient than the use of knowing participants.'" *Anthony*, 280 F.3d at 701. As a result, "in addition to the *number* of countable non-participants, the test for functional equivalence requires that a sentencing court consider how significant the role and performance of an unwitting participant was

69

to the ultimate criminal objective." *Anthony*, 280 F.3d at 701 (emphasis in original).

Fata's scheme was unquestionably "otherwise extensive." The knowing participants in the scheme were two:  Fata and Guardian Angel's owner. Fata organized and led countless other unknowing participants who were "peculiar and necessary" to his crime: it is impossible to assign a specific number given the volume of employees who churned through his turnstile at MHO and the numerous hospital staff he directed over the years of the scheme. The qualitative nature of the unknowing participants' actions was undeniably integral and vital to the success of the scheme.  This fraud could not have been accomplished without the unknowing assistance of countless individuals at MHO. Multiple employees, including nurse practitioners (NPs) and Swan for Life social workers reported that Fata made them participate in the scheme to send patients to Guardian Angel, at times over the objection of the patient. MHO staff and Swan for Life social workers were also responsible for fielding numerous complaints about the company and reassuring patients who wanted to be sent elsewhere.  The patients themselves were unwittingly drawn into the scheme, and numerous examples have been provided of patients who received problematic care from Guardian Angel.

All of this evidences how crucial the non-participants were to continuing the kickback scheme and the value Fata provided to the companies. Fata met repeatedly with Guardian Angel representatives at the MHO offices and allowed them to solicit business from non-participant physicians working under him. He allowed Guardian Angel to advertise both through MHO and Swan for Life. Fata relied on his staff to execute many of his orders (as he only spent around 5 minutes with most existing patients). Without the many MHO and Swan for Life employees at his disposal, he could not have efficiently funneled Medicare patients to the Guardian Angel companies.  While *Anthony* cautioned that that counting non-participants can be difficult where non-participants are only tangentially involved in the offense, *Anthony*, 280 F.3d at 700, such a concern is not presented here. The essential aid provided by unknowing participants was sufficient to render the fraud the functional equivalent of a five-member scheme.  All of the roles of the unwitting participants were significant to the ultimate criminal objective.

Several Circuit Courts of Appeal have upheld four-level role enhancements in situations analogous to this one.  In *United States v. Frost*, 281 F.3d 654 (7th Cir. 2002), two defendants (named Frost and Bracken) who owned and managed an Indiana trade school were convicted of fraudulently obtaining federal student loan funds to which they were not entitled.  Each defendant received a four-level

enhancement for an aggravating role, which they challenged on appeal. The Court assumed that the defendants were the only two criminally culpable participants, and that employees at the school "who aided Frost and Bracken could not have been convicted of conspiring to defraud the United States—that those who aided Frost and Bracken were their dupes rather than knowing participants." *Id.* at 658. The Court nonetheless noted that Frost and Bracken supervised many staff at the school who assisted them in submitting false applications for student aid, and upheld the four level enhancements for the two defendants, given that the scheme was "otherwise extensive." *Id.*

Similarly, in *United States v. Yeager*, 331 F.3d 1216 (11th Cir. 2003), the Eleventh Circuit affirmed a four-level leadership role enhancement for a defendant in a conspiracy with only two participants. The offense of conviction, which involved the active use of many non-culpable employees in a pharmaceutical distribution business, was found to be "otherwise extensive."[7] The defendant noted that the other participant had likewise received a four-level enhancement at

---

[7] The defendant in Yeager owned a small pharmaceutical distributor, and his co-conspirator owned a mail-order pharmacy. The conspirators obtained a restricted right from a drug manufacturer to distribute certain pharmaceuticals at a low price to a group of home health patients; they in fact worked together to sell those pharmaceuticals at a large profit to non-authorized buyers. Both defendants directed their respective employees to engage in conduct designed to conceal the scheme from the drug manufacturer. *Id.* at 1220.

sentencing, and argued that only one participant should be eligible for such an enhancement. The Court disagreed, noting that a two-participant conspiracy can involve each participant exercising control or influence over the other participant with respect to certain aspects of the plan. *Id*. at 1226. The Court went on to note that "even more telling, the record indicates that Yeager directed other employees," presumably non-participant dupes, "to undertake risks designed to further the scheme." *Id*. The oversight and direction of non-criminally culpable participants in an otherwise extensive scheme is an appropriate basis for application of the enhancement.

