UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

v.

FARID FATA,

                    Defendant.

_____/

Civil Action No. 13-20600

District Judge
Paul D. Borman

Magistrate Judge
David R. Grand

## REPORT AND RECOMMENDATION TO DENY DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE [212]

On September 16, 2014, without the benefit of a plea agreement, Farid Fata pleaded guilty to numerous crimes related to his knowing administration of chemotherapy and other cancer-fighting treatments to hundreds of patients who either did not have cancer or did not need the treatments. Between his guilty plea and sentencing hearings, Fata admitted knowing that the treatments were medically unnecessary, and that in violating the Hippocratic Oath, he "caused anguish, hardship and pain to [his] patients and their families." He admitted that he "grossly abused the trust that [his] patients placed in [him]" and that he acted "because of power and greed." He explained that he decided to accept responsibility and plead guilty because he "did not feel [he] deserved a trial" and did not want to make his patients endure a lengthy trial. Fata answered "Yes, your Honor," when asked if he was satisfied with the "advice and service" of his two attorneys, Christopher Andreoff and Mark Kriger.

On July 10, 2015, the Honorable Paul D. Borman sentenced Fata to a total of 45 years' imprisonment on the charges to which Fata pleaded guilty. Presently before the Court is Fata's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, in which he argues that

he pleaded guilty "based on two distinct misrepresentations by his lead counsel, Mr. Andreoff." (ECF No. 212; No. 212-1, PageID.3298).[1]  In short, Fata claims that Andreoff misled him in terms of (1) the leniency he would receive from Judge Borman by pleading guilty, and (2) the credit he would receive (from a U.S.S.G. § 5K1.1 sentence reduction) by cooperating with the government.[2] (ECF No. 212-1, PageID.3298-3300).  Fata avers that but for counsel's ineffectiveness as to those issues, he would have proceeded to trial rather than pleading guilty.  (*Id.*, PageID.3299, 3301).

Fata's motion lacks merit both legally and factually.  First, from a legal perspective, Sixth Circuit case law makes clear that Fata cannot obtain § 2255 relief by ignoring one "effective" counsel's advice in favor of different advice from his other counsel.  *Logan v. United States*, 910 F.3d 864, 871 (6th Cir. 2018).  "To hold otherwise would allow defendants represented by multiple lawyers to take two bites at the apple . . . ." *Id.* (quoting *Stoia v. United States*, 109 F.3d 392, 399 (7th Cir. 1997)).  Second, from a factual perspective, an evidentiary hearing held in this matter leaves no doubt that Fata's contentions about the purported "advice" and representations he received from Andreoff (and Kriger) are untrue.  When Fata decided to plead guilty, he did so against the advice of *both* of his attorneys.  He was never promised an opportunity to meet with the government in person regarding potential cooperation, and was never promised any cooperation credit.  Indeed, the hearing established that one of the key documents on which Fata's "cooperation" argument is based contains forged signatures of his attorneys.  For these reasons, and those explained below, Fata's § 2255 motion should be denied.

---

[1] Pursuant to U.S.C. §636(b)(1)(B), the Honorable Paul D. Borman has referred this matter to the undersigned for a report and recommendation.  (ECF No. 229).

[2] After filing his motion, Fata tweaked this argument in two respects.  First, he now contends that *both* of his attorneys misled him regarding "cooperation" issues.  Second, Fata contends that in addition to not getting the cooperation credit he was promised, he was not given an in-person "debrief" with the government to discuss his cooperation information.

**Background**

    *1. Charges*

On August 6, 2013, Defendant/Petitioner Farid Fata was charged in a criminal complaint with health care fraud.  (ECF No. 1).  He was later indicted and charged in a fourth superseding indictment with: nineteen counts of health care fraud (18 U.S.C. § 1347); one count of conspiracy to pay and receive kickbacks (18 U.S.C. § 371); one count of unlawful procurement of naturalization (18 U.S.C. § 1425(a)); and two counts of money laundering (18 U.S.C. § 1956(a)(1)(A)(i)).  (ECF No. 66).  Fata's crimes, however, are hardly "financial crimes."  Fata had been an oncologist/hematologist, and most of the charges against him relate to chemotherapy and other cancer-fighting treatments he administered to hundreds of patients, knowing that they did not have cancer and/or did not need the treatments.

    *2. Guilty Plea Hearing*

On September 16, 2014, Fata, represented by his two attorneys, Christopher Andreoff and Mark Kriger, appeared for an arraignment on the fourth superseding indictment and a guilty plea hearing.  (ECF No. 111).  At the beginning of that hearing, Fata acknowledged the charges against him and the staggering penalties he faced – 2,775 months imprisonment – if he were to plead guilty or be convicted on all charges.  (*Id.*, PageID.1101).

Judge Borman then asked Fata's counsel whether Fata wished "to enter a plea of guilty as to parts of the indictment."  (*Id.*, PageID.1102).  Andreoff answered in the affirmative, explaining that after thorough exploration of Fata's options, and much discussion, Fata wished to plead guilty to certain charges, even though no plea agreement existed:

> I want the Court to know that we, myself, Mr. Kriger, have shared all of the discovery information, including all the discovery received from the government, including all the patient files, all the witness interviews for the last 13 months.  We have gone through it thoroughly with him and met with

> him probably in excess of 50 occasions at the federal detention center to discuss the evidence in this case, various defenses, motions that could be filed and including potential trial strategy.   My client has decided, notwithstanding all of that, to tender pleas today, and we are prepared at this point to do so.   There is no Rule 11 plea agreement.

(*Id.*, PageID.1103).

Andreoff also stated that he and Kriger had "discussed thoroughly" the specific criminal statutes relating to the charges against Fata, as well as the sentencing guidelines, and that Fata was "well aware" of them.  (*Id.*, PageID.1104).  Fata concurred with Andreoff's statement to this effect.  (*Id.*)  Fata was then placed under oath, and he acknowledged the importance of testifying truthfully to the questions put to him.  (*Id.*, PageID.1104-05).

Fata then testified that he had discussed the matter with Andreoff and Kriger, and was "satisfied" with "their advice and service."  (*Id.*, PageID.1107).  He testified that he understood that by pleading guilty he was giving up his right to a trial, but that he still wished to plead guilty.  (*Id.*, PageID.1108).  Fata then entered guilty pleas, count-by-count, to thirteen counts of healthcare fraud (Counts 3-6 and 9-17), one count of conspiracy to pay and receive kickbacks (Count 20), and two counts of money laundering (Counts 22 and 23).[3]  (*Id.*, Page ID.1112-1131).  Fata acknowledged understanding that the maximum potential sentence he faced on these particular charges was 175 years in prison.  (*Id.*, PageID.1109).

As to each count, Fata provided a factual basis for his guilty plea, admitting that he had administered to his patients chemotherapy and other treatments that were not medically necessary, and then submitted claims for payment to Medicare or medical insurance companies for those services.  (*Id.*)  Judge Borman began by taking Fata's plea on Count 3, and Fata agreed that he had

---

[3] Fata entered no plea as to six separate counts of health care fraud (Counts 1-2, 7-8, and 18-19), and as to the one count of unlawful procurement of naturalization (Count 21), and those counts "remained" in the case.  (*Id.*, Page ID.1104, 1112-1131).

4

not been "coerced [] or threatened" to plead guilty, that it was his "choice to plead guilty," and that he was "pleading guilty freely and voluntarily because [he was] guilty."  (*Id.*, PageID.1113-14). Throughout the remainder of Fata's guilty pleas, he made similar admissions.  (*Id.*, PageID.1116-28).  No reference whatsoever was made at the hearing to Fata meeting with the government for a "debrief" regarding cooperation information or to Fata even potentially receiving cooperation credit.  Judge Borman accepted Fata's guilty pleas, finding they were made knowingly, freely, and voluntarily.

### 3. *Sentencing Hearing*

Fata's sentencing hearing took place over the course of five days, July 6-10, 2015, with one day devoted to hearing from some of Fata's many victims and their family members about the unbearable pain and suffering they endured, and will continue to endure, as a result of Fata's criminal conduct.  At his allocution, Fata admitted to having violated the Hippocratic oath and having caused his patients and their families anguish, hardship and pain.  (ECF No. 161, PageID.2487).  He explained that he decided to accept responsibility and admit his guilt because he did not feel he deserved a trial and did not want to make his patients suffer through that process. (*Id.*).  In a letter he wrote to Judge Borman prior to sentencing, Fata similarly explained, "[My attorneys] were both preparing for my trial, but I decided to accept responsibility, plead guilty and save[] my patients [from having] to take the stand at trial."  (ECF No. 147-7).  Judge Borman sentenced Fata to serve a total of 540 months' (45 years') imprisonment and ordered him to forfeit more than $10,000,000 in assets.  (ECF No. 158).

