TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

**No envelope attached.**

--------------------------------------------------------------

FROM: 48860039
TO:
SUBJECT: MOTION FOR RECONSIDERATION
DATE: 02/02/2021 12:24:44 PM

CASE No.  2:13-Cr-20600

**RECEIVED**

FEB 18 2021

PAUL D. BORMAN
U.S. DISTRICT JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA          )
Plaintiff,                                      )
                                                   )
v.                                                )       Hon. Paul D. Borman
                                                   )       No. 2:13-Cr-20600
FARID FATA,                              )
Defendant.                                 )

MOTION FOR RECONSIDERATION OF FARID FATA'S MOTION FOR SENTENCE REDUCTION PURSUANT TO 18 U.S.C. 3582 (C)(1)(A).

Before the Court is Defendant Farid Fata ("Fata"), pro Se Motion for reconsideration of his Motion for sentence reduction pursuant to 18 U.S.C. 3582 (C)(1)(A). In support thereof, Fata offers the following.

I- BACKGROUND:

On November 22, 2019, Defendant Fata wrote the warden at FCI Williamsburg, South Carolina seeking compassionate release or reduction in his sentence in light of his health conditions (DE 265-1). More than 30 days passed before the warden denied Fata's request (DE 265-2). The warden's denial letter was dated February 20, 2020.

On May 5, 2020, Fata filed a motion for reduction of sentence pursuant to 18 U.S.C. 3582 (C)(1)(A), where "extraordinary and compelling reasons" related to Fata's deteriorating health warranted such a reduction.

Fata is 55 years old suffering type-2 diabetes with diabetic neuropathy and vision complications. Fata has low white blood cell count and low neutrophil count that renders him immune-compromised. Fata also suffers from gastro-intestinal bleeding and worsening acid esophageal reflux (DE 265 at 7). Fata cited the COVID-19 outbreak at FCI Williamsburg, South Carolina where he is housed that places Fata at direct risk of infection and death (DE 265 at 7).

The Government filed it resistance on May 19, 2020 (DE 272). Fata filed a reply on June 2, 2020 (DE 278). The Government argued in its response, in part, that Fata did not exhaust his administrative remedies because he had only requested compassionate release in 2019 for non-COVID related reasons (DE 265 at 14-18). The District Court entered an order on June 11, 2020, rejecting the Government's argument, declining to strike Fata's Motion as premature, finding that his 2019 request to the warden satisfied the exhaustion requirement per statute 18 U.S.C. 3582 (C)(1)(A), and continuing jurisdiction over Fata's motion for reduction of sentence (DE 283).

On July 10, 2020, the District Court denied Fata's Motion (DE 284). The Court relied on U.S.S.G. 1B1.13's criteria

— 1 —

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

-------------------------------------------------------------------------------

to justify its decision based on two grounds related to failure to meet the required "extraordinary and compelling

reasons" per statute:

(a) Fata has not established his qualification to be categorized as suffering from a terminal illness or a substantially

diminished ability to provide self-care. Certainly he has not established an inability to recover from his conditions as

required by U.S.S.G. 1B1.13 (Page ID# 4450, DE 284).

(b) Fata is not high risk for contracting COVID-19 at his current place of incarceration, and his generalization

regarding COVID-19 in the federal prison generally and his speculation that he "could" contract the virus and the virus

"could" jeopardize his health fails to satisfy 1B1.13's criteria (Page ID# 4456-7, DE 284).

Moreover, the court denied Fata's motion based on the 3553(a) factors that will be detailed in this motion.

II- FATA'S EXTRAORDINARY AND COMPELLING REASONS:

a- FATA'S MEDICAL CO MORBIDITIES HAVE WORSENED, AND HE RECENTLY CONTRACTED COVID-19 IN PRISON:

a-1- Fata's diabetic neuropathy has progressed despite medical treatment:

The district court has correctly stated that Fata's diabetic neuralgia with "burning" and pain in both feet has initially

responded to Duloxetine as shown in clinical encounter of 3-20-2019 (DE 272-1 at 1, Exhibit 1). But the court omitted

that the nerve pain did worsen later and required maximizing the treatment dose with persistent pain". The BOP

clinical encounter dated 11-1-2019 notes:

" Fata still has pain in both feet related to DM, but duloxetine is still of benefit". But on 11-22-2019, the BOP

clinical encounter re-stated: (DE 272-1 at 1, Exhibit 1). Quote:

" Fata already on 30 mg twice a day, this is the maximum allowable dose for the drug daily".

Pain: yes

Quality of pain: burning

Pain scale: 6

Duration: 6-12 hours per day exacerbating factors: Movement.

Diagnosis: Neuralgia and neuritis.