In sum, the combination of knowing participants (Fata and Guardian Angel's owner) and non-participants in the offense is unquestionably far beyond the functional equivalent of an activity involving five criminally responsible participants. Moreover, Fata plainly exercised oversight and control over a substantial number of "dupes" who were integral to the success of the home health scheme. Accordingly, this Court should apply the four-level enhancement pursuant to 3B1.1(a).

### E.    Upward Departures Applicable to Fata's Conduct

In the event the Court determines that the Guidelines for Fata's offenses are anything less than life imprisonment, the United States respectfully moves the

Court to depart upward to life imprisonment. Fata's conduct falls far outside the heartland of cases within the 2B1.1 guidelines, *Koon v. United States*, 518 U.S. 81, 94 (1996), and numerous 5K upward departures apply.

### 1. Aggravating Role Departure (Section 3B1.1(a))

If the Court does not apply an enhancement for aggravating role pursuant to Section 3B1.1, the Court should depart upward pursuant to Application Note 2 as it may be warranted where the defendant "nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.G.G. § 3B1.1(a), Application Note 2.

As discussed, *supra*, in the Factual Background, Fata managed all of the property, assets and activities of MHO, United Diagnostics, Vital and Swan for Life which were simply the corporate names he gave to the criminal organization he orchestrated, developed, and led on a daily basis in order to line is pockets with millions of dollars in total disregard of the heath of his patients.

### 2. Physical and Psychological Harm (Section 2B1.1, 5K2.1, 5K2.2, 5K2.3)

The physical and psychological harm Fata caused are understated by the Guidelines range, which is driven primarily by the pecuniary harm Fata caused. Probation has applied, and the parties agree that the Section 2B1.1(b)(15)(A)(2) level enhancement for "conscious or reckless risk of death or serious bodily

74

injury." Nevertheless, these two levels do not begin to account for the immense physical and psychological harm he caused to not merely the over 500 identified victims, but also to others that remain unidentified by the government but suffered nonetheless. The extent of the harm—coming as it does from the repeated administration of poisonous drugs with no benefits—is staggering.

Application Note 20(A)(ii) of Section 2B1.1 permits an upward departure where "the offense caused or risked substantial non-monetary harm" such as "physical harm, psychological harm or severe emotional trauma." Section 5K2.0 of the United States Sentencing Guidelines similarly instructs sentencing courts that they may depart upward under a variety of circumstances of a kind not adequately taken into account, including risk of death (Section 5K2.1), physical injury (Section 5K2.2), and extreme psychological injury (Section 5K2.3), overlapping with the 2B1.1 departure.[8]

### a.   Section 5K2.1:  Death

Fata's mistreatment of his hematology and oncology patients knowingly risked death warranting an upward departure under Section 5K2.1.  The

---

[8]    If the Court departs upward based on physical or psychological injuries, it should choose to do so only under one upward departure provision to avoid double counting, *i.e.* physical injury:  Section 2B1.1, App. Note 20 or Section 5K2.2; severe psychological injury:  Section 2B1.1, App. Note 20 or Section 5K2.3.

government need not prove that Fata's conduct actually caused a death or multiple deaths; it is sufficient that Fata knowingly engaged in criminal activity that risked death for an upward departure to be legally permissible. *See, e.g., United States v. White*, 979 F.2d 539, 545 (7th Cir. 1992) (death need only be intentionally or knowingly risked);  *see also United States v. Nossan*, 647 F.3d 822, 826-27 (8th Cir. 2011) (applied even though defendant did not intend to kill the person to whom she twice distributed heroin and cocaine); *United States v. Mousseau*, 517 F.3d 1044, 1049 (8th Cir. 2008) (defendant distributed methamphetamine to a minor who died after using the drug; defendant's conduct was dangerous and defendant disregarded a known risk); *United States v. Reis*, 369 F.3d 143, 152 (2d Cir. 2004) (defendant knowingly risked death by squeezing the victim's neck); *United States v. Fortier*, 242 F.3d 1224, 1232-33 (10th Cir. 2001) (death was reasonably foreseeable when defendant sold weapons and gave proceeds of the sales to the bombers of the Murrah Federal Building in Oklahoma City); *United States v. Davis*, 30 F.3d 613, 614-15 (5th Cir. 1994) (defendant should have anticipated that serious injury or death could result when gas station employee died from an aneurysm during robbery);  *United States v. Grover*, 486 F. Supp. 2nd 868, 887 (N.D. Iowa 2007) (defendant sold heroin to victim twice and knew the heroin was especially pure and dangerous).