### 4. *§ 2255 Motion Briefing*

#### a. *Fata's § 2255 Motion*

On May 22, 2018, after his direct appeal in the Sixth Circuit, and his petition for a writ of

certiorari in the United States Supreme Court failed, Fata timely filed the instant Motion under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (ECF No. 212), along with: a memorandum of law (ECF No. 212-1); his own declaration (ECF No. 212-2); a declaration from one of his two former attorneys, Mark J. Kriger (ECF No. 212-3); and an e-mail chain between his attorneys and the Assistant United States Attorneys ("AUSAs") who prosecuted his case (ECF No. 212-4).

The Court begins with the salient averments in Fata's declaration about Andreoff's alleged misrepresentations regarding "leniency" and "cooperation benefit" that led Fata to plead guilty:

> I was represented in the above criminal case by attorneys Christopher Andreoff and Mark Kriger. Mr. Andreoff served as lead counsel. From the beginning of my relationship with Mr. Andreoff, he attempted on a regular basis to convince me that it would be in my best interest to plead guilty.
>
> Mr. Andreoff advised that he would be able to secure a sentence of 20 years as opposed to the life sentence the government was seeking. However, I continuously refused. I maintained my innocence and requested to proceed to trial. . . .
>
> I told both Mr. Andreoff and Mr. Kriger that I maintained my innocence and refused to accept a plea agreement. . . .
>
> After the fourth superseding indictment, Mr. Andreoff continuously repeated that I would lose at trial, and that Mr. Andreoff believed my case was too complex to defend and introduced the idea of cooperating with the government. As a doctor with no criminal history, being unfamiliar with the concept of "cooperation," I followed Mr. Andreoff's recommendation to cooperate.
>
> * * *
>
> Mr. Andreoff enforced the idea of pleading guilty by leading me to believe that I would receive leniency by entering guilty pleas. In contrast, Mr. Kriger disagreed with Mr. Andreoff's assessment, and recommended I proceed to trial. . . .
>
> In a meeting with Mr. Andreoff and Mr. Kriger in September 2014, Mr. Andreoff acknowledged again that whether I pled guilty or went to trial, I was likely to receive a sentence that for all intents and purposes would be a

life sentence.  Mr. Andreoff asked again to explore a plea deal before trial, and asked whether the government would consider my cooperation.  My attorney[s] arranged [] for a meeting with three government attorneys.  Both Mr. Kriger and Mr. Andreoff "took notes" on the meeting.  After the meeting, both of my attorneys advised me that the government would sit down with me, in good faith, to debrief me after I pled guilty.  Mr. Andreoff reassured me that if the government accepts my cooperation after the debriefing, I would receive a 50% sentence reduction.  I acknowledge that it is within the government's discretion whether to make such a recommendation.  However, Mr. Andreoff assured me that the government would not debrief me nor accept my cooperation until I pled guilty.

Based on counsel's assurances related to cooperation, I agreed to plead guilty.  However, I advised both of my attorneys that I would plead guilty for reasons not related to guilt.  It was primarily related to the cooperation incentive as presented to me.  It was only after my guilty plea that I discovered the government had no intention of debriefing me.  I pled guilty for this reason only to later discover it was all for naught.

* * *

Mr. Andreoff advised, influenced, and convinced me to plead guilty based on the foregoing.  The idea of **leniency and cooperation benefit** was the catalyst that Mr. Andreoff created to create a false glamour of not dying in federal prison.  Had I been properly advised by Mr. Andreoff with respect to the above, I would not have pleaded guilty and instead proceeded to trial as I had always intended to do.

* * *

In sum, I expressed to my attorneys that I would only enter my guilty pleas based on Mr. Andreoff's advice, and that my guilty pleas were not the result of my actually being guilty. . . . I maintain that I only agreed to plead guilty in this case due to Mr. Andreoff's false promises and misadvice.  . . .

(ECF 212-2, PageID.3306-11) (emphasis added).

### i.   *Fata's Leniency Argument*

As to Andreoff's alleged misrepresentation regarding leniency, Fata argues:

Fata had every intention of seeing his case through trial.  Fata retained two attorneys – Mr. Andreoff and Mr. Kriger – to prepare and represent Fata at trial.  However, in a sudden about-face, Fata entered his guilty pleas on September 16, 2014.  Fata avers that he did so based on two distinct misrepresentations by his lead counsel, Mr. Andreoff.  Despite Fata's

persistence in his innocence, attorney Andreoff advised Fata that there was no chance of success at trial, and the only chance for Fata was to plead guilty and throw himself on the mercy of the court to receive leniency. [Andreoff's] advice was apparently based on the assumption that if Fata pled guilty and accepted responsibility, he would receive a sentence that would not equate to Fata spending the rest of his natural life in prison.

On the other hand, Andreoff's co-counsel, Mr. Kriger, advised Fata of the opposite.  Mr. Kriger was aware of Fata's insistence to proceed to trial and adherence to his innocence.  (Decl. of Kriger ¶¶ 3-4).  Further, Mr. Kriger correctly calculated that a sentence by way of guilty plea or conviction would most likely result in an effective life sentence for Fata. (Decl. of Kriger ¶ 3). Knowing these issues, Mr. Kriger believed Fata's best strategy would be to proceed to trial as Fata had nothing to lose by doing so, and nothing to gain by pleading guilty.  (Decl. of Kriger ¶ 3).  Mr. Kriger believed there was a slight possibility of mistrial or if Fata were convicted, a possibility of prevailing on appeal.  (Decl. of Kriger ¶ 3).  In fact, attorney Kriger requested Fata sign a waiver acknowledging that Fata was entering his guilty pleas against Mr. Kriger's advice.  (Decl. of Kriger ¶ 5).  Mr. Andreoff was ineffective for advising Fata to plead guilty where it was all but assured Fata would receive a sentence tantamount to life in prison.  But for this misadvice, Fata would have proceeded to trial instead.  (Decl. of Fata at 5).

(ECF No. 212-1, PageID.3298-99).

Fata's leniency argument was supported by a declaration of attorney Kriger, who did, in fact, aver that he and Andreoff provided Fata with differing advice:

2.  . . . Mr. Andreoff and I concluded that the evidence [against Fata] was extremely strong.  Mr. Andreoff felt that there was virtually no chance of an acquittal and that he would be guilty if he proceeded to trial.  **Therefore, Mr. Andreoff believed that it was in Dr. Fata's best interest to plead guilty.**  Mr. Andreoff felt that by pleading guilty the judge would not be exposed to much of the damaging evidence that would be presented at trial . . . Because Mr. Andreoff was of the belief that there was virtually no chance of succeeding at a trial, the only chance for Dr. Fata to receive leniency would be for him to accept responsibility for his conduct and plead guilty.

3.  Although I agreed with Mr. Andreoff that the case would be extremely difficult to win, I recommended to Dr. Fata that he proceed to trial because it was my belief that even if he accepted responsibility and pled guilty, he would likely receive a sentence that would for all practical purposes amount to life in prison.  While I agreed with Mr. Andreoff that Dr. Fata would likely be convicted, I felt there was always the possibility, however slight, that the jury might be unable to agree on a verdict, or that if convicted, he might prevail on appeal, and perhaps negotiate a more favorable plea agreement....

4.   Approximately two months before Dr. Fata pled guilty, however, the government took the deposition of one of Dr. Fata's patients [T.H.] and shortly after the deposition, we discussed the possibility of negotiating a plea agreement and Dr. Fata authorized us to approach the government about resolving the case pursuant to a Rule 11 plea agreement.   Our efforts to negotiate a Rule 11 plea agreement, however, were unsuccessful.   Up until that time, Dr. Fata expressed to me that he wanted to go to trial and contest the charges and repeatedly maintained his innocence.

5.   Although Dr. Fata was reluctant to plead guilty, **he decided to follow the advice of my co-counsel [Andreoff]** and pled guilty without the benefit of a Rule 11 plea agreement.   Because I felt that Dr. Fata should not plead guilty, **I had Dr. Fata execute a written statement that he was pleading guilty against my advice**.

(ECF No. 212-3, PageID.3313-15) (emphasis added).