The BOP clinical encounter dated September 30, 2020, shows progressive deterioration in Fata's neuropathy, failing

Duloxetine treatment with intense pain scale of 9 over 10 with more durable pain in both feet, limiting Fata's physical

activity as noted on page 2 of 3 of the clinical encounter. "General: Foot pain, Gait Abnormality".

Even after discontinuing Duloxetine and initiating oxacarbazepine as new treatment for the neuropathy, and after

completion of 100-day treatment course, Fata's neuropathic pain has not improved at all. Fata was informed of the

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

-----------------------------------------------------------------------------------

"irreversible and incurable" nature of his diabetic neuropathy. The words of the Bureau physician S.H. on September 30, 2020 say it all:

Pain Assessment
Date: 9-30-2020  10:28
Location: Feet-bilateral
Quality of Pain: burning
Pain scale: 9
Intervention: none effective
Onset: 1-5 years
Duration: 12-24 hours
Exacerbating Factors: ROM/Position, walking/standing
Relieving Factors: None yet

The September 30, 2020, BOP clinical encounter also states Fata's limited treatment options because of his persistent neutropenia (ANC 700) as "exclusion factor or criteria" to benefit from standard treatment options for neuropathy (normal neutrophil count is between 2000-9000). The BOP clinical encounter noted: "Duloxetine, so far, of no benefit, and cannot use ----- at this point (WBC 3,100 with ANC 700).

Fata's follow-up appointment in December 2020 to address the failure of oxacarbazepine was cancelled as the new COVID-19 outbreak invaded FCI Williamsburg causing Fata to contract the virus as he was symptomatic and tested positive on December 18, 2020 as detailed later in this motion.

Fata's neuropathy is secondary to type-2 diabetes. This court noted that Fata's type-2 diabetes is well controlled and he is not on insulin (DE 284 at 11).

First, Fata's type-2 diabetes has fluctuated despite maximizing the metformin dose, the record shows that Fata's hemoglobin A1c remained elevated (See Lab Corp. HgbA1c on 9-10-2015, 11-3-2017, 6-21-2018- 5-7-2020). The fluctuation of hemoglobin A1c from normal to high and later to normal levels and vice versa is directly associated with end-organ damage such as neuropathy and ocular complications. The CDC has reported a significant risk to contract COVID-19 and die of its complications in patients with type-2 diabetes independent of age, hemoglobin A1c fluctuation, whether they are treated with insulin or oral medication. i.e. the CDC guidelines make no distinction between diabetes managed by medication or insulin. Nor does it exclude from at-risk group diabetes whose condition is managed with oral medication. Indeed, the above risk factors consolidate the inevitable: "Fata contracted COVID-19 on December 18, 2020 at FCI Williamsburg and became symptomatic in Prison. The question that Fata had long raised was not "IF" he will contract COVID-19 in prison, but "When", facing the inevitable in prison.

a- 2- Fata tested positive for COVID-19 and became symptomatic:

On December 18, 2020, Fata tested positive for COVID-19 as he was complaining of 2 day cough and profound fatigue, both lasting 9 days. The BOP clinical encounter - Administrative note dated 12-23-2020 shows that Fata was

TRULINCS 48860039 - FATA, FARID - Unit: WIL-A-B

--------------------------------------------------------------------------------

prescribed Acetaminophen for pain or fever, as Fata was complaining of persistent headaches and muscle pain, though

the Bureau provider clinical notes failed to mention the muscle pain. After 17 days of isolation in the Special Housing

Unit, the repeat RNA test was reported "not detected" on January 5, 2021, and Fata luckily recovered from his

symptoms and did not require hospitalization, still waiting to see a Bureau provider to address his residual COVID

related symptoms.

a-3- Other combined secondary medical issues:

a-3-(i) Diabetic ocular complications:

   Although the medical records note a finding of "no retinopathy", the same records show that the optometrist's

encounters on 11-21-2018 and 1-9-2020 showed worsening refraction of the lens from -075 to -100 commonly seen in

patients with diabetes. Accordingly, Fata was prescribed a new set of glasses.

a-3-(ii) The records do contain periodic testing showing low white blood cell count and low neutrophil count that render

Fata immune compromised which place him at increased risk to develop infections and recurrent infections such as

developing a second course of COVID-19 infection as reported by the CDC. The CDC recently reported that new cases

of COVID-19 will sour in 6 to 14 weeks because of new variants (www.CDC.gov/coronavirus).