This upward departure may be applied even though the Court will have applied the 2B1.1(b)(15)(A)(2) level enhancement for "conscious or reckless risk of death or serious bodily injury." U.S.S.G. § 5K2.0(a)(2)(B)(3). It is the degree of the upward departure under 5K2.1 that is to be considered when the 2B1.1 enhancement has already been applied. In this case, the government submits that Fata's conduct warrants an adjustment higher than the mere 2-level adjustment provided by 2B1.1(b)(15)(A), as the Guidelines do not adequately account for the immense risks he created for his patients, risks that may well have hastened some deaths.

> b.    *Physical Injury: Section 5K2.2 or Physical Harm Section 2B1.1, App. Note 20(A)(ii)*

The Guidelines allow an upward departure based on a factor already taken into account in the guideline calculation "if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate." U.S.S.G. § 5K2.0. To depart upward for the documented physical injuries caused by Fata's unnecessary treatments, this Court need only find that the two-level adjustment for conscious or reckless risk of serious bodily injury under Section 2B1.1(b)(15)(A)(2) was inadequate. *United States v. Myers,* 66 F.3d 1364, 1374-75 (4th Cir. 1995); *United States v. Evans*, 272 F.3d 1069, 1089 (8th Cir. 2001) (no impermissible double counting where factor is present to an exceptional degree

or the case is significantly different from the ordinary case where the factor is present). Unquestionably, this is undeniably an exceptional case where the physical injuries are present to a degree substantially in excess of that which ordinarily is involved in fraud offenses, which two levels hardly represent.

      c.    *Extreme Psychological Injury (Section 5K2.3) or Psychological Harm/Emotional Trauma (Section 2B1.1, App. Note 20(A)(ii))*

Fata's unfathomable criminal conduct caused not only physical, but also extreme psychological injury to his patients and to the family members of his patients. An upward departure for extreme psychological injury is authorized by Section 5K2.3 where victims suffer psychological injury "much more serious than that normally resulting from commission of the offense." U.S.S.G. §5K2.3.[9] The Court should take into account the (1) severity of the injury and extent to which it was (2) intended or knowingly risked. *Id.* In addition, the Court should look to how likely it was, given the defendant's conduct, that "substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the

---

[9] Because physical and psychological injuries are distinct injuries suffered by each patient, separate upward departures are appropriate. *See United States v. Newman*, 965 F.2d 206 (7th Cir. 1992) (in a fraud prosecution, the court need not merge upward departures for both bodily and psychological harm; upward departures are appropriate for both when physical harm to a victim is distinct from psychological injuries inflicted by the defendant's threats, lies, and physical harm).

78

impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns." *Id.*

As illustrated by numerous interviews and Victim Impact Statements, Fata is responsible for causing profound levels of psychological and emotional injuries. Sadly and significantly, these extreme psychological injuries were knowingly risked by Fata. Fata chose to exploit the most vulnerable of victims, namely cancer patients and their fear-ridden families. As their trusted doctor, Fata was in a uniquely well-placed position to foresee the damage to patients and families that his scheme would and did cause by, among other things:

- Traumatizing people who did not have cancer by telling them that they would die without his treatment.

- Telling people who had terminal cancer that they could survive with his treatment.

- Not informing patients of their options, whether it was a cure (transplant) or end-of-life (hospice), leaving them and/or their families to always wonder what if?

- Creating ongoing doubt, anxiety and fear in his patients about their health after unnecessary treatments.

- Creating ongoing doubt, anxiety and fear in his patients about their ability to trust any medical professional.

For these reasons, an upward sentencing departure based on extreme psychological injury is warranted. *See, e.g., United States v. Barnes*, 125 F.3d

1287 (9th Cir. 1997) (pharmacist who, after losing his license, impersonated a doctor and fraudulently treated patients); *United States v. Greene,* 17 F. App'x (9th Cir. 2001) (defendant marketed bogus HIV tests that gave false results to AIDS victims). Several cases involving conduct far less egregious than Fata's have resulted in Section 5K2.3 upward departures. *See, e.g., United States v. Jarvis,* 258 F.3d 235, 239-41 (3rd Cir. 2001) (defendant's mail fraud investment scheme caused victims to seek counseling and take medication for depression); *United States v. Astorri*, 923 F.2d 1052, 1058-59 (3rd Cir. 1991) (two victims of an investment fraud were found to have suffered extreme psychological injury, evidenced by one victim seeking treatment for high blood pressure); and *United States v. Pergola* , 930 F.2d 216, 219 (2nd Cir. 1991) (offense conduct of mailing sixty threatening letters to people caused the recipients of the letters to suffer severe emotional impairment).