Thus, Kriger's affidavit appears on its face to at least arguably support one of the underlying premises of Fata's argument – that he had received conflicting advice from his counsel about whether he should plead guilty or go to trial.[4]

### ii.   Fata's Cooperation Argument

Whereas Fata's declaration seems to exclusively blame Andreoff for his decision to plead guilty, Fata's "cooperation" argument is actually leveled at both of his attorneys.   First, Fata's

---

[4] As discussed below, *see infra* at 17-18, 20-21, it turns out that the statements highlighted above in Kriger's declaration were not entirely accurate.   First, the credible evidence unequivocally establishes that Andreoff (and Kriger) initially worked diligently to develop a trial defense, including by finding experts who would defend the treatments Fata ordered.   It was only after those efforts proved fruitless that Andreoff became in favor of attempting to negotiate a plea *deal with an agreed-upon maximum sentence*.   When it became apparent that the government would not offer any deal, Andreoff, like Kriger, recommended that Fata go to trial.   Second, and relatedly, whereas Kriger averred, "*I* had Fata execute a written statement that he was pleading guilty against *my* advice," in fact, the "written statement" (which was not supplied to the Court until after it ordered an evidentiary hearing) makes clear that Fata decided to plead guilty against the advice of *both* Kriger and Andreoff.   (ECF No. 212-3, PageID.3315) (emphasis added).   The Court will refer to this "written statement," which is dated September 4, 2014, and signed by Fata, Kriger, and Andreoff, as the "Waiver."   (ECF No. 244-3).

memorandum on this issue repeatedly references representations of "counsel," without any reference to Andreoff:

> . . . Fata's guilty plea was entered unknowingly due to counsel's misrepresentations that Fata would receive a reduction under U.S.S.G. § 5K1.1 if he pled guilty and cooperated with the Government.  Of course, no 5K1.1 motion was filed.  In fact, the Government rejected Fata's cooperation entirely, contradicting counsel's assurances to Fata. . . .
>
> In the instant case, Fata was assured by counsel that the Government would provide a proffer session after he entered his guilty plea.  In the series of emails attached as Exhibit A, defense counsel notes that the offer of cooperation "played a significant role" in Fata's guilty plea.  []  Defense counsel's misrepresentations regarding the possibility of a reduction for cooperation was ineffective assistance of counsel, and caused Fata to enter an involuntary and unknowing guilty plea.  As noted by defense counsel's email, the promise of cooperation was a significant factor in Fata's decision to plead guilty in addition to the grounds presented above.  But for counsel's ineffectiveness, Fata avers that he would not have entered a guilty plea and proceeded to trial instead.  []

(ECF No. 212-1, PageID.3298-3301).

Second, in his declaration, Fata averred, "*both* of my attorneys advised me that the government would sit down with me, in good faith, to debrief me after I pled guilty . . ." (ECF No. 212-2, PageID.3309) (emphasis added).  And, at the July 30, 2019 evidentiary hearing in this matter, Fata testified that "both" of his attorneys promised him he "would absolutely" receive a 50% cooperation credit if he pleaded guilty.  (Tr. 41).[5]  Thus, the Court will analyze this issue assuming it is directed at both of Fata's attorneys.

Turning back to the e-mails referenced in Fata's memorandum, the first one was sent on November 1, 2014, from Andreoff to the AUSAs prosecuting Fata's case.  (ECF No. 212-4, PageID.3321).  Andreoff wrote, "It has been nearly seven weeks since [Fata's] plea and no meeting has been set to debrief Dr. Fata under a Proffer or Kastigar letter.  [Kriger] and I were hoping that

---

[5] References to the transcript pages of the evidentiary hearing (ECF No. 256) are cited as "Tr. _."

the debriefing could take place in the very near future.  [Fata] is very anxious to meet with you to discuss the possibility of cooperation."  (*Id.*)

The next e-mail is dated November 25, 2014, and is from Kriger to the AUSAs:

> Your phone call yesterday wherein you stated you were not interested in Dr. Fata's cooperation unless it involved 'poisoners' took us by surprise, and not in a good way.
>
> You will recall that when we met with you [and the other AUSAs] to discuss the possibility that Dr. Fata would plead guilty to several counts without a Rule 11 agreement, we began to outline with some specificity his proposed cooperation.  [One of the AUSAs] interrupted and said that the details of the cooperation would be addressed after the plea.  While you certainly did not make any promises about whether that cooperation would result in a 5K1.1 motion, as we recall, and as our notes of the meeting reflect, you stated that you would certainly debrief him and 'would keep an open mind.'  At no time during the meeting, did you indicate that you would not be interested in his cooperation in the area of health care fraud.
>
> We, of course, passed that information along to Dr. Fata, and in our view that representation (that you would debrief him in the areas of both national security and health care fraud and 'keep an open mind['] as to the value of this information) played a significant role, if not the primary role, in his decision to plead guilty.  . . .
>
> As you know, since the plea, we have on several occasions raised the issue of when the proffer would take place.  We did so because Dr. Fata has repeatedly asked us when the proffer will take place.  In response, we told him that he need not worry, there is plenty of time, and that the government will debrief him as promised, and fairly evaluate what he has to say.
>
> Quite frankly, after your call yesterday, we feel that you have pulled the rug out from under us, and put both of us in a very difficult situation.  On the one hand, we would like to ask you to honor your representation, conduct the promised proffer with Dr. Fata, and 'keep an open mind' as promised.  On the other hand, however, given your message, we question whether any such proffer would be anything but an exercise in futility at least in the area of health care fraud.
>
> While we try to come up with a way out of this quandary, I would be interested in hearing your thoughts on the matter.

(*Id.*, PageID.3319-20).

One of the AUSAs responded to Kriger's e-mail a few minutes later:

Mark,

We told you from the beginning that we would never foreclose the possibility of a proffer and we haven't.  I certainly did not promise a debrief, much less on any particular areas and [none of my colleagues] made any promises.  We did promise to keep an open mind and we have.

We're willing to have an attorney proffer on national security issues.  I asked what kind of health care fraud information you had and if it rose to the level of what Dr. Fata did (in essence, poisoning people) and it did not.  We are not going to proffer Dr. Fata about lesser health care fraud crimes than he committed.  This decision is collective, not mine alone.

Your client pleaded straight up without cooperation and no promise was ever made regarding cooperation.  If that was why he decided to plead, that was a consideration discussed between you and him.  You certainly never conveyed that to us as the primary motivator and we would have told you (again as we did many times) that we were making no compromises or promises.  There was no plea offer, no plea agreement and no promise of cooperation, which you know is many steps beyond a proffer. . . .

(*Id.*, PageID.3318-19).

The remaining e-mails simply discuss arranging a time to further discuss the matter together.  (*Id.*, PageID.3318).  It is undisputed that, in April 2015, the AUSAs met with Fata's counsel regarding Fata's cooperation information, and ultimately declined to offer Fata any cooperation credit for information provided to the government.  (Tr. 116).

Fata now argues that these e-mails show that he "was assured by counsel that the Government would provide a proffer session after he entered his guilty plea," that "[d]efense counsel's misrepresentations regarding the possibility of a reduction for cooperation was ineffective assistance of counsel, and caused [him] to enter an involuntary and unknowing guilty plea," and that "[b]ut for counsel's ineffectiveness, [he] [] would not have entered a guilty plea and [would have] proceeded to trial instead."  (ECF No. 221-1, PageID.3300).

   b.  *Government's Response to Fata's § 2255 Motion*

The government filed a response to Fata's § 2255 motion on October 15, 2018, along with

12

an affidavit from Andreoff.  (ECF Nos. 225, 225-2, 226).

Andreoff described the significant efforts he and Kriger made at first to review the government's evidence against Fata, and attempt to identify and engage expert witnesses who would be willing to opine that Fata's treatments were medically necessary and appropriate.  (ECF No. 225-2, PageID.3387-90).  Those efforts lasted months and were aimed at assisting Fata in presenting a defense to the charges at trial, as was his desire.  (*Id.*) ("Prior to January 2014, both Kriger and I did not advocate pursuing a plea offer, as we were still in the process of learning whether outside experts could or would defend Dr. Fata's diagnoses and treatments of each patient.").  Andreoff avers that with things not going well on the expert witness front, he and Kriger met with Fata on April 24, 2014, to "discuss his case and potentially pleading and cooperating," but that Fata "maintained his desire to go to trial."  (*Id.*, PageID.3389).

In August 2014, after all nine experts identified by Andreoff and Kriger indicated that they were unwilling to defend Fata's treatments, the attorneys and Fata met to discuss "the possibility of pursing a negotiated plea agreement with the government."  (*Id.*, PageID.3391).  Fata authorized them to pursue a plea agreement that would have subjected him to a maximum 20-year sentence. (*Id.*).  Contrary to Fata's assertion, Andreoff avers that he never advised or promised Fata that he could "secure" such a plea agreement; rather, Andreoff promised to *attempt* to obtain such an agreement.   (*Id.*).   The government flatly rejected the proposal and did not make any counterproposal.  (*Id.*).

On August 15, 2014, Fata and his attorneys attended the deposition of one of Fata's former patients, T.H., who testified that he had never heard of some of the diagnoses Fata had put in his records.  (*Id.*).  Andreoff avers that this "preview of the testimony he would face at trial" impacted Fata's decision to go to trial, a point Fata affirmed at his sentencing hearing when he explained his

decision to plead guilty. (*Id.*; ECF No. 161, PageID.2487) ("I did not want to bring my patients, the older ones most, to take the stand for a two-month trial. It's brutal, no way."). However, on August 28, 2014, Andreoff and Kriger advised Fata that the government had declined to offer Fata any plea deal whatsoever; thus, his only options were to plead guilty without a plea deal or go to trial. (ECF No. 225-2, PageID.3391-92). Although Andreoff and Kriger believed there was little chance of an acquittal at trial due to the strength of the government's evidence against Fata, they continued preparing diligently for trial. (*Id.*). Among other actions, they prepared and reviewed jury questionnaires and prepared motions to change venue, to suppress evidence, and to subpoena patient files. (*Id.*, Tr. 134-35).