   On January 13, 2021 and January 25, 2021, Fata requested to receive the COVID-19 vaccine (Exhibit A), even

though neither the Pfizer nor the Moderna vaccines were tested in individuals with neutropenia as neutropenia was

an exclusion criteria for vaccine enrollment on the Phase III vaccine trial. Fata was given numerous obstacles that defer

him to receive the vaccine, and those included, but not limited to, vaccine supply shortage at BOP and FCI Williamsburg,

and inmate list for vaccination being generated by central office rather than FCI Williamsburg. Fata was also told that

he may be immune to COVID-19 as he had contracted the virus in prison, though FCI Williamsburg never tested Fata for

antibody response. Moreover, FCI Williamsburg's failure to vaccinate all the inmate population at risk is a concern as the

CDC recently reported that the current vaccines are less effective to prevent the COVID-19 variants (as mutants may be

more infectious or contagious than the wild type, and that may require a boost vaccine dose).

   In his original brief, Fata stated that his medical co morbidities can be considered extraordinary and compelling with

the recent outbreak of COVID-19 at FCI Williamsburg, as the commission also provided a catch-all provision that allows

the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than,

or in combination with the reasons described in U.S.S.G. 1B1.13 subdivisions (A) Through (C). A.cmt.n.1 (D), where

these cases fall outside the standard:

   The Sixth Circuit (United States v. Jones, (No. 20-3701), 6th Cir. November 20, 2020), The Seventh Circuit (United

States v. Gunn, No. 20-1959, 7th Cir. November 20, 2020) and Second Circuit (United States v. Booker, 976 F.3d 228,

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

--------------------------------------------------------------------------------

2nd Cir. 2020), all held that U.S.S.G. 1B1.13 does not apply to post-First Step Act Sentence reduction motions. In other words, if a compassionate release motion is not brought by the BOP Director, Guideline 1B1.13 does not, by its own terms, apply to it. Because Guideline 1B1.13 is not "applicable" to compassionate release motions brought by defendants. Application note 1(D) cannot constrain district courts' discretion to consider whether any reasons are extraordinary and compelling.

Therefore, Fata's deteriorating health problems of worsening diabetic neuropathy refractory to treatment limiting his physical activity and gait, plus persistent neutropenia with immune suppression contracting COVID-19 in prison placing him at high risk for re-infection with the COVID-19 mutants, and persistent gastrointestinal bleeding of unknown origin (as Fata had normal colonoscopy and a remote history of hemorroidectomy), are newly developed during his incarceration, and meet the extraordinary and compelling reasons requirement per statute.

TRULINCS 48860039 - FATA, FARID - Unit: WIL-A-B

--------------------------------------------------------------------------------

FROM: 48860039
TO:
SUBJECT: MOTION FOR RECONSIDERATION- Part 2
DATE: 02/01/2021 01:57:44 PM

b- REHABILITATION:

   As in United States v. Daniel Brown 4:05-CR-00227-1. DE 246-S.D. Iowa, April 29, 2020, rehabilitation can be

considered part of a compassionate release motion. cf. Corley v. United States, 556 U.S. 303, 314 (2009)(stating that

a "statute" can be construed so that effect is given to all its provisions (quoting Hibbs v. Winn, 542 U.S. 88, 101 9 2004)).

   Several courts have concluded the same and considered a defendant's rehabilitation in granting compassionate

release. E.g. United States v. Marks, No.03-CR-6033L, 2020 WL, at *7 (W.D.N.Y. Apr. 20, 2020)(collecting cases).

Fata has not had a single disciplinary incident in federal custody (DE 265-4) during the past 8 years since his arrest

August 6, 2013 (Summary Re-entry Plan Progress Report). According to Fata's peers in the BOP, Fata has completed

exemplary rehabilitative record as a testament to his positive character and efforts. Fata has taken 4000 hours of

programming including 2200 hours in apprenticeship program (DE 265-4). Fata is employable and has a job offer to

join the Christian Ministry upon his release (DE 278, Exhibit B, Under seal). Fata will work at home to prevent exposure

to COVID-19 and its variants in the community, as some variants may be resistant to the standard COVID-19 vaccines.

   Fata attests that the 7 and half years of incarceration since his arrest "have been a blessing" because they

transformed [his soul] into the man he is today. Fata's words, but more importantly his favorable actions in prison,

reveal that he has gained valuable insight and is ready to rejoin the community, at least on a Home Confinement basis

to protect him from the imminent re-infection with COVID-19 and its variants.

c- COVID-19 AT FCI WILLIAMSBURG:

   The Victims and the Public monitored Fata's redemption in prison, and offered him "Safe Environment" from COVID-19

to work at his release residence upon release. The victims and the public also offered Fata a job at home. Fata will be

quarantined to work from home contrary to his high risk exposure to the virus in prison.

   Fata does not dispute that BOP has taken precautions through the federal prison system to mitigate the spread of

COVID-19 as the Sixth Circuit held in Wilson v. Williams, 961 F.3d 829, 841, 6th Cir. 2020)(finding that the BOP

reasonably responded to the risk posed by COVID-19 by implementing a phased action to reduce the risk of COVID-19

spread, taking preventative measures including screening for symptoms, educating staff and inmates, quarantining

new inmates, implementing regular cleaning, and providing masks and expanding testing). DE 284 at 16, PgID 4456.