### 3.   Extreme Conduct (Section 5K2.8)

Section 5K2.8 separately permits an upward departure in this case to account for his crimes, which were "unusually heinous, cruel, brutal, or degrading" to the victims. U.S.S.G. § 5K2.8. "Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation. *Id.*

80

Fata's scheme was clothed in legitimacy, but at its base required him to act brutally: he ordered his patients poisoned for money. He saw many of them deteriorate before his eyes, and ordered more treatments.  As his patients declined, Fata escalated. Fata's conduct is deeply offensive to human norms of decency and morality. Taking advantage of sick patients or making healthy ones believe they are sick is unusually heinous and sadistically cruel. People entrusted Fata with not money, but their lives.  He betrayed that trust on an unprecedented scale.

Fata's fraud was not the result of a spontaneous decision borne out of financial distress, a heat of the moment lapse in judgment or crime of passion. Rather, his crimes were generated and prolonged by daily and hourly decisions cold-bloodedly carried out year after year after year. As illustrated by the Victim Impact Statements and all of the facts set forth in this sentencing memorandum, his conduct was extreme, extraordinary, and unprecedented.  An upward departure under Section 5K2.8 would appropriately recognize Fata's extreme conduct.

## IV.    Section 3553(a) Factors

Title 18, United States Code, Section 18 U.S.C. § 3553(a), provides numerous factors that the Court shall consider in sentencing Fata. Factors pertinent to the instant offense are referenced and/or discussed below.

**A.    The nature and circumstances of the offense and the history and characteristics of the defendant.**

81

*See* Factual Background, *supra.*

**B.    The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with appropriate education, vocational training, or medical care.**

As illustrated by the Victim Impact Statements, *see, e.g.*, Exhibit K (Victim Impact Statement Excerpts), the physical and emotional impact of Fata's crimes is staggering. Only a life sentence appropriately recognizes the seriousness and magnitude of this scheme and the effect it had on its victims. The imposition of such a sentence is particularly appropriate because the impact of Fata's crimes will have a lifelong effect on his victims.[10]

In imposing the statutory maximum – 150 years – on notorious Ponzi schemer Bernard Madoff, the sentencing judge discussed the importance of deterrence and symbolism, considerations that are at issue here.  Judge Chin acknowledged that any sentence beyond a dozen years or so would be largely symbolic for Mr. Madoff, who was 71 and had a life expectancy of about 13 years at the time of sentencing.  But, as with Fata, such "symbolism is important for at least three reasons."  Ex. D (Madoff Sentencing Transcript) Tr. at 47.

---

[10]    In this case, of course, the longest available term is the statutory maximum of 175 years.

> First, retribution. . . .  Here, the message must be sent that Mr. Madoff's crimes were extraordinarily evil. . . .  Second, deterrence. . . The strongest possible message must be sent to those who would engage in similar conduct that they will be caught and that they will be punished to the fullest extent of the law.  Finally, the symbolism is also important or the victims.  [M]ore is at stake than money, as we have heard.  The victims placed their trust in Mr. Madoff.

*Id.* Judge Chin also noted that these same victims were "placing their trust in the system of justice," adding that "[a] substantial sentence, the knowledge that Mr. Madoff has been punished to the fullest extent of the law, may, in some small measure, help these victims in their healing process."  Tr. at 49.

Symbolism is important here for the same three reasons:  Fata's crimes were "extraordinarily evil."  A life sentence would deter others from committing similar crimes.  It would also assist the healing process for the victims and their families who would know that Fata has been punished to the full extent of the law.

**C.    The sentencing range established by the United States Sentencing Guidelines**

*See* Sentencing Guidelines Section, *supra*.

**D.    Any pertinent policy statement issued by the United States Sentencing Commission ("U.S.S.C.")**

*See* Upward Departure Section*, supra*.

**E.    The need to avoid unwarranted sentencing disparities among defendants with similar records**

83

1.      **Sentences Over 100 Years/At Statutory Maximum for Fraud**

For fraudulent schemes with a potential of physical harm, Fata is most comparable to Roger Day, who committed $11.2 million in procurement fraud, and who was sentenced to the statutory maximum of 105 years in prison. *United States v. Roger Charles Day*, No. 07-00154 (E.D. Va. 2011) (Offense Level 45, Criminal History IV). Day created fake companies to bid on government contracts and then sold parts to the U.S. military that were substandard or defective and could not be used for their intended purposes. The court found that the Government did not provide evidence of actual harm to members of the military, but in furnishing its sentence, stated that "somebody's life was put in jeopardy" as a result of Day's scheme. (Tr. R 85, ¶ 19-20). Like Day, Fata's scheme risked lives. Although Day had a higher Criminal History category, Fata's loss amount is twice that of Day's, And Fata's fraud involved actual harm rather than risk of harm.