Andreoff avers that after the government made clear it would not offer any plea deal whatsoever, he "advised Dr. Fata to go to trial." (*Id.*, PageID.3392). He further avers that on September 4, 2014, he and Kriger met with Fata "to discuss the evidence in the case, potential cooperation with the government, and further evidence that had been provided by the government." (ECF No. 225-2, PageID.3392). He further avers that Fata "informed us during that meeting that he did not want to proceed to trial and was prepared to plead to all counts of the indictment in order to avoid trial." (*Id.*). Andreoff avers "Mr. Kriger and I advised against such a plea . . ." (*Id.*).[6]

Andreoff avers that he and Kriger met with the AUSAs on September 8, 2014, to discuss Fata pleading without a plea agreement, and that they specifically discussed "the potential for Dr. Fata to cooperate in other cases." (*Id.*, PageID.3393). The government's response was that "such a possibility would not be discussed prior to Dr. Fata pleading guilty." (*Id.*). Andreoff and Kriger

---

[6] These averments appear to conflict with Kriger's that, "Although Dr. Fata was reluctant to plead guilty, he decided to follow the advice of my co-counsel [Andreoff] and pled guilty without the benefit of a Rule 11 plea agreement." (ECF No. 212-3, PageID.3315).

met with Fata the next day to discuss "the pros and cons of a plea," "the fact that there would be no guarantee of any particular sentence," that "the government might not be interested in his cooperation," and that "the issue of cooperation could only be visited after his guilty pleas were entered." (*Id.*). They further advised Fata that "(1) even if the government chose to meet with him concerning cooperation, it was solely in the government's discretion to determine if that cooperation rose to the level of 'substantial assistance'; (2) it was solely in the government's discretion to move later for the Court to reduce his sentence on that basis; and (3) it was solely in the Court's discretion whether to consider the cooperation and reduce his sentence." (*Id.*). Andreoff avers that he made no promise to Fata that Fata "would receive a 50 percent sentence reduction." (*Id.*, PageID.3394). Andreoff further avers that "immediately prior" to Fata entering his guilty pleas, the two attorneys met with Fata, and Andreoff "specifically informed Dr. Fata that the government had not agreed to consider cooperation." (*Id.*). Finally, Andreoff avers that Fata never stated that he was pleading guilty for reasons unrelated to guilt. (*Id.*, PageID.3394-95). Fata then pleaded guilty as indicated above.

Andreoff avers that after Fata entered his guilty pleas, the two attorneys "had multiple phone calls and meetings with the [AUSAs] regarding potential cooperation." (*Id.*, PageID.3395). The government determined that none of the information provided "rose to a level that the government was willing either to meet with Dr. Fata personally or provide cooperation credit." (*Id.*). After the government's decision was communicated to Fata, he asked his attorneys about withdrawing his guilty pleas. (*Id.*). After consulting with his attorneys (and one of Kriger's partners), Fata ultimately elected not to file such a motion. (*Id.*). He was then sentenced by Judge Borman to 45 years in prison on July 10, 2015, and Andreoff's representation terminated a few weeks later. (*Id.*, PageID.3395-96).

      *c.   Fata's Reply*

Fata filed a reply on November 16, 2018 (ECF No. 227), and attached a number of documents, including a single page of handwritten notes, dated April 24, 2015, that purports to bear the signatures of his two attorneys, Kriger and Andreoff (the "April 24, 2015 Notes").  (ECF No. 227-1, PageID.3424).   The April 24, 2015 Notes are entitled "Mark [Kriger] and Chris [Andreoff] New Sentencing Guidelines," and they purport to reflect that the three had some sort of discussion about a "50% cooperation" credit, which would have reduced the 292-360-month sentencing guideline range referenced in those Notes.   (*Id.*)   The Notes, if authentic, would have at least potentially bolstered Fata's averment that "Andreoff reassured me that if the government accepts my cooperation after debriefing, I would receive a 50 percent sentence reduction" and the slightly different argument in Fata's memorandum that Andreoff had misrepresented to him that he "would receive a reduction under U.S.S.G. § 5K1.1 if he pled guilty and cooperated with the Government."  (ECF No. 212-2, PageID.3309; No. 212-1, PageID.3300).

      *d.   Supplemental Briefing Regarding Fata's "Conflicting Advice" Argument*

On December 14, 2018, the government filed a memorandum of supplemental authority based on the Sixth Circuit's ruling, a day earlier, in *Logan*, *supra*.  (ECF No. 230).  A few weeks later, Fata filed his own supplemental brief addressing *Logan*.  (ECF No. 231).  To the extent Fata argues that he received conflicting advice from Kriger and Andreoff about whether to plead guilty, and that "Andreoff was ineffective for advising Fata to plead guilty," *Logan* is directly on point.  (ECF No. 212-1, PageID.3299).   *Logan* held that a petitioner's claim of "conflicting advice undercuts . . . [a] claim of ineffective assistance of counsel . . ." because the Sixth Amendment "encompass[es] an affirmative right (the right to effective assistance of counsel at critical

proceedings), not a negative right (the right to be completely free from ineffective assistance)." *Logan*, 910 F.3d at 870.

> e.  *Order Setting Evidentiary Hearing*

On March 20, 2019, the Court issued an Order setting an evidentiary hearing on Fata's § 2255 motion.  In doing so, the Court noted that (1) Kriger's declaration seemed inconsistent with certain aspects of Andreoff's affidavit, and (2) the April 24, 2015 Notes that Fata supplied with his reply brief, and which purportedly bore the signatures of his two attorneys, appeared to at least potentially corroborate some of Fata's allegations about cooperation credit.  (ECF No. 236).

> f.  *Government's Supplemental Brief and Exhibits*

On June 7, 2019, the government filed a supplemental brief in response to Fata's § 2255 motion, along with a number of exhibits.  First, the government provided the Supplemental Affidavit of Christopher A. Andreoff, Esq.  (ECF No. 244-2).  Andreoff averred that in April 2019 – after this Court had ordered an evidentiary hearing – he retrieved files that had been at an "off-site storage facility."  (*Id.*, PageID.3485).  In those files, he located the September 4, 2014 Waiver, which he attached as an exhibit to his supplemental affidavit.  (ECF No. 244-3).  The three-page Waiver is comprised of two pages of handwritten text and a handwritten signature page.  (*Id.*)  It is written by Fata in the first person, and reads, in its entirety:

> I have advised my attorneys, Christopher Andreoff and Mark J. Kriger that it is my decision to plead guilty to all the counts in the indictment.  I have directed them based on my decision not to prepare for trial.
>
> My attorneys have recommended that I proceed to trial because there is no guarantee that the outcome will be better if I decide to plead guilty and that if I plead guilty the government's recommendation will in all likelihood will [sic] be life in prison.
>
> My attorneys have also advised me that while I have information that I wish to provide to the government, there is no guarantee that the government will

give me any consideration for my cooperation or the cooperation of others on my behalf.

My attorneys have also advised me that I should not plead guilty unless I am in fact and that they have strongly advised me that I should proceed to trial if I am not guilty.

My attorneys have advised me that they will make every attempt to make my cooperation known to the government, including contacting Justice [D]epartment officials, and others including Homeland Security, CIA and others in Washington.

(*Id.*, PageID.3490-91).  Fata, Andreoff, and Kriger each initialed both pages of text, as well as all edits that were made to the document.  (*Id.*).  Each also signed and dated (September 4, 2014) the document's final page.  (*Id.*, PageID.3492).

### 5.  *Evidentiary Hearing*

The Court held an evidentiary hearing on July 30, 2019, and heard testimony from Fata, Kriger, and Andreoff.  (ECF No. 256).

#### a.  *Fata's Testimony*

The main gist of Fata's testimony at the evidentiary hearing was that in connection with their September 4, 2014 meeting, his attorneys represented to him that if he pleaded guilty, he would be given leniency and an opportunity to meet with government representatives to provide information about health care fraud and national security, and that he would "not receive an effective life sentence" and "would absolutely" receive a 50% cooperation credit for providing that information.  (Tr. 22, 27, 33, 41).  Fata also testified that based on his discussion with his attorneys on September 4, 2014, he understood them to be advising him that "pleading guilty with this representation [about cooperation credit] would be more beneficial to [him] than going to trial."  (Tr. 14).  Fata characterized his attorneys' purported representations as having "coerced" him to sign the September 4, 2014 Waiver.  (Tr. 28).  Fata reiterated that he blamed "both"

18

Andreoff and Kriger for this supposed "coercion". (Tr. 29).