   But, the direct impact of this pandemic on the prison population is bigger than the BOP modest preventative

measures to limit the virus spread. This matter is manifested by the exponential rising number of staff and inmates

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

-------------------------------------------------------------------------------------------------------

that have tested positive throughout the pandemic to date, as well as the recent rising number of federal inmates

who have died from COVID-19 in custody (www.bop.gov/coronavirus). Fata would reference the October 1, 2020

Department of Justice Office of Inspector General findings that the "Bureau of Prisons facilities have seen some of

the largest COVID-19 outbreaks since the start of the pandemic and the Department has been criticized for lacking a

coherent virus response plan".

   With respect to FCI Williamsburg in specific, there continue to be severe protocol violations to limit the virus spread.

The housing unit where Fata is housed at FCI Williamsburg contains 100 inmates. Physical distancing is not possible,

and FCI Williamsburg has not decreased the housing unit density nor the number of inmates in each housing unit.

Moreover, FCI Williamsburg lacks fundamental sanitation measures: FCI Williamsburg declined to provide additional

soap bars to keep basic hygiene measures nor employ more janitors for sanitation. Nowhere in the unit, inmates can

find hand sanitizers nor were inmates ever provided hand sanitizers since the beginning of the pandemic. Since the

recent outbreak of COVID-19 inside the prison in December 2020 and January 2021. FCI Williamsburg failed  to screen

the temperature of inmates inside the housing units daily. Inmates moving on the compound and comingling with

other inmates from different housing units do not have their temperatures checked either. What is equally concerning

is the non-compliance among inmates and staff to wear face masks in the housing units. FCI Williamsburg's

administration is well aware of these violations, corrective measures have yet to be taken. The above mentioned

protocol violations have directly impacted Fata's vulnerable immune compromised status, causing him to contract the

virus even when Fata was so compliant to wear the mask and take basic hygiene and sanitation measures.

   FCI Williamsburg failed to protect its staff and inmates jointly: FCI Williamsburg is currently reporting 35 Corona

virus cases among employees according to the Bureau of Prisons COVID-19 database. Only 10 other federal prisons have

more reported active COVID-19 cases among staff. The steady increase in reported cases over the past 3 weeks comes

after the BOP's database indicated a total of eight active COVID-19 cases among staff. BOP has then reported that there

have now been two corona virus related inmate deaths and 31 active cases among inmates. In early January 2021, the

president of staff union representing FCI Williamsburg's employees called for the removal of executive staff, alleging

in part that the process of screening individuals entering the compound for potential COVID-19 symptoms was shifted

from outside the facility to inside in early December 2020: "They made some changes on the process of what we were

 doing...that allowed COVID to actually walk into the institution"- American Federation of Government Employees'

Local 525 President Stephen Pinckney said at the time: "From there, it spread like a wildfire once it got in".

However, BOP spokesperson Justin Long subsequently stated that "COVID-19 screening for visitors and staff at FCI

Williamsburg has remained outside the secure confines of the institution since its implementation in March 2020".

TRULINCS 48860039 - FATA, FARID - Unit: WIL-A-B

-------------------------------------------------------------------------------------

Williamsburg County Emergency Medical Services (WCEMS) Director Judy McCrea stated to Live 5 (Channel 5, South Carolina, January 21, 2021) investigates that WCEMS responded to 22 calls in 2020 to FCI Williamsburg, noting that "we were not provided any information on COVID-19 on any call, as we had requested". Although the BOP responded to questions in writing in December 2020 and early January 2021, the agency has not yet answered any questions with respect to the recent COVID outbreak and inmate deaths and the increase in reported cases among staff at FCI Williamsburg.

To end, Fata's concern of re-infection with COVID-19 at FCI Williamsburg is imminent and not speculative, as he was deferred to receive the vaccine, and as the warden at FCI Williamsburg has issued on January 21, 2021 the COVID-19, Phase 9 enhanced modified operations plan being implemented allowing inmates from different housing units to comingle together at work sites (Food service, Unicor, Facilities, ...etc) which can spread the virus from one unit to another, and as the BOP has reported the death of 2 inmates who were considered "recovered" by medical staff as determined by CDC guidelines, but months later re-tested positive for COVID-19 and died (Two BOP Press Releases, Inmate Death at Terminal Island, May 27, 2020 and Inmate Death at FMC Carswell, August 26, 2020). Fata has yet to see the Bureau Provider after he recovered from COVID-19, as his residual COVID related muscle pain remains persistent (fibromyalgia type of pain).