For comparatively-sized fraudulent schemes without physical harm to the victims, Fata is also similar to a number of defendants who were convicted of running Ponzi schemes. Like a Ponzi scheme, Fata preyed on the most vulnerable people to make money. But unlike a Ponzi scheme, Fata did not just steal money, he used cancer patients and vulnerable people he made believe were cancer

84

patients, as props for days and weeks on end, subjecting them to unnecessary chemotherapy in order to steal more money.

In imposing a 330-year sentence on Norman Schmidt, who committed $43 million in investment fraud on approximately 1,000 victims, the court stated "What is also unique is the harm caused by these offenses. This defendant did not simply steal money from the rich in Robin Hood like fashion, he stole money from the elderly, the infirm and the disabled. The victim letters attached to the pre-sentence report indicate clearly that he ruined many people's lives by defrauding them of their life savings." *United States v. Norman Schmidt*, No. 04-00103 (D. Colo 2008) (Offense Level 45, Criminal History V) (Tr. at 51, ¶ 4-10). Schmidt was 72 years old at the time of sentencing and faced a statutory maximum of 345 years. Like Schmidt, Fata ruined people's lives. Unlike Schmidt, Fata did this by affecting their health and not just their savings. *See also United States v. Williams*, No. 09-00213 (D. Md. 2012) (sentenced to 150 years for his participation in a $34 million mortgage fraud Ponzi scheme involving more than 1,000 victims).

Bernard Madoff received the statutory maximum sentence of 150 years in arguably the most famous white collar sentence ever to be handed down. *See United States v. Madoff*, No. 09-00213 (S.D.N.Y. 2009) (Offense Level 52, Criminal History I). In imposing a sentence greater than other financial fraud

cases, and greater than the 50 years requested by Probation, Judge Chin acknowledged, "I have taken into account the sentences imposed in other financial fraud cases in this district.  But, frankly, none of these other cases is comparable to this case in terms of scope, duration and enormity of the fraud, and the degree of betrayal."  Ex. D (Madoff Sentencing Transcript) at 46. Fata, like Madoff, is not comparable to any other crime in this District in the scope and enormity of the fraud and degree of betrayal. In many ways, he is worse than Madoff, in that he wreaked damage on not only his victims' bank accounts, but their bodies.

Similar to Madoff, Allen Stanford was convicted of running a $7 billion Ponzi scheme and sentenced to 110 years.  *United States v. Stanford*, No. 09-00342 (S.D. Tex. 2012) (Offense Level 56, Criminal History I, Maximum Sentence 230 years).  Unlike Madoff, however, Stanford's scheme, like Fata's, overwhelmingly benefited one person – himself.

In requesting either the statutory maximum or an effective life sentence, the Government highlighted that Stanford had closely supervised the fraud and orchestrated an elaborate cover-up of his actions.  For example, Stanford's analysts, who were responsible for running the day-to-day business operations, had access to only 15-20% of the bank's portfolios.

Similarly, Fata singlehandedly designed the fraud, which necessitated fooling his own employees and professional staff. Questions from other doctors and nurses were met with lies and high-handed dismissal. Employees who did push back on Fata – sending patients to non-Guardian Angel home cares and hospices or insisting he stop treatments contrary to known administrations – were met with resistance at every step.  Fata went to extreme lengths to cover up his actions not just to insurers and patients, but within his organization. His position as a doctor, trusted to make decisions base on patient care, helped him cover up his real motives. Many of MHO's doctors, nurses, medical assistants and staff tried to do their best for Fata's patients, only to have Fata reverse those efforts so he could perpetrate his fraud. Fata bears an enormous responsibility for this fraud that is comparable to or greater than Stanford's.

The Judge sentenced Stanford to the statutory maximum of 20 years on the one count of conspiracy to commit wire and mail fraud, and 20 years on each of the four counts of wire fraud, as well as 10 years on the SEC obstruction charges – to run consecutively for a total of 1320 months (110 years).  The Judge also sentenced Stanford to the statutory maximum sentences on the other charges, to run concurrently.