Fata testified that after he entered his guilty plea, he learned that the government would not be meeting with him. (Tr. 34). Instead, the government met only with Fata's lawyers. (*Id.*). When Fata learned of the government's position about an in-person meeting with him, and ultimately that the government had decided not to offer him any cooperation credit for the information his attorneys had provided on his behalf, Fata asked his attorneys about withdrawing his guilty plea. (*Id.*). However, they successfully dissuaded him from doing so because he would have lost any hope of receiving leniency from the Court. (*Id.*). Fata testified that if he had known the government would not meet with him, and that he would not be receiving a 50% cooperation credit, he would have elected to go to trial. (Tr. 33-34).

Finally, Fata was shown a copy of the April 24, 2015 Notes, which contain a reference to a "50% cooperation" credit, and was asked about the following signatures that appear at the end of that document:



(Tr. 49; ECF No. 227-1, PageID.3424). Fata testified that these signatures were authentic, *i.e.*, "signed by" his attorneys, Kriger and Andreoff. (Tr. 49-50).

> b. *Attorney Kriger's Testimony*

Kriger testified next, and when asked whether the "Kriger" signature on the April 24, 2015 Notes was his, he unequivocally testified, "It is not." (Tr. 82). Kriger also explained in detail his representation of Fata in this matter. Kriger testified that he had consistently told Fata that the case against him was "very strong," and that he should go to trial because the sentence he would

receive whether he went to trial and lost or pled guilty "would be equivalent to close to life."  (Tr. 52, 53).

Kriger testified that Andreoff believed that Fata should attempt to "work out a plea" and "hope for . . . leniency."  (Tr. 53, *see also* Tr. 66).  Kriger also testified about how both he and Andreoff attempted to secure a negotiated plea for Fata, first for 20 years' imprisonment, and then, when the government rejected that proposal, for 30 years' imprisonment.  (Tr. 62-63).  When Fata was left with only two possibilities – go to trial or enter an open plea – both Kriger and Andreoff recommended that he go to trial.  (Tr. 63-64).  But Fata rejected that advice and entered an open guilty plea.  (Tr. 54).

Fata's counsel questioned Kriger about the November 25, 2014 e-mail that Kriger sent to the AUSAs.  In that e-mail, Kriger had asserted that the AUSAs had told him that they "would certainly debrief" Fata and "keep an open mind" as to information he could provide, both as to health care fraud and national security, and that that "promise" by the government "played a significant role, if not the primary role, in [Fata's] decision to plead guilty."  (Tr. 56; ECF No. 212-4, PageID.3319-20).  Kriger testified that he wrote those statements because, "when we told Dr. Fata that [the government was] not going to debrief him personally, he was upset.  So I was hoping that I could get [the government] to debrief [Fata] personally."  (Tr. 57-58).

Kriger also testified about the Waiver, reiterating one of its central points; that Kriger and Andreoff had advised Fata that "there was no guarantee that the government would give his cooperation any credit at all. . . . And then ultimately it's the government's decision."  (Tr. 59).

Kriger was then questioned about his declaration that Fata had attached as an exhibit to his § 2255 motion.  (Tr. 67-71).  As discussed above, *see supra* at 9 n.4, Kriger testified that his averments in the declaration regarding the Waiver were "not completely accurate."  (Tr. 68).

Kriger explained that he did not have a copy of the Waiver when he prepared his declaration, and that he prepared it based on his memory. (*Id.*). Kriger testified that the Waiver accurately reflects that, as of September 4, 2014, both he and Andreoff recommended to Fata that he go to trial. (*Id.*). Kriger also explained that one of the Waiver's main purposes was to memorialize Fata's recognition that he was going to be pleading guilty against the advice of Kriger and Andreoff, and that "by pleading guilty, he was still going to probably get life in prison . . ." (Tr. 68-70).

Kriger testified that: (1) the government had advised him that it was "not even going to discuss [Fata's cooperation] unless [Fata] plead[ed] guilty"; (2) the government did not promise that, if Fata did plead guilty, he would receive any cooperation credit; and (3) he never promised Fata that he would receive a 50 percent cooperation credit for his cooperation. (Tr. 71, 73).

Kriger also agreed that after his November 2014 e-mail exchanges with the AUSAs, *see supra* at 11-12, he and Andreoff did, in fact, provide the national security *and* health care fraud information that Fata hoped would result in his receipt of cooperation credit. (Tr. 74-75). Kriger also agreed that after this information was provided to the government, he and Andreoff attended a meeting on Fata's behalf with the National Security Chief from the United States Attorney's Office. (Tr. 75). When the government ultimately decided it would not offer Fata any cooperation credit, Kriger and Andreoff appealed that decision to supervisors within the United States Attorney's Office, which appeal was denied. (Tr. 80). Finally, Kriger testified that he never told Fata that a "debrief" meant he necessarily would receive a recommendation for a reduced sentence by the government. (Tr. 76).

### c. Attorney Andreoff's Testimony

Andreoff testified to the significant efforts he and Kriger made to help Fata mount a defense from the time they began representing Fata until he instructed them, on September 4, 2014, that he

had decided to plead guilty.  This included retaining nine oncologists in an effort to find one who would support the treatments Fata had prescribed.  (Tr. 93).  It became clear, however, that none of the experts – not even one who had been a close friend of Fata's – was willing to testify that Fata's treatments were appropriate.  (Tr. 94-96).  Andreoff and Kriger also shared with Fata the overwhelming evidence against him, including: (1) the government's expert's opinions; (2) his own employees' statements; and (3) statements of the treating physicians who took over the care of Fata's former patients.  (Tr. 45, 96-97).  This led Andreoff and Kriger to attend a "reverse proffer" with the government, where they were able to zero in further on the strength of the government's evidence against Fata and his potential sentencing exposure.  (Tr. 100).  Even at this juncture, however, Fata insisted on pursuing a defense instead of engaging in plea negotiations. (*Id.*).  Fata's counsel therefore continued – unsuccessfully – to pursue an expert witness who was willing to testify on his behalf.  (*Id.*).

In August 2014, Fata, his attorneys, and two of the experts they had engaged met to discuss Fata's treatments and the government's evidence against him.  (Tr. 102-03).  When the doctors explained to Fata why they could not support his treatments, Fata's insistence on going to trial waned.  (Tr. 103).  He authorized his attorneys to pursue a negotiated plea with the government. (*Id.*).  His attorneys made multiple proposals to the government, but the government made clear that it would not offer Fata any plea deal whatsoever.  (Tr. 104).

On August 15, 2014, Fata and his attorneys attended the deposition of one of his patients, which deposition was being taken because of concerns that he may not live long enough to be able to testify at trial.  (Tr. 104-05).  Andreoff testified that the deposition "went very badly for the defense."  (Tr. 105).  Fata then asked his attorneys to again raise the issue of a possible plea with the government.  (*Id.*).  The government, however, remained uninterested.  (*Id.*, Tr. 109).

Thus, at the end of August 2014, Andreoff and Kriger were still actively preparing for trial, including drafting a motion to suppress and reviewing jury questionnaire information. (Tr. 105). Andreoff testified that although he felt Fata's chances were "slim, if none," he still believed that, without a negotiated plea, it was Fata's best chance for any sort of positive outcome. (*Id.*). Then Fata and his attorneys had the September 4, 2014 meeting, at which they all signed the Waiver confirming that, against the advice of both of his attorneys, Fata had decided to plead guilty. (*Id.*). As of this time, Fata's attorneys had fully educated him as to "federal [S]entencing [G]uidelines 5K1.1 and other issues dealing with cooperation and how the system works." (Tr. 109-110). Andreoff testified that Fata was specifically told that it was the government's decision as to whether to recommend he receive any cooperation credit, and that ultimately it would be up to Judge Borman as to whether he received any cooperation credit. (Tr. 110). Andreoff testified unequivocally, "We also were told [by the government] that no cooperation would be considered of any kind until after [Fata] pled. And we took that back to [Fata]." (Tr. 111). Indeed, Andreoff testified that on the day of Fata's guilty plea hearing, prior to going on the record, he and Kriger reviewed with Fata his constitutional rights and reiterated to him that "[c]ooperation would not even be considered if at all until after the plea." (Tr. 123). Andreoff also testified that "[a]t no time" did the government promise him or Kriger that the government would meet directly with Fata. (Tr. 111, 114-15).

Andreoff was then asked about what purports to be his signature on the April 24, 2015 Notes that Fata had attached to his reply brief. (Tr. 115). Andreoff unequivocally testified that it was not his signature. (*Id.*). Whereas the April 24, 2015 Notes reflect a discussion about Fata receiving a 50% cooperation credit, Andreoff testified that on that date, he and Kriger actually discussed with Fata the government's decision not to recommend that he receive any cooperation

credit whatsoever. (Tr. 115-16).[7] Copies of Andreoff's billing records from April 24, 2015 and the few days that followed are consistent with Andreoff's testimony. (ECF No. 245-1).