III- FACTORS UNDER 18 U.S.C. 3553(a):

In assessing Fata's 3553(a) factors at "original sentencing" that have since changed when compared to the factors "at reduction", Fata is asking this Honorable Court to appropriate his substantial rehabilitation as correlative measure to offset the seriousness of Fata's offense that affected many victims. Not all victims agree with the court's severe punishment to keep Fata in prison being vulnerable facing "Death Penalty" from COVID-19 (DE 278 at 7, Exhibit B). Fata recognizes that 'Rehabilitation alone shall not be considered" sufficiently extraordinary and compelling to justify compassionate release. 994(t), but courts consider rehabilitation as part of a compassionate release motion, and collectively with the above mentioned factors that Fata has referenced in this motion. Cf v. United States, 556 U.S. 303, 314 (2009).

On the other hand, the Sixth Circuit approved a court's determination of the "percentage of time" served, as a "barometer to measure", in its required discussion of the 3553(a) factors. United States v. Kinkaid, 805 F. App'x 394, 495-96 (6th Cir. 2020). Fata acknowledges that district courts have broad discretion to determine what sentence will serve 3553(a) statutory objectives, though the concern is that they put too much weight on some of the 3553(a) factors and too-little on post-sentence rehabilitation as well as the history and current characteristics of the defendant which

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

--------------------------------------------------------------------------------

can change and evolve after 8 years of incarceration. But Fata is asking this court to determine at what threshold or

correlative measure should rehabilitation "offset the percentage of time" for sufficient punishment, where

extraordinary and compelling reasons exist as in 'Brown' (United States v. Daniel Brown 4:05-CR-00227-1; DE 246,S.D.

Iowa, Apr.29, 2020) (The Court  reduced 30 years from Brown's sentence for exemplary rehabilitation, unwarranted

draconian sentence for 924(c) with similar nonterminal medical condition of neutropenia, neuropathy, age less than

65, not fulfilling the old 1B1.13 guidelines). This question has yet to be determined, as the First Step Act promotes

rewards of time credit to non-violent offenders, and the Supreme Court has determined that courts may consider

post-sentencing conduct and rehabilitation in assessing the 3553(a) when considering whether to adjust a previously

imposed sentence. Pepper v. United States, 131 S.Ct. 1229, 1241 (2011) (The Court emphasized the vital nature of

post-sentence rehabilitation, stating that "there would seem to be no better evidence than a defendant's post

incarceration conduct". Id. Although Pepper dealt with plenary resentencing procedure, whereas the First Step Act

18 U.S.C. 3582 (C)(1)(A) granted courts the power to modify sentences. Under United States v. Allen 956 F.3d. 355

(6th Cir. 2020), the Sixth Circuit held considering post-sentencing conduct in assessing the 3553(a) factors during a

3582 (C)(1)(A) sentence-reduction proceeding. Under "Allen" the Sixth Circuit noted that 'Congress intended district

courts to apply existing sentencing standards when exercising their discretion". Rose, 379 F. Supp. 3d at 325

(S.D.N.Y. 2019). Also, applying the 3553(a) factors to the current facts that include the defendant's post-sentencing

conduct is more manageable for district courts.

   The "characteristics of the defendant" are remarkable in this case based on Fata's exemplary conduct in prison.

Given defendant's spotless prison disciplinary record, Fata is again asking this court whether incarceration is necessary

to "protect the public from further crimes of the defendant" 3553(a)(2)(c). Fata is not a risk to public safety as his

PATTERN SCORE (Score of Recidivism) is "minimum" as reported by the Department of Justice on 7-10-2020. Although

Fata's offense is heinous but non-violent, he has no criminal history, and his violent PATTERN SCORE is -4 (minimum)

and his General recidivism score is -12 (minimum) (See Exhibit B). The district court decision to protect the public

from Fata's potential for further criminal activity if released (DE 284 at 20) should be reconsidered as it is

contradicted by the PATTERN SCORE collectively.

   Meanwhile, given Fata's exhaustive use of prison programming, the only thing left "to provide Fata with needed

educational or vocational training" is to pursue an actual vocation. 3553(a)(2)(D). Fata is offered a job by his former

patients and the Christian Congregation in Michigan who are waiting on his release and looking forward to work with

Fata as his ministry experience as ordained minister while in prison is highly valued (DE 265-4 Exhibit D, see

certificates for religious programming and evidence for Fata's ordinance as minister).

TRULINCS 48860039 - FATA, FARID - Unit: WIL-A-B

-------------------------------------------------------------------------------------------------

FROM: 48860039
TO:
SUBJECT: MOTION FOR RECONSIDERATION- PART 3
DATE: 02/01/2021 07:41:55 AM

To consolidate his purpose and mission as minister, Fata has just completed the "BOP Threshold Program" which is a

9-month comprehensive religious program provided at FCI Williamsburg. Fata will be working at home in Michigan

being protected from COVID-19 exposure to prevent COVID-19 re-infection, contrary to his current exposure at

FCI Williamsburg in South Carolina where the COVID-19 South African variant has been identified. Such mutant is

more contagious than the wild type and renders standard COVID vaccines less effective.