87

**2.      Courts Have Imposed Sentences Up To 50 Years for Defendants Convicted of Health Care Fraud Without Harm To Patients**

Defendants convicted of health care fraud are routinely sentenced at, or above, the top of the Guideline range, and often receive effective life sentences of 30 or more years. *See United States v. Alvarez*, No. 08-20270 (S.D. Fla. 2008) (54-year-old sentenced to 30 years (360 months) when the Guideline range was 210-262 months for her participation in a $9 million healthcare fraud); *United States v. Antonio Macli*, No. 11-20587 (S.D. Fla. 2013) (73-year-old sentenced to 30 years (360 months) when the Guideline range was 292-365 months for his participation in a $50 million healthcare fraud).

In *United States v. Duran*, No. 10-20767 (S.D. Fla. 2011) (Offense Level 50, Criminal History I), Duran was sentenced to 50 years imprisonment for his role in a fraudulent Partial Hospitalization Program (PHP). In that case, Defendant Duran was responsible for conspiring with others to submit thousands of false claims totaling more than $200 million to the Medicare program.  During the course of his criminal conspiracy, Duran falsified medical records, taught others to do so, and paid for the patients to be brought into the scheme.  Duran's Guidelines were calculated at Life, and the court explained the impact of the scheme on the patients when discussing the vulnerable victim enhancement:

88

The record shows that these patients were elderly, sick, demented, and suffering from, in many instances, substance abuse, who could not and did not benefit from partial hospitalization treatment that was alleged by the operator. . . .  Not only was the treatment purportedly offered to them, not only was it useless, but by spending their days at ATC and ASI, these people were denied their opportunity to receive treatment appropriate for their illnesses. The doctors at ATC and ASI would sign off on charts without ever having examined or consulted with these people. . . They could have received. .. .treatment that perhaps or might have helped them. Might not have, depending on the state of their disease, but nevertheless, this was the process." (Tr. at 21-23).

Although the amount of loss caused by Duran was greater than that caused by Fata, his fraud was like many of the typical health care fraud cases in which services or treatments are billed for, but not rendered.  Rather than causing affirmative harm, he failed to treat or provided useless treatment.  Fata is unique in the annals of health care fraud in that did not just bill for medically unnecessary treatments, but that he actually rendered a huge quantity of them, all of which posed serious risks or harm or actually caused harm.

On May 21, 2015, *United States v. Khan*, No. 12-00064 (S.D. Tex. 2015), former hospital assistant administrator Khan was sentenced to 40 years imprisonment for submitting claims for $116 million in partial hospitalization program services that were not medically necessary and, in some cases, never provided.  Khan also admitted that he and his co-conspirators paid kickbacks to patient recruiters and to owners and operators of group care homes in exchange for

89

which those individuals delivered ineligible Medicare beneficiaries to the hospital's PHPs.  As with *Duran*, although the loss amount is higher, this case involves a failure to deliver adequate or medically necessary services, not actual harm to the patients. The paid amount in the scheme was, in fact, only around $31 million. Neither Duran nor Khan comes close to the type of harm inflicted by Fata on hundreds of patients with such devastating results.

Because statutory maximum sentences of more than 100 years have been given in fraud cases, and because of the patient harm in this case, the requested sentence of 175 years does not create an unjustified sentencing disparity, and is appropriate to the defendant's crimes.

90

## Recommendation

Based upon the considerations set forth above, the United States respectfully requests that this Court impose a term of life imprisonment, *i.e.*, the statutory maximum of 175 years.

Respectfully submitted,
BARBARA L. MCQUADE

*United States Attorney*

/s/ Sarah Resnick Cohen
SARAH RESNICK COHEN
*Assistant United States Attorney*
*United States Attorney's Office*
*Eastern District of Michigan*

/s/ Catherine K. Dick
CATHERINE K. DICK
*Assistant Chief*
*U.S. Department of Justice*
*Criminal Division, Fraud Section*

/s/ John K. Neal
JOHN K. NEAL
*Chief, White Collar Crime Unit*
*United States Attorney's Office*
*Eastern District of Michigan*

Date: May 28, 2015

91

**Certificate of Service**

I hereby certify that on May 28, 2015, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to counsel for the defendant.

/s Catherine K. Dick
Assistant Chief
U.S. Department of Justice
1400 New York Ave., N.W.
Bond Building
Washington, D.C.  20005
Phone:  (202) 538-4049
E-Mail: Catherine.Dick@usdoj.gov

92