### 6. Post-Evidentiary Hearing Briefs

With the Court's permission, both sides filed post-evidentiary hearing briefs summarizing the hearing testimony's impact on their respective positions. (ECF No. 255; No. 257). The most significant issue raised by Fata is that whereas Kriger testified that "the opportunity to cooperate . . . played a significant role in Fata's decision to plead guilty," Andreoff did not mention "cooperation" as one of the factors that had motivated Fata to plead guilty. (ECF No. 255, PageID.3681, 3684-86) (citing Tr. 54, 100, 121, 132). The government argues that this merely shows a "difference of opinion" between the two attorneys about what motivated Fata to plead guilty, and that, at any rate, both attorneys agreed that "multiple factors played a role in Fata's decision . . ." (ECF No. 257, PageID.3842-43).

### Applicable Legal Standards

Under 28 U.S.C. § 2255, a prisoner sentenced by a federal court may "move the court which imposed the sentence to vacate, set aside or correct the sentence" based on a claim "(1) 'that the sentence was imposed in violation of the Constitution or the laws of the United States;' (2) 'that the court was without jurisdiction to impose such sentence;' (3) 'that the sentence was in excess of the maximum authorized by law;' or (4) that the sentence 'is otherwise subject to collateral attack.'" *Hill v. United States*, 368 U.S. 424, 426-427 (1962). To prevail on a Section 2255 motion, the petitioner must prove by a preponderance of the evidence that his constitutional

---

[7] After the meeting on this date, Fata e-mailed Andreoff and summarized his "understanding" of their discussions. (ECF No. 244-5). Fata's e-mail makes no reference to a 50% cooperation credit. (*Id.*). Indeed, consistent with Andreoff's testimony, the e-mail makes no reference to Fata receiving any cooperation credit whatsoever. (*Id.*).

rights were denied or infringed. *United States v. Wright*, 624 F.2d 557, 558 (5th Cir. 1980).

A petitioner seeking to establish ineffective assistance of counsel must satisfy the standards set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). First, he must show that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* Counsel's performance is deficient only where it falls "below an objective standard of reasonableness." *Id.* at 687-88. Judicial scrutiny of counsel's performance "must be highly deferential." *Id.* at 689. A reviewing court should avoid second-guessing counsel and must ensure that "every effort is made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Second, the petitioner must show that counsel's deficient performance prejudiced the defense. *Id.* at 687. To satisfy the prejudice prong, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Here, Fata asserts that he received ineffective assistance of counsel in connection with his decision to plead guilty. Thus, the Court must analyze that claim – particularly as it relates to the prejudice prong – in the context of the law pertaining to the validity of a defendant's guilty plea. The prejudice requirement for such claims focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Thus, Fata must show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id. See also*

*Smith v. United States*, 348 F.3d 545, 551-52 (6th Cir. 2003).   An assessment of whether a defendant would have gone to trial but for counsel's errors "will depend largely on whether the [] defense likely would have succeeded at trial." *Hill*, 474 U.S. at 59.   This requires the Court to examine the petitioner's defense to determine whether but for counsel's error, petitioner would likely have gone to trial instead of pleading guilty. *See Maples v. Stegall*, 340 F.3d 433, 440 (6th Cir. 2003).   "The petitioner must therefore show a reasonable probability that but for counsel's errors, he or she would not have pleaded guilty, because there would have been a reasonable chance that he or she would have been acquitted had he or she insisted on going to trial." *Kue v. Birkett*, No. 2:10-CV-11925, 2013 WL 2155527, at *10 (E.D. Mich. May 17, 2013) (citing *Garrison v. Elo*, 156 F.Supp.2d 815, 829 (E.D .Mich. 2001)).   A petitioner's "conclusory allegation that, but for an alleged attorney act or omission he [] would not have pleaded guilty, is therefore insufficient to prove such a claim." *Id.* (citing *Garrison*, 156 F.Supp.2d at 829).   "The test of whether a defendant would have not pleaded guilty if he [] had received different advice from counsel 'is objective, not subjective' . . ." *Id.* (quoting *Pilla v. U.S.*, 668 F.3d 368, 373 (6th Cir. 2012)).

Moreover, a guilty plea "is constitutionally valid only to the extent it is 'voluntary' and 'intelligent.'" *Bousley v. United States*, 523 U.S. 614, 618 (1998) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)).   A guilty plea is voluntary if the accused understands the nature of the charges against him and the constitutional protections that he is waiving. *Henderson v. Morgan*, 426 U.S. 637, 645, n.13 (1976).   A plea is knowing and intelligent if it is done "with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748.   While "a [guilty] plea may be involuntary if the defendant did not understand what he was giving up and receiving in entering his guilty plea," *United States v. Lang*, 46 F. App'x 816, 818 (6th Cir. 2002), "not 'every item of misinformation which counsel may impart vitiates the voluntariness of a plea.

Each case must depend largely on its own facts.'"  *Black v. Palmer*, No. 16-13756, 2019 WL

3067926, at *4 (E.D. Mich. July 12, 2019) (quoting *Hammond v. United States*, 528 F.2d 15, 18

(4th Cir. 1975)).

As discussed below, Fata's claims fail at every level.  He failed to show that either of his

attorneys made any misrepresentation to him, and thus, failed to show that they were "deficient."

Moreover, as to the only alleged misrepresentation for which Fata presented any even potentially

credible evidence – his attorneys' purported representation to him that the government would meet

with him in person after his guilty plea for a "debrief" regarding cooperation information – Fata

failed to show that he was prejudiced.  The only reasonable conclusion from a review of the

credible evidence is that even knowing that he would be providing cooperation information to the

government only through his attorneys – as opposed to in person – Fata would not have chosen to

go to trial instead of pleading guilty.

**Analysis**

*1. Leniency Argument*

Fata argues, "Andreoff was ineffective for advising Fata to plead guilty where it was all

but assured Fata would receive a sentence tantamount to life in prison.  But for this misadvice,

Fata would have proceeded to trial instead."  (ECF No. 212-1, PageID.3299).  This argument fails

both legally and factually.  First, to the extent Fata's argument is based on the assertion that

Andreoff advised him to plead guilty, whereas Kriger advised him to go to trial, the argument fails

under *Logan*.  *Logan* held that a petitioner's claim of "conflicting advice undercuts . . . [a] claim

of ineffective assistance of counsel . . ." because the Sixth Amendment "encompass[es] an

affirmative right (the right to effective assistance of counsel at critical proceedings), not a negative

right (the right to be completely free from ineffective assistance)."  *Logan*, 910 F.3d at 870.

Because Fata does not contend that Kriger's advice to proceed to trial was ineffective, Fata suffered

no Sixth Amendment violation due to Andreoff's alleged contrary advice.  *Id.  See also Harrison*

*v. Motley*, 478 F.3d 750, 755-56 (6th Cir. 2007).

Second, the central factual premise of Fata's argument – that Andreoff advised him to plead

guilty – is simply untrue.  While the initial briefing and exhibits provided by the parties raised

some questions about what Fata's attorneys' respective advice was at the time he decided to plead

guilty on September 4, 2014, *see, e.g., supra* at 9, 14 n.6, with the record now complete, it is clear

that Fata's decision was made against the advice of *both* of his attorneys.  The credible evidence

shows that after first attempting to mount a vigorous defense for Fata and getting nowhere,

Andreoff came to believe it would be in Fata's best interest to attempt to negotiate a plea deal with

the government where Fata's sentencing exposure would be capped at an agreed-upon number of

years.  When the government rejected all such proposals and indicated that it would not offer Fata

any sort of plea agreement whatsoever, and would only consider his cooperation information after

he pleaded guilty, Andreoff (like Kriger) specifically advised Fata to go to trial.  This advice is

reflected in the Waiver that Fata and both of his counsel signed, which states, "I have advised **my**

**attorneys, Christopher Andreoff and Mark J. Kriger** that **it is my decision to plead guilty** to

all the counts in the indictment.  **I have directed them based on my decision not to prepare for**

**trial**.  **My attorneys have recommended that I proceed to trial** because there is no guarantee

that the outcome will be better if I decide to plead guilty and that if I plead guilty the government's

recommendation will in all likelihood will [sic] be life in prison."  (ECF No.244-3, PageID.3489)

(emphasis added).  Both Kriger and Andreoff credibly testified that the Waiver accurately reflects

their advice to Fata at the time he decided to plead guilty, and Kriger adequately explained why

his initial declaration mistakenly suggested that in deciding to plead guilty, Fata had followed

Andreoff's advice.  For all of these reasons, Fata is entitled to no relief based on his leniency argument.