    Incarceration also is not the only "kind [] of sentence available" 3553(a)(3). Non-custodial sentences also curtail

"prized liberty interests" and "defendant always faces the harsh consequences that await if he violates the conditions"

attached to such a sentence. United States v. Gall, 374F. Supp. 2d 758, 763 (S.D. Iowa, 2005), rev'd, 446 F.3d 884

(8th Cir. 2006), rev'd, 552 U.S. 38 (2007). Such restrictions also promote respect for the law and do not constitute

any endorsement of defendant's conduct. See Id.

    And while the Sentencing Commission's Guidelines counseled in favor of a long sentence, they are not but one

factor. See 3553(a)(4). And because the Commission never released guidelines with respect to compassionate release

under the First Step Act, 3553(a)(5)'s "pertinent policy statement" factor is neutral.

    Finally, the need to avoid unwarranted sentence disparities among defendants with similar conduct", 3553(a)(6),

also cuts in favor of release. Even if this court considers that Fata's conduct involves more than simple fraud, it is

difficult to compare Fata's case to the heartland of fraud cases. Fata's research has disclosed cases, however, that

involve conduct analogous to that of Fata's.

    Dr Aria Omar Sabit pled guilty to four counts of Health Care Fraud, one count of Conspiracy to Commit Health Care

Fraud, and one count of Distribution of Controlled Substances. According to the guilty plea, Dr. Sabit convinced patients

to undergo spinal fusion surgeries with instrumentation, which he never rendered. These invasive surgeries caused

serious bodily injury to the patient. This court sentenced him to 235 months (United States v. Sabit 797 Fed Appx. 218

(6th Cir. 2019).

    In United States v. Ana Alvarez, Case No. 1:08-cr-20270 (S.D. Fla), Dr. Alvarez, a Miami physician was indicted for

multiple health fraud offenses including kickbacks, false claims, and conspiracy. She worked at St Jude Rehab Center,

a clinic that purported to specialize in treating AIDS patients. All patients would receive the same treatment of WinRho,

which was made from human plasma. As part of the scheme, and to support the use of WinRho, Dr. Alvarez falsely

noted that the patients had bleeding disorders, and amended several patient records to falsely indicate that the patient

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

--------------------------------------------------------------------------------

had a bleeding disorder. Unlike Fata, Dr. Alvarez went to trial and a jury convicted her on all counts. She was sentenced to 360 months followed by three years of supervised release.

In United States v. Kushner, Case No. 2011-cr-20587 (S.D. Fla), Dr. Gary Kushner, M.D., a psychiatrist and medical director of Biscayne Milieu Health Center, was indicted in connection with a large scale Medicare Fraud scheme during which claims exceeding $50 million were submitted to Medicare. Medicare paid out just under $11 million on the aforementioned claims. According to the Government's sentencing memorandum, Dr. Kushner "certified patients as eligible for PHP treatment - either knowing they did not meet program requirement, or simply not caring". RE 1212, Page ID#2, he also "falsified scores of records to cover-up the joint criminal activity. He tailored admission documents to avoid alerting Medicare officials that he was admitting ineligible patients. He routinely pencil whipped patient progress notes, as well as regulatory certifications that falsely represented that he was overseeing billing practices. Beyond the fraudulent admission of patients, unlawful billing, and falsified records, Dr. Kushner exploited chronic and acute drug abusers in desperate need of substance abuse treatments, at which point Dr. Kushner again recruited them for treatment at the hospital. He was convicted at Trial and was sentenced to 12 years in prison followed by three years of supervised release.

In United States v. Moon, Case No. 05-cr-00003 (M.D. Tenn, 2005), aff'd 513 F.3d 527 (6th Cir. 2008), the defendant Dr. Young, a physician specializing in hematology and oncology, was charged and convicted at trial of health care fraud for under dosing patients receiving chemotherapy, many of whom were elderly, and billing Medicare for full doses. As in the case at bar, defendant's conduct involved the risk of death or great bodily harm. Unlike Fata, defendant Moon was convicted at trial and in fact he testified at trial denying the allegations. 513 F.3d at 540-542. Dr Moon was sentenced to 188 months followed by two years of supervised release.