　　2.　*Cooperation Argument*

Fata also argues that both of his attorneys provided ineffective assistance with respect to the possibility of him receiving cooperation credit if he pleaded guilty.  Here, Fata's argument is two-pronged.  First, Fata contends that his attorneys promised him that if he pleaded guilty, the government would debrief him in person about cooperation information he possessed.  Second, Fata contends that both of his attorneys promised him that if he pleaded guilty he "would absolutely" receive 50% cooperation credit.  Fata contends that these purported promises were "misrepresentations," absent which he would have gone to trial rather than pleading guilty.  Fata's arguments, which the Court will address in reverse order, fail.

　　a.　*50% Cooperation Credit*

Fata argues that prior to him pleading guilty, both of his attorneys represented to him that he "would absolutely" receive a 50% cooperation credit for information he planned to provide to the government regarding health care fraud and national security issues.  As to this point, Fata's only evidence consists of his own self-serving testimony that his counsel made such a representation, and the April 24, 2015 Notes, which contain two vague references to Fata receiving a "50% cooperation" credit.  (ECF No. 227-1, PageID.3424).  But, for a slew of reasons, neither piece of evidence is credible.

First, it defies all logic and common sense that experienced and accomplished criminal defense attorneys with approximately 85 combined years of practicing law – would represent to Fata that he would receive any particular level of sentence reduction, let alone one of the magnitude claimed by Fata, unless it had been memorialized in writing with the government.  It is undisputed

that no such writing exists.  Second, Fata provided inconsistent testimony regarding the supposed "promise" about cooperation credit.  Prior to testifying that he was told he "would absolutely" receive a 50% cooperation credit, Fata testified that he understood that his receipt of any cooperation credit was dependent on the government's discretion to accept it.  (Tr. 9 ("And [Andreoff] told me if the government accept[s] my cooperation, I will receive an incentive or reduction or a credit."); ECF No. 212-2, PageID.3309 ("Mr. Andreoff assured me that if the government accepts my cooperation after debriefing, I would receive a 50 percent sentence reduction."); ECF 212-2, PageID.3309 ("Mr. Andreoff reassured me that if the government accepts my cooperation after the debriefing, I would receive a 50% sentence reduction.  I acknowledge that it is within the government's discretion whether to make such a recommendation.").  Third, both Kriger and Andreoff testified that they never made the alleged representation to Fata.  Their testimony is credible because it is both logical and consistent with the other credible documentary evidence.  Indeed, Fata's contention about receiving a 50% cooperation credit is belied by not one, but two unambiguous paragraphs of the Waiver that he signed: (1) "My attorneys have recommended that I proceed to trial because there is no guarantee that the outcome will be better if I decide to plead guilty and that **if I plead guilty the government's recommendation will in all likelihood will [sic] be life in prison**"; and (2) "My attorneys have also advised me that while I have information that I wish to provide to the government, **there is no guarantee that the government will give me any consideration for my cooperation or the cooperation of others on my behalf.**"  (ECF No. 244-3, PageID.3489-90) (emphasis added).[8]

  Fata's contention that the second statement only applied if he chose to go to trial makes no

---

[8] The first statement also clearly disproves Fata's testimony that, "I was told and advised [by Kriger and Andreoff] based on many calculations that I will not receive an effective life sentence.  Based on the representation of leniency and cooperation."  (Tr. 27).

sense.  (Tr. 30).  The entire gist of the Waiver was that Fata's attorneys were advising him of the

risks he was taking in *rejecting* their advice that he go to trial.  Moreover, Andreoff's and Kriger's

testimony was consistent with the Waiver's clear intention and plain language.  Andreoff testified

that he advised Fata that "[t]he government refused to consider any cooperation of any kind ***unless***

***the defendant pled guilty***.  ***And at that point***, that would be an open issue."  (Tr. 109 (emphasis

added)).   Kriger testified that he advised Fata "[t]hat there was no guarantee that ***after [the***

***government] listened*** to whatever he could cooperate on that he would get a motion for downward

departure based on his cooperation."  (Tr. 59 (emphasis added)).  *See also, supra* at 15.

Just as Fata's testimony about a promised 50% cooperation credit lacks credibility, so too

does the documentary evidence on which he relies.  Fata points to the April 24, 2015 Notes, and

the document's two references to "50% cooperation" credit in support of his claim.  However,

while that document purports to be signed by both Kriger and Andreoff, and Fata testified that the

signatures were authentic, both attorneys testified that the signatures were not theirs.  The Court

finds Kriger's and Andreoff's testimony to be credible, and that Fata's contrary testimony is not

credible.  The attorneys' testimony is consistent with the other credible evidence discussed above

that no 50% cooperation credit (or any particular level of cooperation credit) was ever offered to

Fata.  It is also consistent with the fact that an e-mail Fata sent to Andreoff shortly after the April

24, 2015 meeting at which the Notes were purportedly taken makes no reference to Fata receiving

any cooperation credit, let alone a 50% credit.  (ECF No. 244-5; *see also supra* at 24 n.7).[9]  That

Fata submitted a document containing the forged signatures of his attorneys is reason enough to

---

[9] The government asks the Court to consider that Fata had previously attempted to use a fabricated document to support his defense strategy.  Given all of the foregoing, it is clear that Fata's testimony about the signatures on the April 24, 2015 Notes was untruthful, and the Court declines to consider the earlier fabricated document as part of its analysis.

discredit its entire contents.  At any rate, even taking the document at face value, its vague references to "50% cooperation" credit do not establish that any actual promise was made to Fata, and it certainly does not trump the wealth of credible evidence discussed above, which establishes that Fata was not promised any level of cooperation credit, let alone a 50% credit.

In sum, the credible evidence shows that Fata was advised that the government was only willing discuss the possibility of cooperation credit if he first pleaded guilty, and that there was no guarantee that Fata's subsequent provision of cooperation information would result in a recommendation for a sentence reduction.  Accordingly, Fata is entitled to no relief based on his assertion that he was promised a 50% cooperation credit.

### b.  In-Person Debrief Regarding Cooperation Information

Fata also contends that both of his attorneys represented to him that if he pleaded guilty, the government would meet with him in person to debrief him as to cooperation information he possessed related to healthcare fraud and national security issues.  Fata contends that absent that representation, he would have proceeded to trial instead of pleading guilty.  This argument fails both because the credible evidence shows that Fata's attorneys made no such representation to him and because Fata failed to show a reasonable probability that but for the alleged misrepresentation he would have elected to go to trial rather than pleading guilty.

Fata presents no documentary evidence in which any representative of the government offered to meet with him in person.  Indeed, the documentary evidence suggests no such offer was made.  One paragraph of the Waiver specifically touches on the manner in which Fata's cooperation credit would be provided to the government.  That paragraph makes no mention of an in-person meeting between the government and Fata, and instead explicitly states that it is Fata's *attorneys* who will provide that information directly to the government.  (ECF No. 244-3,

PageID.3490) ("My attorneys have advised me that they will make every attempt to make my cooperation known to the government, including contacting Justice [D]epartment officials, and others including Homeland Security, CIA and others in Washington.").   Moreover, the one communication in the record that was authored by the government on this subject – the AUSA's response to Kriger's November 25, 2014 e-mail, *see supra* at 11-12 – specifically disclaimed ever having promised an in-person cooperation debrief with Fata.   (ECF No. 212-4, PageID.3318) ("I certainly did not promise a debrief . . .").

While these documents cut against Fata's argument, they do not end the issue because, in Kriger's November 25, 2014 e-mail to the AUSAs, he asserted that the government had told him that it would "debrief" Fata – which implies an in-person meeting – and that he passed that "promise" along to Fata.   (*Id.*, PageID.3319-20).   However, when questioned about his e-mail, Kriger did not testify that an actual and definitive promise had been made, but said that he wrote it because, "when we told Dr. Fata that [the government was] not going to debrief him personally, he was upset.   So I was hoping that I could get [the government] to debrief [Fata] personally."   (Tr. 57-58).   Andreoff, in turn, unequivocally testified that "[a]t no time" did the government promise him or Kriger that the government would meet directly with Fata to discuss his cooperation information.   (Tr. 111, 114-15).   The Court credits the attorneys' testimony, as it is consistent with (1) the Waiver's reference to Fata's *attorneys* providing his cooperation information to the government, (2) its silence as to an in-person debrief, and (3) the AUSA's assertion.   Looking at the evidence as a whole, then, Kriger's e-mail merely reflects him being a zealous advocate for – and trying to appease – his disappointed client.   It does not establish by a preponderance of the evidence that Fata was promised an in-person debrief with the government.   This conclusion alone warrants denying this aspect of Fata's claim.

Even if Fata's attorneys told him that he would be given an opportunity to meet in person with the government to provide cooperation information, the result would be the same. The law is clear that to prevail on this aspect of his § 2255 motion, Fata must show prejudice, *i.e.*, "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 58; *see also Kue*, 2013 WL 2155527, at *10; *see also Smith*, 348 F.3d at 551-52.