In United States v. Marianella Vallera, Case No. 1:10-cr-20767 (C.D. Fla), Marianella Valera, a Miami therapist, was one of three owners and operators of American Therapeutic Corporation (ATC)- a partial hospitalization program, its management company Medlink Professional Management Group, Inc., and its sister company American Sleep Institute (ASI) which collectively defrauded Medicare of more than $205 million over an eight-year period. Ms Valera pled guilty to one count of Conspiracy to Commit Health Care Fraud, 11 counts of Health Care Fraud, one count of Conspiracy to Defraud the United States and to Receive and Pay Health Care Kickbacks, one count of Conspiracy to Commit Money Laundering, two counts of Money Laundering and five counts of Structuring Financial Transactions to Avoid Reporting Requirements. The Company had clinics stretching from Miami to Fort Lauderdale to Orlando.

According to the Government, the defendant "masterminded and executed one of the largest and most brazen health care fraud conspiracies in recent memory" which resulted in billing Medicare for more than $205 million in

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

--------------------------------------------------------------------------------------------

fraudulent claims and collecting over $87 million based on the false claims. Government's Sentencing Memorandum,

RE 294, Page ID# 1.

In order to obtain patients for ATC's PHP program, Ms. Valera and her co-conspirators paid kickbacks to patient

brokers, halfway house owners, and assisted living facility owners, who would in return refer patients with valid

Medicare numbers to ATC. Id at 2. Patients would then visit ATC's facility and purportedly received PHP treatment,

though a large majority of the patients did not need it, and those who did need it were improperly treated. Ibid. More

significantly, however, is that the defendant's exploited extremely vulnerable members of society (elderly residents of

assisted living facilities who had dementia, brain damage, or substance abusers who were desperate for treatment).

See Government's Sentencing Memorandum, RE 294, Page ID# 2-3.

In addition, Ms. Valera and her co-conspirators, forced 76% of patients to undergo unnecessary sleep studies. Id.

at 3. To keep the scheme going and to prevent detection, Ms. Valera and her co-conspirators, paid millions of dollars in

Medicare reimbursements to Medlink, which it used to pay kickbacks. Id at 3. And Ms. Valera would personally cash

checks and launder them into cash to pay kickbacks. Id at 3-4. Indeed, there were staff members whose sole job was

to launder money, in part by setting up phony corporations and stealing identities. Id. at 4.

Ms. Valera, whose loss figure was more than 10 times that of Fata's, was sentenced to 35 years in prison. See

Judgment, RE 329, Page ID #2.

CONCLUSION:

Fata respectfully asks this court to consider the substantial change in circumstances that the past seven and half years

have brought about, as well as the serious threat to Fata's health after he had contracted COVID-19 in prison where two

prisoners died of COVID-19. This motion is all about making a good faith effort to show that Fata was intending to

change his life.

Fata is urging this court to unleash its discretion and release Fata as COVID-19 is just "one more way to perish in prison" ?

Respectfully Submitted

Farid Fata        Farid Fata        2 - 2 - 2021
# 48860-039
FCI Williamsburg
P.O. Box 340
Salters, SC 29590

EXHIBIT A

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

---------------------------------------------------------------------------------------------

FROM: 48860039
TO: COVID-19 Vaccine Request
SUBJECT: ***Request to Staff*** FATA, FARID, Reg# 48860039, WIL-A-B
DATE: 01/13/2021 08:20:23 PM

To: medical
Inmate Work Assignment: csd

I am interested to receive the COVID Vaccine

thank you

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

------------------------------------------------------------------------------------------------------------------

FROM: 48860039
TO: Nursing
SUBJECT: ***Request to Staff*** FATA, FARID, Reg# 48860039, WIL-A-B
DATE: 01/25/2021 09:32:59 AM

To: Mrs. Mims
Inmate Work Assignment: csd

Mrs. Mims,

As you know, I am 56 years old and have diabetes and neutropenia.

I have requested to take the COVID vaccine, but have not heard yet

Please advise

TRULINCS  48860039 - FATA, FARID - Unit: WIL-A-B

---------------------------------------------------------------------------------------

FROM: Provider
TO: 48860039
SUBJECT: RE:***Inmate to Staff Message***
DATE: 01/30/2021 09:17:02 PM

Your request has been forwarded to your provider.

>>> ~^!"FATA, ~^!FARID" <48860039@inmatemessage.com> 1/30/2021 5:03 PM >>>
To: Dr. Hoey
Inmate Work Assignment: csd

Dr. Hoey, (important)

As you know, I have diabetes with diabetic neuropathy and neutropenia and gastro-intestinal bleeding. I recently recovered from COVID-19 after experiencing cough, headaches and fatigue.

I have 3 concerns that I need you to address:

1- I have persistent muscles aches/pain since I recovered from COVID. what to do ? When is my medical visit coming ?

2- My diabetic neuropathy / my feet are killing me. I have stopped taking Oxcarbazepine because after 100 day treatment, it is not helping my feet burning pain at all. I can barely walk. Please advise

3- It came to my attention that my records show care level 1. It was always care level 2. Can you correct / amend it to care level 2 as it has always been.