As to prejudice, Fata argues:

> But for counsel's ineffectiveness, Fata avers that he would have proceeded to trial rather than pleading guilty. Moreover, Fata submits that had he proceeded to trial, there would have been at least a reasonable probability of a favorable outcome or mistrial.
> Fata's statutory maximum sentence for the counts he pled guilty to was 2,100 months, or 175 years. There was no plea agreement in place that could have capped Fata's sentencing exposure at anything less. Additionally, even a precursory review of the Guidelines prior to Fata's guilty plea would have led a reasonable attorney to speculate that Fata's Guidelines range would have been a minimum of 30 years to life.
>
> Had Fata been convicted of all counts at trial, his sentencing exposure would have undoubtedly been higher. However, it would have been a distinction without a difference. Fata was 49 at the time of his rearraignment. Whether Fata pled guilty or was convicted at trial, it was all but assured that Fata would receive an effective life sentence. Indeed, Fata pled guilty and received a 45-year term of imprisonment. If Fata were to survive to his 2052 release date, he would be in his late-eighties.

(ECF No. 212-1, PageID.3297-98).

Fata's argument fails in numerous respects. First, Fata gives no persuasive, reasoned explanation as to how his cooperation information being provided to the government through his attorneys rather than an in-person debrief would outweigh all of the other reasons that caused him to decide to plead guilty. *See infra* at 36-37. Instead, his argument is largely supported only by his own conclusory, self-serving assertions that but for the alleged misrepresentation about an in-person cooperation debrief, he would have gone to trial. As a matter of law, such assertions are

not sufficient to establish prejudice. *Moore v. United States*, 676 F. App'x 383, 387 (6th Cir. 2017) (petitioner's "self-serving, conclusory statement – indicating that he would have gone to trial had he known the [alleged misrepresented information]" insufficient to establish "prejudice"); *Kue*, 2013 WL 2155527, at *10 (a "petitioner's conclusory allegation that, but for an alleged attorney act or omission he [] would not have pleaded guilty, is [] insufficient to prove [prejudice]").

Second, contrary to Fata's assertion, he cannot show there was "at least a reasonable probability of a favorable outcome or mistrial." Fata fails to identify any evidence or defenses that would have led to such an outcome, and the reality is that Fata and his attorneys agreed that he had virtually no chance of success at trial. It is undisputed that Fata's counsel put in yeoman's work trying to help him mount a defense. This is perhaps best exemplified by their attempt to find an oncologist who was willing to testify to Fata's principal defense – that the treatments he prescribed to his patients were necessary and appropriate. Not only were Kriger and Andreoff unable to locate a single oncologist willing to provide that testimony, they could not even convince Fata's close friend oncologist to meet with them to discuss his treatments. Fata's own employees were prepared to testify that they saw him rendering inappropriate treatment and that he had lied to them as well. (Tr. 45). The new physicians who began treating Fata's patients after his arrest were similarly prepared to testify that Fata's treatments were inappropriate. (Tr. 97). The government's own respected expert witnesses were also ready to testify against Fata. (Tr. 96-97, 132).

At the evidentiary hearing, Kriger testified that the government's case against Fata was "very strong," that he thought Fata "would be found guilty at trial," and that the strength of the government's case was one factor that motivated Fata to plead guilty. (Tr. 52, 67, 69-70). Andreoff testified that he "did not see any chance that Dr. Fata would be acquitted at a trial" because the evidence against him was "not even overwhelming. It was devastating." (Tr. 104).

Fata did not deny that his staff was prepared to testify that he lied to them and had given inappropriate treatment. He did not deny that his patients' new physicians were prepared to testify that his treatments had been inappropriate. And, he did not deny that his former patients "looked at their files and said that's not what [Fata] told me." (Tr. 45). Instead, addressing each of these groups of adverse witnesses, Fata simply said, "That's their opinion." (*Id.*). In short, if Fata went to trial, the evidence that would have been presented against him was more than overwhelming, and his odds of a successful outcome were virtually nil.

Fata's final argument is that even if he had virtually no chance of success at trial, without the promise of an in-person cooperation debrief, going to trial was still a better option than pleading guilty because, given his sentencing exposure, "[w]hether [he] pled guilty or was convicted at trial, it was all but assured that [he] would receive an effective life sentence." (ECF No. 212-1, PageID.3298). This argument is flawed at the outset because it ignores all of the many variables that led Fata to decide to plead guilty. The Court's "but for" analysis must take into account all of the facts as they existed at the time Fata decided to plead guilty, including, for instance, his professed desire to not put his patients through a lengthy and "brutal" trial, and his awareness that his ultimate receipt of cooperation credit was dependent upon the government recommending it and the Court deciding credit was warranted. The real question, then is whether, viewed objectively, a defendant in Fata's position would have altered course and decided to proceeded to trial if he learned, *prior to entering into his guilty plea*,[10] that rather than debriefing him in person, the government would receive his cooperation information through his attorneys. That question

---

[10] The fact that Fata requested to withdraw his guilty plea after he learned that the government was not going to meet with him in person, and was not going to recommend that he receive any cooperation credit, does not change the analysis. (Tr. 78; ECF No. 212-2, PageID.3310-11). As of the time Fata pleaded guilty, he would not have known the government's ultimate position as to whether to recommend that he receive any cooperation credit.

clearly must be answered in the negative.

Fata, knowing his receipt of any cooperation credit was uncertain, pleaded guilty for many reasons, including: the evidence against him was overwhelming; he knew he would receive a life sentence if convicted at trial; he wanted to save his patients from having to testify at trial and from enduring a lengthy and "brutal" trial; he recognized the horrific nature of his conduct and "did not feel [he] deserved a trial"; he wanted an opportunity to ask for leniency and mercy, which request would carry more weight if he pleaded guilty and accepted responsibility for his actions; he wanted an opportunity to provide cooperation information to the government in the hopes of getting cooperation credit,[11] and knew that opportunity only existed if he first pleaded guilty; it had been discovered that Fata had forged a document in an attempt to manufacture a defense; and ultimately, as Fata testified at his guilty plea hearing, he pleaded guilty "because" he believed he was guilty. (Tr. 31, 121-23, 134; ECF No. 111, PageID.1114; ECF No. 161, PageID.2479-80, 2487). In light of the foregoing, Fata failed to show that an objectively reasonable defendant would have altered

---

[11] In his post-evidentiary hearing brief, Fata rhetorically asks, "why would Mr. Andreoff completely avoid [mentioning] cooperation as a major factor in Fata's [decision to plead guilty]?" (ECF No. 255, PageID.3686). But Fata reads too much into Andreoff's hearing testimony. When asked, "Did [Fata] state at any time during this meeting prior to walking into the courtroom that he was pleading guilty **only** because he was hoping or expecting to receive cooperation credit?," Andreoff simply answered, "No." In other words, although Andreoff did not specifically mention "cooperation" as one of the reasons Fata pleaded guilty (Tr. 132), he did not deny that the possibility of receiving cooperation credit factored into Fata's decision-making process. Moreover, Andreoff and Kriger could reasonably disagree about the extent to which the possibility of Fata receiving cooperation credit impacted his decision. Andreoff testified about the steps he and Kriger took to ensure that Fata was fully educated about the various types of cooperation the government might consider, and "how the system works." (Tr. 109-113). Andreoff then testified that immediately before the guilty plea hearing, he and Kriger, "informed [Fata] specifically this has nothing to do with cooperation. Cooperation would not even be considered if at all until after the plea. So he understood that. And his desire was expressed again that he wanted to go and plea before Judge Borman that day." (Tr. 111-13, 123). Thus, while Kriger believed the "opportunity to cooperate . . . played a significant role in [Fata's] decision to plead guilty," that does not necessarily mean Andreoff must have held that same opinion. (Tr. 54).

course and chosen to go to trial rather than pleading guilty simply because his cooperation information would be presented to the government through counsel, rather than through an in-person debrief.[12]  For all of these reasons, Fata failed to show that the alleged misrepresentation prejudiced him, and he is entitled to no relief on this claim.

## Certificate of Appealability

When considering a § 2255 motion, this Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts.  A petitioner must obtain a certificate of appealability ("COA") before he may appeal the denial of his § 2255 motion.  28 U.S.C. § 2253(c)(1)(B).  A COA will issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  In cases like Fata's, where the petitioner's claims are rejected on their merits, a movant "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" to warrant a COA.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Here, for all of the reasons stated above, the Court finds that Fata did not make "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and cannot satisfy the *Slack* criteria.  Accordingly, the Court should deny Fata a certificate of appealability.

## Conclusion

For the reasons set forth above, **IT IS RECOMMENDED** that Fata's motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence **(ECF No. 212)** be **DENIED**, and that a certificate of appealability also be **DENIED**.

---

[12] This also shows that even if Fata was mistakenly advised that he would have the opportunity to provide cooperation information to the government "in person," that misinformation did not render Fata's plea involuntary or unknowing.  *See Black*, 2019 WL 3067926, at *4.

Dated: February 7, 2020                    s/David R. Grand
Ann Arbor, Michigan                        DAVID R. GRAND
                                           United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 7, 2020.


<u>s/Eddrey Butts</u>
EDDREY BUTTS
Case Manager