PLEASE ADVISE. THANK YOU

EXHIBIT B

## MALE PATTERN RISK SCORING

| Register Number: | 48860-039 | | Date: | 7/10/2020 | |
|---|---|---|---|---|---|
| Inmate Name: | Fata, Farid | | | | |

| MALE RISK ITEM SCORING | CATEGORY | GENERAL SCORE | Enter Score | VIOLENT SCORE | Enter Score |
|---|---|---|---|---|---|
| **1. Current Age** 51-60 Click on gray dropdown box to select, then click on dropdown arrow | > 60 | 0 | **7** | 0 | **4** |
| | 51-60 | 7 | | 4 | |
| | 41-50 | 14 | | 8 | |
| | 30-40 | 21 | | 12 | |
| | 26-29 | 28 | | 16 | |
| | < 26 | 35 | | 20 | |
| **2. Walsh w/Conviction** No | No | 0 | **0** | 0 | **0** |
| | Yes | 1 | | 0 | |
| **3. Violent Offense (PATTERN)** No | No | 0 | **0** | 0 | **0** |
| | Yes | 5 | | 5 | |
| **4. Criminal History Points** 0 - 1 Points | 0 - 1 Points | 0 | **0** | 0 | **0** |
| | 2 - 3 Points | 8 | | 4 | |
| | 4 - 6 Points | 16 | | 8 | |
| | 7 - 9 Points | 24 | | 12 | |
| | 10 - 12 Points | 32 | | 16 | |
| | > 12 Points | 40 | | 20 | |
| **5. History of Escapes** None | None | 0 | **0** | 0 | **0** |
| | > 10 Years Minor | 2 | | 1 | |
| | 5 - 10 Years Minor | 4 | | 2 | |
| | < 5 Years Minor/Any Serious | 6 | | 3 | |
| **6. History of Violence** None | None | 0 | **0** | 0 | **0** |
| | > 10 Years Minor | 1 | | 1 | |
| | > 15 Years Serious | 2 | | 2 | |
| | 5 - 10 Years Minor | 3 | | 3 | |
| | 10 - 15 Years Serious | 4 | | 4 | |
| | < 5 Years Minor | 5 | | 5 | |
| | 5 - 10 Years Serious | 6 | | 6 | |
| | < 5 Years Serious | 7 | | 7 | |
| **7. Education Score** HS Degree / GED | Not Enrolled | 0 | **-4** | 0 | **-2** |
| | Enrolled in GED | -2 | | -1 | |
| | HS Degree / GED | -4 | | -2 | |
| **8. Drug Program Status** No Need | No DAP Completed | 0 | **-9** | 0 | **-3** |
| | NRDAP Complete | -3 | | -1 | |
| | RDAP Complete | -6 | | -2 | |
| | No Need | -9 | | -3 | |
| **9. All Incident Reports (120 months)** 0 | 0 | 0 | **0** | 0 | **0** |
| | 1 | 1 | | 1 | |
| | 2 | 2 | | 2 | |
| | > 2 | 3 | | 3 | |
| **10. Serious Incident Reports (120 months)** 0 | 0 | 0 | **0** | 0 | **0** |
| | 1 | 2 | | 2 | |
| | 2 | 4 | | 4 | |
| | > 2 | 6 | | 6 | |
| **11. Time Since Last Incident Report** 12+ months or no incidents | 12+ months or no incidents | 0 | **0** | 0 | **0** |
| | 7-12 months | 2 | | 1 | |
| | 3-6 months | 4 | | 2 | |
| | <3 | 6 | | 3 | |
| **12. Time Since Last Serious Incident Report** 12+ months or no incidents | 12+ months or no incidents | 0 | **0** | 0 | **0** |
| | 7-12 months | 1 | | 2 | |
| | 3-6 months | 2 | | 4 | |
| | <3 | 3 | | 6 | |
| **13. FRP Refuse** NO | NO | 0 | **0** | 0 | **0** |
| | YES | 1 | | 1 | |
| **14. Programs Completed** 4 - 10 | 0 | 0 | **-6** | 0 | **-3** |
| | 1 | -2 | | -1 | |
| | 2 - 3 | -4 | | -2 | |
| | 4 - 10 | -6 | | -3 | |
| | > 10 | -8 | | -4 | |
| **15. Work Programs** 0 Programs | 0 Programs | 0 | **0** | 0 | **0** |
| | 1 Program | -1 | | -1 | |
| | >1 Program | -2 | | -2 | |

| Total Score (Sum of Columns) | General: | **-12** | Violent: | **-4** |
|---|---|---|---|---|
| General/Violent Risk Levels | General: | Minimum | Violent: | Minimum |
| OVERALL MALE PATTERN RISK LEVEL | | **Minimum** | | |